UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| NAICOM CORPORATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-01405-JAW |
| | ) | |
| DISH NETWORK CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DISH NETWORK CORPORATION'S MOTION TO DISMISS**

A corporation moves to dismiss plaintiffs' seven-count complaint alleging the corporation assisted in a conspiracy to steal plaintiffs' intellectual property under the guise of a legitimate law enforcement investigation.  The Court grants the motion, dismissing all seven counts of the complaint.  At the outset, the Court dismisses the Computer Fraud and Abuse Act claim, the Stored Communications Act claim, the Digital Millennium Copyright Act claim, and the Defend Trade Secrets Act claim because the corporation lacks sufficient minimum contacts with Puerto Rico.  The Court dismisses the RICO claims because plaintiffs have not adequately pleaded the existence of an enterprise, a pattern of racketeering activity, or a conspiracy.  Finally, having dismissed all claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the Puerto Rico Uniform Trade Secrets Act claim and instead dismisses it.

## I.    PROCEDURAL HISTORY

On August 27, 2021, Naicom Corporation, D&V IP Holdings, LLC, Paylink, LLC, and Kiaras, LLC filed a seven-count complaint against approximately twenty

known Defendants and two dozen unknown Defendants.[1] *Compl.* (ECF No. 1). The Court has twice permitted Plaintiffs to amend their complaint, and the Second Amended Complaint is now the operative complaint. *Am. Compl.* (ECF No. 100); *Second Am. Compl.* (ECF No. 130).

The parties categorize the numerous Defendants into four groups: 1) DISH Network LLC, NagraStar LLC, Bert Eichhorn, Emily Rinkel,[2] Jordan Smith, and Kevin Gedeon (the DISH/NagraStar Defendants); 2) DISH Network Corporation (DISH Corp. or DNC); 3) Toltec Investigations, LLC and its President and CEO, Michael Thomas Jaczewski (the Toltec Defendants); and 4) former U.S. Attorney Rosa E. Rodriguez-Velez, former Assistant U.S. Attorney Jose Capo-Iriarte, Assistant U.S. Attorney Nicholas W. Cannon (the USAO Defendants) and Special Agents and employees of the Federal Bureau of Investigation Douglas Leff, Bradley Rex, Lance Lange, Kevin Pearson, Clay Rehrig, Juan Galarza, and Jason Lopez (the FBI Defendants) (collectively, the Federal Defendants).

Plaintiffs allege: 1) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO); 2) a RICO conspiracy; 3) violations of the Computer Fraud and Abuse Act (CFAA); 4) violations of the Stored Communications Act (SCA); 5)

---

[1]       This is the second lawsuit arising out of the underlying events at issue. On August 25, 2020, a group of plaintiffs, including many of Plaintiffs here, filed a *Bivens* action against many of the same defendants. *See Quinones-Pimentel v. Cannon*, No. 3:20-cv-01443-JAW, 2022 U.S. Dist. LEXIS 48109, at *2-3 (D.P.R. Mar. 17, 2022). On March 17, 2022, the Court dismissed the plaintiffs' *Bivens* action. *Id.* at *88. The plaintiffs appealed, and the Court of Appeals for the First Circuit affirmed the Court's dismissal on October 27, 2023. *Quinones-Pimentel v. Cannon*, 85 F.4th 63, 66-68 (1st Cir. 2023).

[2]       In their Second Amended Complaint, Plaintiffs use the spelling, "Rinkle." *See, e.g.*, *Second Am. Compl.* ¶ 43. In her filings, however, Ms. Rinkel uses the spelling, "Rinkel." *See, e.g.*, *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Mot. to Dismiss* at 1 (ECF No. 134). No doubt, Ms. Rinkel knows how to spell her own name, and the Court uses "Rinkel" throughout this order.

violations of the Digital Millennium Copyright Act (DMCA); 6) violations of the Defend Trade Secrets Act (DTSA) by misappropriation of trade secrets; and 7) violations of the Puerto Rico Industrial and Trade Secrets Protection Act (PTSA) under the Uniform Trade Secrets Act (Law No. 80). *Second Am. Compl.* ¶¶ 124-202.

On October 31, 2022 and November 1, 2022, each of the four groups of Defendants filed a motion to dismiss the Second Amended Complaint. *Def. DISH Network Corp.'s Mot. to Dismiss* (ECF No. 136) (*Def.'s Mot.*); *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Mot. to Dismiss* (ECF No. 134); *Defs.' Toltec Investigations, L.L.C. and Mike Jaczewski's Mot. to Dismiss* (ECF No. 137); *Fed. Defs.' Mot. to Dismiss* (ECF No. 138).

On December 5, 2022, Plaintiffs responded to the DISH/NagraStar Defendants' motion to dismiss. *Mot. in Resp. to Dish/NagraStar Defs.' Mot. to Dismiss* (ECF No. 147) (*Pls.' Opp'n to DISH/NagraStar Mot.*). On January 18, 2023, Plaintiffs responded to the Federal Defendants' motion. *Mot. in Resp. to the Fed. Defs.' Mot. to Dismiss* (ECF No. 153). On February 21, 2023, the Toltec Defendants withdrew a section of their motion to dismiss, *Unopposed Notice of Partial Withdrawal of Toltec Investigations L.L.C. and Mike Jaczewski's 12(b)(2) Mot. to Dismiss* (ECF No. 163), and on February 27, 2023, Plaintiffs responded to the remainder of the Toltec Defendants' motion. *Mot. in Resp. to Toltec Investigations and Mike Jaczewski's Mot. to Dismiss* (ECF No. 167). On March 17, 2023, Plaintiffs responded to DISH Corp.'s motion. *Mot. in Resp. to Dish Network Corp.'s Mot. to Dismiss* (ECF No. 179) (*Pls.' Opp'n*).

3

Each group of Defendants filed a reply in support of its motion. *DISH Network Corp.'s Reply in Supp. of Its Mot. to Dismiss* (ECF No. 196) (*Def.'s Reply*); *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Reply* (ECF No. 164); *Fed. Defs.' Reply* (ECF No. 173); *Defs. Toltec Investigations L.L.C. and Michael Jaczewski's Reply in Supp. of Rule 12(b)(6) Mot. to Dismiss* (ECF No. 185).

Finally, Plaintiffs filed sur-replies opposing each motion. *Sur-Reply Mot. to Dish Network Corp.'s Reply Mot. to Pls.' Resp. to Mot. to Dismiss SAC* (ECF No. 199) (*Pls.' Sur-Reply*); *Sur-Reply to the Dish Network, LLC and NagraStar, LLC Reply Mot. to Pls.' Resp. to Defs.' Mot. to Dismiss SAC* (ECF No. 182); *Sur-Reply Mot. to Fed. Defs.' Reply Mot. to Pls.' Resp. to Fed. Defs.' Mot. to Dismiss, SAC* (ECF No. 190); *Sur-Reply Mot. to the Toltec Investigations L.L.C. and Michael Jaczewski's Reply Mot. to Pls.' Resp. to Their Mot. to Dismiss SAC* (ECF No. 195).

## II.  FACTS[3]

### A.  The Parties

In 2015 and 2016, Darwin Quinones-Pimentel and Victor Vega-Encarnacion founded Naicom Corporation (Naicom) and D&V IP Holdings, LLC to offer Internet Protocol Television (IPTV) services. The companies are structured such that D&V holds the proprietary "intellectual technology" created by Mr. Quinones, and Naicom

---

[3]     Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Second Amended Complaint. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in plaintiffs' favor" (internal citation omitted)).

licenses the technology from D&V to distribute television programming.  *Second Am.*
*Compl.* ¶ 63.  Kiaras, LLC (Kiaras) and Paylink, LLC (Paylink) are also joint ventures
operated by Mr. Quinones and Mr. Vega.  *Id.* ¶ 14.  Kiaras is a human resources and
time-and-attendance management company, and Paylink is a payroll processing
company.  *Id.*  Both Kiaras and Paylink operate on the "PAYLINK AND KIARAS
Cloud Network," another proprietary intellectual technology creation of Mr.
Quinones. *Id.* ¶¶ 5-6.  All four companies are corporations existing under the laws of
the commonwealth of Puerto Rico with their places of business located at Building
Centro de Seguros, 701 Ponce de Leon, Suite 208, San Juan, Puerto Rico 00907.  *Id.*
¶¶ 33-36.

DISH Network Corporation (DISH Corp.) was organized in 1995 as a
corporation under the laws of the State of Nevada, started offering the DISH®
branded pay-tv service in March 1996, and is the nation's third largest pay-tv
provider.  *Id.* ¶ 37.  DISH Network LLC (DISH LLC) was organized in 1987 as a
Limited Liability Corporation under the laws of the state of Colorado.  *Id.* ¶ 38.

NagraStar, LLC is a joint venture between DISH Corp. and Kudelski SA
formed in 1998.  *Id.* ¶ 39.  NagraStar's focus is delivering and maintaining security
solutions for satellite and Internet-based television systems and other connectivity
initiatives in North America, and its mission also includes anti-piracy investigations
and cooperation with law enforcement agencies.  *Id.*  Jordan Smith was at all relevant
times a Manager of Field Security & Investigations and Senior Anti-Piracy
Investigator for NagraStar.   *Id.* ¶ 41.   Bert Eichhorn and Emily Rinkel were

Managers of Field Security & Investigations for NagraStar. *Id.* ¶¶ 42-43. Kevin Gedeon was a Manager of Fraud Investigations for NagraStar. *Id.* ¶ 44.

Toltec Investigations, LLC (Toltec) is a private investigative agency specializing in investigating the technology and distribution involved in IPTV systems, copyrights, patents, and "Trademark and Brand's Intellectual Property." *Id.* ¶ 40. Michael Thomas Jaczewski, a.k.a. Brian Parsons, was at all relevant times President and Chief Executive Officer of Toltec. *Id.* ¶ 45.

Rosa Emilia Rodriguez-Velez was at all relevant times the United States Attorney for the District of Puerto Rico. *Id.* ¶ 46. Jose Capo-Iriarte was an Assistant U.S. Attorney (AUSA) and head of the office's Criminal Division. *Id.* ¶ 47. Nicholas Cannon was an AUSA and Deputy Chief of the Cybercrimes Division. *Id.* ¶ 48.

Douglas Leff was at all relevant times Special Agent in Charge of the FBI's San Juan Division. *Id.* ¶ 49. Also in that division, Brad Rex was a Supervisory Special Agent; Lance Lange, Kevin Pearson, and Clay Rehrig were Special Agents; Juan Galarza a Computer Science Officer; and Jason Lopez an Evidence Technician. *Id.* ¶¶ 50-55.

### B.    Naicom's Origins

Between 2002 and 2012, Mr. Quinones developed the intellectual technology, including the source code, underpinning the Paylink and Kiaras Cloud Workforce Management system and Naicom's IPTV services. *Id.* ¶ 5. The proprietary IPTV system was characterized as a Dynamic Internet Semantic Multicast Environment (DISME), which "enabled for the first time the broadcast of media via private networks and the internet, a new concept of IPTV service to distribute Live-Video

Television Content (media) to residences, business, and primes customers." *Id.* ¶¶ 8-11.

By 2016, Mr. Quinones had completed all DISME technology alpha and beta tests and, alongside Mr. Vega, founded Naicom. *Id.* ¶ 12. Naicom is a network and internet communication platform that delivers live television, video on-demand content, internet, and wireless network services to subscribers worldwide. *Id.* Naicom also provides instant access to television shows, movies, and music/videos on-demand, and live sports and music events through Naicom's set-top box using IPTV and TV Everywhere (TVE) on any mobile device. *Id.*

Mr. Quinones and Mr. Vega registered Naicom as a closed corporation with the State Department of Puerto Rico and complied with all requirements as a legitimate IPTV business. *Id.* ¶ 66. Naicom also requested to manufacture its own brand of set-top boxes for end users through Informir LLC and acquired the programing licenses to distribute on-demand content in the United States, Puerto Rico, and the U.S. Virgin Islands through worldwide television network companies. *Id.* ¶¶ 67-68. In 2017, Naicom became a member of the National Rural Telecommunications Cooperative (NRTC). *Id.* ¶ 68.

On January 6, 2017, Naicom submitted a request to the Apple Corporation to have its TV App added to Apple's AppStore. *Id.* ¶ 69. Apple's legal department requested that Naicom produce all licenses authorizing the distribution of programming to Naicom's subscribers via Naicom's TV App. *Id.* On February 16, 2017, Apple approved Naicom's App for inclusion in the Apple AppStore. *Id.* ¶ 70. In

December 2017, Sam's Club approved Naicom to launch and distribute Naicom's IPTV set-top box in their retail stores. *Id.* ¶ 71.

### C.    Naicom's Information Security

Naicom went to great lengths to protect its intellectual technology. *Id.* ¶¶ 64-65.  D&V IP Holdings and Naicom developed significant amounts of confidential and proprietary information, including non-public information relating to the DISME's source codes, patterns, formulas, algorithms, methods, and techniques; the technological vision for Naicom's IPTV content, distribution, marketing, servicing, research and development efforts and strategies; business and marketing performance strategies; financial data and business plans; technical data; customer development management programs; and subcontractor and vendor relationships (collectively, with the DISME, the Confidential Information or Naicom's Confidential Information).  *Id.* ¶ 64.

To protect this information, Plaintiffs only installed on their servers, located at the Naicom Data Center Facility, what is known as a compiled executable.  *Id.* ¶ 65.  The entire system was installed with an operating system that allowed the hard drive to be encrypted and, to access the servers, an authorized employee would need to enter the secure data facility and provide a username and password.  *Id.*  The server is not exposed to the internet and could only be accessed from inside the facility.  *Id.*  The Confidential Information was also downloaded onto a hard disk and kept in a safe box.  *Id.*

Plaintiff companies took additional steps to safeguard their confidential information and proprietary data, including restricting employee access, requiring

employees to execute non-disclosure agreements, imposing restrictions on remote access, and implementing encryption.  *Id.*  ¶¶ 72-76.

### D.    Negotiations with Claro Puerto Rico

In 2017, Naicom entered into negotiations with Claro Puerto Rico[4] (Claro) to distribute Naicom set-top boxes to Claro customers.  *Id.* ¶ 77.  Claro represented to Naicom that it had approximately 320,000 internet subscribers who received only five megabytes and thus could not subscribe to Claro's IPTV services, which required sixty megabytes to upload programming.  *Id.* ¶ 78.  During negotiations, Naicom and Claro entered into a mutual non-disclosure agreement prior to discussing and analyzing business information and the contents of the resellers' agreement.  *Id.* ¶ 79.  Claro's Product Development Officer, Anibal Rios, projected that the Claro-Naicom business alliance would bring in over $10,000,000 in monthly gross revenue for the first year and over $13,000,000 for the second year only taking into account Claro's corporate and residential subscribers in Puerto Rico.  *Id.* ¶ 80.  Naicom projected that the Claro-Naicom alliance would add 100,000 new corporate subscribers, plus another 150,000 residential subscribers, bringing in projected monthly gross sales of $9,000,000 in the first year and $12,000,000 in the second year.  *Id.* ¶ 81.

Claro had an existing contract with DISH Network Satellite TV, whereby DISH Network provided TV programming to Claro's internet subscribers who could

---

[4]      Presumably because Claro Puerto Rico is a well-known business in Puerto Rico, the Second Amended Complaint does not describe Claro Puerto Rico except by name.  *See Second Am. Compl.* ¶ 68.  According to Wikipedia, Claro Puerto Rico is the one of the largest telecommunications companies in Puerto Rico.  *See Claro P.R.*, WIKIPEDIA (updated Oct. 14, 2023), *https://en.Wikipedia.org/ wiki/Claro_Puerto_Rico.*

not subscribe to Claro's IPTV services.  *Id.* ¶ 82.  The Naicom deal represented a cancellation threat to DISH Network's contract with Claro.  *Id.*  Claro was also considering shutting down its IPTV business division due to loss of revenue.  *Id.* During the negotiations for the Claro-Naicom deal, Carlos Garcia, Claro's IPTV business manager, became privy to information that the Claro-Naicom deal would leave him jobless if Claro opted to shut down its IPTV division.  *Id.* ¶ 83.  Mr. Garcia alerted DISH Network that the Claro-Naicom IPTV deal would lead to cancellation of the DISH contract with Claro, which Plaintiffs allege led to "great animosity" between DISH Network and Naicom.  *Id.* ¶ 84.  On August 14, 2018, after a year of meetings between Naicom and Claro, Claro pulled out of negotiations without notice. *Id.* ¶ 85.  Plaintiffs believe the DISH Network Defendants advised Claro to withdraw because the FBI was investigating Naicom and its founders.  *Id.* ¶ 86.

### E.    The DISH Network Investigation

On August 7, 2017, the DISH/NagraStar Defendants and DISH Corp. instructed the Toltec Defendants to purchase two Naicom TV set-top box receivers so that the Defendants[5] could reverse engineer Plaintiffs' intellectual technology.  *Id.* ¶ 87.  The Defendants conducted "sniffing" to determine the direction of Naicom TV traffic and locate Naicom's facility.  *Id.*  The Defendants also used sniffing to attack and penetrate Naicom's servers and computers, monitoring content and capturing information on the network under the supervision of the Federal Defendants.  *Id.*

---

[5]      The Second Amended Complaint often refers to the "Association in Fact defendants."  *See, e.g., Second Am. Compl.* ¶ 87.  As the Court understands the Second Amended Complaint, this term refers to all Defendants collectively.  *See id.* ¶¶ 17, 62 (listing all the Defendants as together "form[ing] an Association in Fact").

One of the two set-top box receivers was maintained by the DISH/NagraStar Defendants, the other by the Toltec Defendants. *Id.* ¶ 88. Both receivers were used for the attacks on Naicom's data center servers. *Id.*

Mr. Jaczewski purchased the two set-top boxes from Naicom under the false name of "Brian Parsons," and he provided false contact information. *Id.* ¶ 89. The Defendants' investigation revealed that the receiver provided access to approximately forty-three channels, including Disney, TBS, ESPN, CNN, HBO, Showtime, and Cinemax. *Id.* ¶ 90. The Defendants downloaded the Naicom TV App through the Apple AppStore, which provided access to approximately forty-two channels, and tested Naicom TV several times to determine whether it was providing DISH programming. *Id.* In each case, the tests revealed no DISH content. *Id.*

The Defendants also contacted several media companies to inquire into whether Naicom had the appropriate licensing contracts to distribute programming. *Id.* ¶ 91. On each occasion, the investigators were informed that Naicom was authorized to distribute the network's content. *Id.* The investigators also discovered that Naicom's TV distribution technology was a threat to DISH Network and Sling TV, representing future competition for subscribers in Puerto Rico and the United States. *Id.* ¶ 92.

The DISH/NagraStar Defendants informed the other Defendants that they could not penetrate Naicom's Data Center computers and servers remotely, and thus direct, physical access would be required to extract Naicom's intellectual property. *Id.* ¶ 93. They knew that by entering the data center and shutting down the

computers and servers, they would be able to bypass Naicom's security measures and access the internal hard drive. *Id.* ¶ 94.

According to Naicom, the Defendants knew that the intellectual property was extremely valuable and worth obtaining by any means necessary to advance their own television programming distribution system, and the Defendants conspired to misappropriate the technology for economic advantage. *Id.* ¶ 95.

The DISH/NagraStar Defendants thereafter filed a complaint with the Federal Defendants alleging that Naicom was running an IPTV pirate operation. *Id.* ¶ 98. Plaintiffs allege that the motive behind the complaint was to secure NagraStar and DISH Network's participation in a search of Naicom's Data Center and the seizure of Naicom's computers, servers, and other hardware containing Naicom's intellectual property and trade secrets, under the ruse of assisting the Federal Defendants in discovering incriminating evidence. *Id.* Acquiring this information has given the DISH/NagraStar Defendants a competitive advantage over Naicom. *Id.* ¶ 99.

### F.    Execution of the Search Warrants

#### 1.    The First Search of Naicom's Data Center

On August 27, 2019, the Federal Defendants applied for two search warrants: one for Naicom Corporation located at Building Centro de Seguros, 701 Ponce de Leon, Suite 208, San Juan, Puerto Rico 00907, and the other for Naicom's Data Center located at Villa Fontana, 4SS N2 Via Josefina, Carolina, Puerto Rico. *Id.* ¶¶ 19, 33, 105. Plaintiffs allege that the search warrants were "issued under illegal and unlawful means" because the Federal Defendants provided affidavits they knew to contain false and perjured information. *Id.* ¶ 20.

On August 27, 2019, the Federal and DISH/NagraStar Defendants executed the warrants, with the DISH/NagraStar Defendants "acting as federal agents." *Id.* ¶ 21. They seized documents, hard drives, and thumb drives, and downloaded data from the computers and servers containing Plaintiffs' Confidential Information. *Id.* Plaintiffs allege that the Defendants knew from their investigation prior to the searches that Naicom was authorized to distribute its programming and was not pirating content. *Id.* ¶ 101. The Defendants also allegedly knew that the evidence collected in the Federal Defendants' investigative files "negated any criminal wrongdoing that Naicom's founders were committing the crimes charged in the search and seizure warrant affidavit and application." *Id.* ¶ 102.

At the conclusion of the August 27, 2019 search, the Federal Defendants "learned that Naicom TV counted with all the programming distribution contract and agreements"[6] and instructed Mr. Quinones and Mr. Vega to report to the FBI offices with their licensing contracts for an interview. *Id.* ¶ 103. This interview took place with the Federal Defendants sitting at one table and the DISH/NagraStar Defendants sitting at another table, allegedly posing as federal agents. *Id.* ¶ 104. The Defendants questioned Mr. Quinones about how Naicom acquired the IPTV distribution contracts and the technology used to distribute the programing. *Id.* They also inspected Naicom's contracts with content providers, which contained trade/business secrets and confidential information regarding DISME technology. *Id.*

---

[6]     Here, the Court quotes the language in the Second Amended Complaint. *Second Am. Compl.* ¶ 103. In the context of this sentence, the meaning of the verb, "counted," is unclear. It would make more sense if the sentence used "complied with," rather than "counted." Whichever verb is correct, however, makes no difference in this Court's ruling on the motion to dismiss.

### 2.   The Second Search of Naicom's Data Center

On August 29, 2019, U.S. Attorney Rodriguez-Velez and AUSAs Capo-Iriarte and Cannon instructed FBI Agents Lange and Pearson to return to Naicom's data center with DISH/NagraStar Defendants Smith, Gedeon, and Eichhorn. *Id.* ¶ 105. Naicom alleges that the USAO Defendants ordered this search despite knowing beforehand that Naicom was a legitimate business and there was no probable cause for continued investigation. *Id.* Without obtaining new warrants, Defendants again entered Naicom's data center facility, performed password resets, and installed "pen drives and other electronic instruments" to bypass security measures and download and seize Naicom's Confidential Information. *Id.* ¶¶ 22, 106. The agents used keys taken from Naicom's offices to enter Naicom's data center. *Id.* ¶ 105.

During the search, Agent Pearson contacted Naicom employee Jaime Echevarria and ordered him to come to the Data Center, as Agent Pearson wanted to speak with him, Mr. Quinones, and Mr. Vega. *Id.* ¶ 107. Upon arriving at the Data Center, Mr. Quinones observed Agents Lange and Pearson allowing Mr. Smith, Mr. Gedeon, and Mr. Eichhorn to access Naicom's Data Center computers, servers, and other hardware equipment without authorization from Naicom. *Id.* ¶ 108.

During the search, Agents Pearson and Lange pressured Mr. Quinones to sign a hold-harmless document accepting that he had run a pirate operation in the past so that they could close the case. *Id.* ¶ 109. Otherwise, they threatened that they would shut down the Data Center operation. *Id.* Mr. Quinones refused, despite Agents Pearson and Lange imploring him to sign the document. *Id.* ¶ 110.

Sometime thereafter, Mr. Vega arrived and, upon entering the Data Center, asked Agents Pearson and Lange if they had another search warrant to enter and search the Data Center. *Id.* ¶ 111. Agent Lange represented to Mr. Vega that the search warrant gave him ten days to come in and out and search the Data Center. *Id.* Mr. Vega told Agent Lange that Agent Lange was violating the United States Constitution and Federal law. *Id.*

Mr. Vega thereafter informed Agents Pearson and Lange that he had discovered via LinkedIn that the alleged FBI experts who executed the search and interrogated Mr. Quinones and him at the FBI offices were Kevin Gedeon, investigator for DISH Network, and Jordan Smith, Bert Eichhorn, and Emily Rinkel, investigators for NagraStar. *Id.* ¶ 112. Mr. Vega questioned Agents Lange and Pearson as to why the FBI brought in his competition to search, inspect, and photograph private documents and allowed them access to computers and servers containing trade secrets, code sources, and business and intellectual property belonging to Naicom. *Id.* ¶ 113. Mr. Vega called his attorney and told him about the second search. *Id.* ¶ 114. After speaking with Agent Lange, the FBI agents and DISH/NagraStar investigators shut down Naicom's business operation and left the premises. *Id.*

### G.    The Demand for the Return of Property Under Rule 41(g)

On September 6, 2019, Plaintiffs filed a motion to demand the return of seized property under Rule 41(g) of the Federal Rules of Criminal Procedure. *Id.* ¶ 115. The District Court granted the Plaintiffs' Rule 41(g) motion on November 5, 2019, noting

that the Government had waived objections to the court's Report & Recommendation. *Id.* ¶¶ 116-17.

## H.     Plaintiffs' Alleged Harm

Plaintiffs allege that the criminal investigation caused significant damage to their business reputation and unfairly enriched their competitors. *Id.* ¶¶ 118-19. They allege that prior to the execution of the search warrants, they had a great reputation and were about to close on a $15,000,000 investment deal, but investors pulled out upon learning Naicom was under criminal investigation. *Id.* ¶¶ 120-21. Plaintiffs also allege that Naicom was about to close a multimillion-dollar deal with Claro when Claro learned of the FBI's investigation and pulled out of negotiations. *Id.* ¶ 122.   Plaintiffs say they have lost subscribers because of negative publicity resulting from the investigation and that the Defendants' intrusion into Naicom's Data Center computers, servers, and equipment caused damage leaving subscribers without TV programming services for several weeks and cost more than $500,000 to repair. *Id.* ¶ 123.

## I.     Plaintiffs' Causes of Action

Plaintiffs bring seven counts. Count One alleges the Defendants violated RICO by forming an association in fact to advance the criminal objective of stealing Plaintiffs' intellectual property and trade secrets by committing mail and wire fraud, among other crimes. *Id.* ¶¶ 124-53.

Count Two alleges the Defendants engaged in a RICO conspiracy by conspiring to plan and execute the scheme outlined in Count One. *Id.* ¶¶ 154-57.

Count Three alleges the Defendants violated the CFAA by accessing Naicom's computer systems without authorization, or in excess of authorization, and obtaining and using valuable information from those computers. *Id.* ¶¶ 158-68.

Count Four alleges the Defendants violated the SCA by "willfully and intentionally access[ing] without authorization a facility which operates servers, encoders, computers, and telecommunications systems and technology, by electronically transmitting communications involved in Webservers, Email-Servers, Carrier Grade Routers which interconnected with local ISP providers through Border Gateway Protocols (BGP) in exchanging routing information between autonomous systems." *Id.* ¶¶ 169-75.

Count Five alleges the Defendants violated the DMCA by illegally obtaining Plaintiffs' copyright-protected software programs, documents, confidential information, and research. *Id.* ¶¶ 176-84.

Count Six alleges the Defendants violated the DTSA by stealing Plaintiffs' trade secrets, including DISME technology, intellectual property, and other confidential information. *Id.* ¶¶ 185-94.

Finally, Count Seven alleges the Defendants misappropriated Plaintiffs' trade secrets in violation the PTSA. *Id.* ¶¶ 195-202.

## III.   THE PARTIES' POSITIONS

### A.   DISH Network Corporation's Motion to Dismiss

DISH Corp. first argues that "Plaintiffs' claims against DNC should be dismissed because the Court lacks personal jurisdiction over DNC as a matter of law." *Def.'s Mot.* at 4 (capitalization altered).

Regarding general personal jurisdiction, DISH Corp. maintains that "DNC's contacts with Puerto Rico are not continuous or systematic," *id.* at 6, because 1) "DNC is neither incorporated [in Puerto Rico] nor maintains its principal place of business there," 2) "DNC conducts no business at all in Puerto Rico, is not registered or qualified to conduct business in Puerto Rico and maintains no registered agent for service of process there," 3) DNC does not "own, manage, or lease any real or tangible property in Puerto Rico," and 4) DNC does not "maintain any retail stores, warehouses, offices, mailing addresses, bank accounts, telephone listings, agents, or employees in Puerto Rico." *Id.* Further, DISH Corp. insists that DISH LLC's "contacts with Puerto Rico cannot be attributed to DNC to confer general jurisdiction over DNC." *Id.* at 6-7. Therefore, DISH Corp. asserts that "DNC has none of the type of contacts with Puerto Rico that would warrant this Court's exercise of general personal jurisdiction over it." *Id.* at 7.

Turning to specific personal jurisdiction, DISH Corp. initially notes that "[t]he First Circuit has interpreted Puerto Rico's long-arm statute to extend personal jurisdiction 'as far as the Federal Constitution permits.'" *Id.* at 5 (quoting *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)). Next, DISH Corp. avers that "Plaintiffs' claims do not relate to *any* contacts with DNC because DNC conducts no business in Puerto Rico." *Id.* at 8 (emphasis in original) (capitalization altered). In particular, DISH Corp. emphasizes that "DNC was neither a party to the searches and seizure that took place on August 27 and 29, 2019 that form the basis of Plaintiffs' claims, nor was

it or any of its officers involved in any criminal investigation complained of by Plaintiffs." *Id.* at 9.

DISH Corp. further submits that "Plaintiffs cannot rely upon the contacts of DNC's indirect subsidiary to establish DNC's purposeful availment of the forum because [DISH LLC's] forum-related contacts are not imputable to DNC by virtue of DNC's status as [DISH LLC's] indirect parent." *Id.* Likewise, DISH Corp. contends that Plaintiffs cannot "rely on DNC's stock ownership in [DISH LLC] to establish that DNC transacted business in the forum through [DISH LLC]." *Id.* at 10. In addition, DISH Corp. declares that "the lack of allegations or evidentiary proffers renders the exercise of specific jurisdiction over DNC in this case unreasonable, unfair, and contrary to traditional notions of fair play and substantial justice." *Id.*

Moving onto its second argument, DISH Corp. argues that "Plaintiffs cannot rely upon their spurious RICO claims to evade due process requirements and obtain personal jurisdiction over DNC." *Id.* at 11 (capitalization altered). DISH Corp. insists that "[t]o the extent Plaintiffs seek to invoke [18 U.S.C.] § 1965 as a source of this Court's personal jurisdiction to permit a broader reach over their RICO claims against DNC, Plaintiffs still fail to establish that the Court's exercise of personal jurisdiction over DNC would be proper." *Id.*

Acknowledging that the First Circuit has not announced a definitive interpretation of 18 U.S.C. § 1965, DISH Corp. urges the Court to follow the approach of the Second, Seventh, Ninth, and Tenth Circuits. *Id.* at 11-12. Under this approach, DISH Corp. suggests the Court lacks personal jurisdiction because "the 'ends of

justice' certainly do not justify it." *Id.* at 12 (quoting *World Depot Corp. v. Onofri*, No. 16-12439-FDS, 2017 U.S. Dist. LEXIS 198814, at *13 (D. Mass. Dec. 4, 2017)). This is so, DISH Corp. continues, because "DNC is not a necessary party to a full adjudication of Plaintiffs' claims and Plaintiffs have failed to allege a colorable RICO claim against DNC premised on the factual allegations asserted in this case." *Id.*

DISH Corp. then discusses its perceived shortcomings of Plaintiffs' RICO claims. *Id.* at 12-22. First, it suggests that "Plaintiffs cannot plead a viable RICO enterprise on the facts." *Id.* at 13 (capitalization altered). DISH Corp. represents that "DNC has taken <u>no</u> part in the course of conduct of any enterprise alleged in this case, as it was not a party to the searches and seizure conducted in August 2019 nor did it or any of its officers participate in any criminal investigation or activities for which Plaintiffs now complain." *Id.* at 15 (internal quotation omitted) (emphasis in original). Further, it submits that the conduct Plaintiffs "attribute to DNC was not in furtherance of some shared illicit purpose reminiscent of an enterprise, but rather due to lawfully authorized investigative activity designed to detect pirated IPTV content." *Id.*

Next, DISH Corp. asserts that "Plaintiffs cannot plead the conduct of a criminal enterprise that is separate and apart from the conduct of Defendants' own affairs." *Id.* at 16 (capitalization altered). In particular, DISH Corp. observes that "Plaintiffs fail to plead any factual allegations establishing how DNC took any part in the 'operation or management' of the alleged RICO enterprise." *Id.* at 17 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).

DISH Corp. also argues that "DNC committed no predicate offenses." *Id.* at 18. It avers that each of the predicate acts alleged by Plaintiffs "'[is] supported by allegations of legitimate government action' and 'even when viewed in the inflammatory light bestowed upon them by Plaintiff[s], in no way resemble criminal activity.'" *Id.* (alterations in *Def.'s Mot.*) (quoting *Kahre v. Damm*, No. 2:07-CV-00231-DAE-RJJ, 2007 U.S. Dist. LEXIS 95978, at *26 (D. Nev. Dec. 18, 2007)). Moreover, DISH Corp. reiterates that "DNC did not participate in the Federal Defendants' criminal investigation, execution of search warrants at Plaintiffs' business premises or the seizure of Plaintiffs' business effects." *Id.* at 20.

In a similar vein, DISH Corp. maintains that it "lacked the criminal intent to engage in 'racketeering activity,'" *id.* (capitalization altered), because "all actions taken by DNC were performed under color of federal law, and at the direction and supervision of the Federal Defendants to assist them in discharging their governmental duties." *Id.*

Even if Plaintiffs could sufficiently allege one or more predicate acts, DISH Corp. continues, "Plaintiffs cannot plead an actionable pattern of racketeering activity on the facts." *Id.* at 21. According to DISH Corp., "[w]hen, as here, a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to

unfold, involves a variety of criminal acts, and targets more than one victim." *Id.* at 22 (quoting *Gamboa v. Velez*, 457 F.3d 703, 708-09 (7th Cir. 2006)).

Turning to Plaintiffs' RICO conspiracy claim, DISH Corp. argues that this claim "fails for two independent reasons." *Id.* First, it submits that Plaintiffs' RICO conspiracy claim should be dismissed because "Plaintiffs have failed to allege an actionable substantive RICO claim." *Id.* Further, it avers that "Plaintiffs' allegations of agreement and conspiracy are too vague and conclusory to state a claim for relief and consist . . . of formulaic recitations and conclusory allegations." *Id.* at 23 (internal quotations omitted).

DISH Corp. concludes by asking the Court to dismiss Plaintiffs' claims with prejudice. *Id.* at 23-24.

## B.   Plaintiffs' Opposition

In response, Plaintiffs first argue that "the Court has personal jurisdiction over [] DNC as a matter of law." *Pls.' Opp'n* at 12 (capitalization altered). Plaintiffs submit that "whether the DNC defendants transacted business within the meaning of Puerto Rico's long-arm statute depends on whether Plaintiffs can establish that the DNC defendants have sufficient minimum contacts with Puerto Rico through NagraStar."[7] *Id.* at 16. Plaintiffs surmise that NagraStar has sufficient minimum contacts with Puerto Rico, and they claim that these contacts should be imputed to DISH Corp.

---

[7]       The Plaintiffs variously spell NagraStar with a capital "S" and with a lower-case "s." *Compare Second Am. Compl.* ¶ 21, *with Pls.' Opp'n to DISH/NagraStar Mot.* at 1. NagraStar spells its name with a capital "S." *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel and Jordan Smith's Mot. to Dismiss* at 1. Again, on the assumption that NagraStar knows how to spell its own name, the Court has used NagraStar and inserted this spelling in lower case references.

because "the DNC defendants are equally liable for the actions of their NagraStar partners under Colorado state law." *Id.* at 18-19.  In Plaintiffs' view, this is so because DISH Corp. and NagraStar are parties to a joint venture, and "[u]nder Colorado law joint venturers are jointly and severally liable for the negligence of another joint venturer." *Id.* at 16-17.

Plaintiffs also maintain that the Court has personal jurisdiction over DISH Corp. for the RICO claims because "under [18 U.S.C. § 1965 and Federal Rule of Civil Procedure 4], personal jurisdiction over defendants can be obtained in RICO cases under circumstances where it otherwise might not exist." *Id.* at 21.  Plaintiffs urge the Court to adopt the interpretation of 18 U.S.C. § 1965 articulated by the Fourth and Eleventh Circuits, which "have held that § 1965(d) is the controlling provision— that is, personal jurisdiction exists over all defendants if any one defendant has 'minimum contacts with the United States—the relevant sovereign.'" *Id.* at 22 (quoting *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 946 n.21 (11th Cir. 1997)).

Shifting to the merits of their claims, Plaintiffs argue that "the procurement of the issuance and execution of the search and seizure warrant and the subsequent warrantless search and seizure execution were illegal and unconstitutional." *Id.* at 25 (capitalization altered).  They contend that all Defendants "jointly and collectively" procured search warrants containing "material false representations and perjured testimony," which ultimately lacked probable cause.  *Id.*  Plaintiffs further submit

that "the alleged initial probable cause dissipated with the first search warrant execution," and thus the second search was "illegal and warrantless."  *Id.* at 30.

Plaintiffs go on to argue that "the affidavit in support of the search warrant was defective on its face."  *Id.* at 31 (capitalization altered).  They contend that their computer systems were protected under the SCA, that the "conclusory" statements in the affidavit were insufficient to justify a search, and that the search ultimately did not comply with the SCA.  *Id.* at 31-33, 35.  According to Plaintiffs, the Federal Defendants did not "seek authorization from the Magistrate to bring Plaintiffs' competitors, the Dish/NagraStar Defendants, to execute the search warrant, depriving the Magistrate of the opportunity to prohibit their participation in its execution."  *Id.* at 35.  Further, although Plaintiffs concede that 18 U.S.C. § 3105 allows private parties to assist in the execution of a search warrant, they counter that "the statute clearly prohibited the executing officer from bringing to the search a party which had another interest, profit, or other marketplace incentive."  *Id.* at 35-36.  Plaintiffs also submit that DISH Corp. cannot rely on the search warrants because the Federal Defendants conceded the invalidity of the warrants when they did not oppose Plaintiffs' motion for return of property under Federal Rule of Criminal Procedure 41(g).  *Id.* at 38-40.

Shifting gears, Plaintiffs argue that "the *Noerr-Pennington* doctrine does not apply to the case at bar."  *Id.* at 40 (capitalization altered).  They also contend that sovereign immunity does not apply because "the charges in this civil action were not brought against the United States, but against specific federal official/agent[]/Dish/

NagraStar and the DNC Defendants, in their individual and personal capacities, for criminal actions indictable under RICO, falling outside their scope of employment, and beyond their statutory authority." *Id.* at 40-41.

Turning to the elements of the RICO counts, Plaintiffs submit that they have "pleaded a colorable RICO claim on the facts," *id.* at 42 (capitalization altered), because they have pleaded "enough facts in the [Second Amended Complaint to give the] DNC defendants a fair notice of what there is, and the grounds upon [which] they rest." *Id.* at 42-43. Plaintiffs add that they have also "pleaded a cognizable RICO enterprise on the facts." *Id.* at 43-46 (capitalization altered).

Plaintiffs further maintain that they have sufficiently "pleaded conduct of a criminal enterprise that is separate and apart from the conduct of Defendants' own affairs." *Id.* at 46 (capitalization altered). In their view, the three required elements for establishing a RICO enterprise are: 1) "an ongoing organization, formal or informal"; 2) that "the various associate[s] function as a continuing unit"; and 3) that the enterprise exists "separate and apart from the pattern of activity in which it engages." *Id.* at 46 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Plaintiffs assert that while they "will ultimately need to establish each of these factors, at this early juncture it is sufficient to merely [] allege the existence of an association-in-fact enterprise." *Id.* at 46-47 (quoting *Pappa v. Unum Life Ins. Co. of Am.*, No. 3:07-cv-0708, 2008 U.S. Dist. LEXIS 21500, at *29-30 (M.D. Pa. Mar. 18, 2008)). They add that it is reasonable to infer from the complaint that "the Association in Fact defendants functioned as a continuing unit and had an

ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." *Id.* at 48.

Plaintiffs go on to argue that "the DNC defendants committed the predicate offense[s] and acted with criminal intent and in bad faith." *Id.* at 50 (capitalization altered). In Plaintiffs' view, "the DNC Defendants' conspiratorial agreement to violate mail and wire predicate acts are criminal and indictable." *Id.* at 51 (capitalization altered). Plaintiffs also maintain that, even if the alleged misrepresentations did not amount to mail or wire fraud, they nevertheless contributed to the Defendants' theft of trade secrets under 18 U.S.C. §§ 1831 and 1832. *Id.* at 50-51.

Plaintiffs then maintain that they have "pleaded a pattern of racketeering activities on the facts," *id.* at 52 (capitalization altered), because have "pleaded that the Association in Fact defendants . . . committed over 30 racketeering acts ranging from Mail and Wire fraud to theft of trade secrets, in a period of two years." *Id.* at 54. In Plaintiffs' view, these facts "satisfied the closed period of repeated conduct," and there are also "allegations of a threat of continued activity, in reference to the DNC, Dish Network and NagraStar corporation's joint venture." *Id.* at 54-55.

Finally, Plaintiffs submit that they have pleaded a viable RICO conspiracy claim because 18 U.S.C. §1962(d) "criminalizes an agreement rather than any substantive criminal offense," meaning that "an agreement to associate with and participate in a yet-to-be-formed racketeering enterprise that would affect interstate commerce constitutes a completed offense under § 1962(d)." *Id.* at 57. Therefore,

Plaintiffs conclude that a substantive RICO claim is not required for a viable RICO conspiracy claim, although they maintain that they have adequately alleged a substantive RICO claim." *Id.*

### C.    DISH Network Corporation's Reply

In its reply, DISH Corp. reiterates that "Plaintiffs' claims against DNC should be dismissed because the Court lacks personal jurisdiction over DNC as a matter of law." *Def.'s Reply* at 2.  DISH Corp. reads Plaintiffs' reply as conceding that "DNC is not subject to general jurisdiction in Puerto Rico [and] that [DISH LLC's] contacts with Puerto Rico cannot be attributed to DNC to confer personal jurisdiction over DNC." *Id.* at 3.  DISH Corp. further points out that "Plaintiffs do not contest" that "neither DNC nor any of its officers were involved in the Federal Defendants' criminal investigation of Plaintiffs, execution of search warrants at Plaintiffs' business premises or the seizure of Plaintiffs' business effects." *Id.* at 4.

Turning to Plaintiffs' argument that "the exercise of specific jurisdiction over DNC is nevertheless proper under a 'joint enterprise' theory with NagraStar, premised on Colorado law," DISH Corp. argues that Plaintiffs' theory "lacks merit and impermissibly confuses the concepts of liability and personal jurisdiction." *Id.* at 4.  DISH Corp. insists that "Plaintiffs fail to even allege facts concerning DNC's transaction of business in Puerto Rico either personally or through NagraStar as an agent." *Id.* at 5.  In DISH Corp.'s view, "Plaintiffs' unsupported allegations that DNC may have engaged in a joint venture with NagraStar is insufficient to attribute NagraStar's contacts to DNC for jurisdictional purposes under either Puerto Rico's

long-arm statute or in compliance with the Due Process Clause of the Fifth Amendment." *Id.*

Addressing Plaintiffs' contention that 18 U.S.C. § 1965(d) creates personal jurisdiction for the RICO claims, DISH Corp. remarks that "Plaintiffs' position has been rejected by a majority of circuit courts that have considered the issue, including at least three district courts within this circuit." *Id.* at 6. DISH Corp. maintains that 18 U.S.C. § 1965(b) authorizes "nationwide service of process and govern[s] the exercise of personal jurisdiction over a civil RICO defendant." *Id.*

Further, according to DISH Corp., 18 U.S.C. §1965(b) "is inapplicable here," *id.* at 7 (capitalization altered), because "the ends of justice do not justify the conferral of personal jurisdiction over DNC, since DNC is not a necessary party to a full adjudication of Plaintiffs' claims in this case." *Id.* (internal quotation omitted). DISH Corp. also suggests that "if the Court dismisses Plaintiffs' RICO claims pursuant to the 12(b)(6) motions filed by the Federal Defendants, the DISH/NagraStar Defendants and the Toltec Defendants, it is unnecessary for the Court to reach DNC's jurisdictional challenge or the applicability of RICO's nationwide service of process provision." *Id.* at 7-8.

Next, DISH Corp. briefly addresses the issue of jurisdictional discovery, arguing that it should not be allowed in this case. *Id.* at 8-9. This is so, it continues, because "Plaintiffs make no effort to describe DNC's specific activities (as opposed to conduct attributed to the myriad of other named Defendants) that caused their alleged injuries," "[n]or do they set forth any allegations of specific contacts among

DNC, Plaintiffs, and Puerto Rico sufficient to demonstrate that personal jurisdiction is authorized and consistent with due process requirements." *Id.*

Finally, DISH Corp. suggests that "Plaintiffs' failure to address their remaining claims related to DNC renders their claims waived or abandoned." *Id.* at 9 (capitalization altered). DISH Corp. then reiterates that the Second Amended Complaint should be dismissed with prejudice. *Id.* at 10.

### D.   Plaintiffs' Sur-Reply

In their sur-reply, Plaintiffs suggest that the Court should "either reject and/or strike from the DNC defendants' Reply any portion not addressing a new matter." *Pls.' Sur-Reply* at 2. They submit that, with one exception, DISH Corp.'s reply "did not contribute anything new that had not already [been] discussed in their" motion to dismiss. *Id.* Plaintiffs also ask the Court to strike all defenses raised by DISH Corp. pursuant to Federal Rule of Civil Procedure 12(f). *Id.* at 9-10.

Turning to the substance of DISH Corp.'s arguments, Plaintiffs contend that selected passages from DISH Corp.'s annual report prove that "DNC is more than a publicly traded holding company and does participate in their subsidiaries' business operations through its employees." *Id.* at 7. Plaintiffs maintain that "by hatching the conspiracy to unlawfully deprive Plaintiffs of their trade secrets and intellectual property through its subsidiary (NagraStar) . . . DNC purposefully not only availed itself of the privilege of conducting business activities, but also protected its business in [Puerto Rico] through its partner in business NagraStar." *Id.* at 7 (internal citation omitted).

Finally, Plaintiffs argue that each of the Defendants "is sufficiently distinct from the RICO enterprise to satisfy the statute's distinctness requirement." *Id.* at 9.

## IV.   LEGAL STANDARDS

### A.   Motion to Dismiss for Lack of Personal Jurisdiction

DISH Corp. moves to dismiss Plaintiffs' Second Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  "To hear a case, the court must have personal jurisdiction over the parties, 'that is the power to require the parties to obey its decrees.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999)).  "On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); and *Mass Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998)). "Faced with a motion to dismiss for lack of personal jurisdiction, a district court 'may choose from among several methods for determining whether the plaintiff has met [its] burden.'" *Id.* (alteration in original) (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007)).  "The different methods involve application by the district court of different legal standards." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674 (1st Cir. 1992); *see also Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995) (describing the prima facie, preponderance and likelihood standards).

Here, the Court elects to use "the 'prima facie method' or the 'prima facie evidentiary standard,' rather than adjudicating the jurisdictional facts. *Astro-Med*, 591 F.3d at 8.  Under the prima facie standard, "the inquiry is whether the plaintiff

has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Bluetarp Fin., Inc. v. Matrix Constr. Co.*, 709 F.3d 72, 79 (1st Cir. 2013) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008)).  In conducting such an inquiry, the Court draws "the relevant facts from 'the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to plaintiff's version of genuinely contested facts.'" *Ward v. AlphaCore Pharma, LLC*, 89 F.4th 203, 209 (1st Cir. 2023) (quoting *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016)).  The Court may also consider "undisputed facts put forth by the defendant." *Baskin-Robbins*, 925 F.3d at 34.  "Withal, the district court acts not as a factfinder, but as a data collector." *Foster-Miller*, 46 F.3d at 145.

Under the prima facie method, "the plaintiff cannot rely solely on conclusory averments but must 'adduce evidence of specific facts.'" *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020) (quoting *Foster-Miller*, 46 F.3d at 145).  Likewise, the Court does not "credit conclusory allegations or draw farfetched inferences." *Ward*, 89 F.4th at 209 (quoting *Ticketmaster-N.Y., Inc. v. Alioto*, 25 F.3d 201, 203 (1st Cir. 1994)).  The "inquiry must be governed by 'evidence of specific facts set forth in the record' — not simply predicated upon a plaintiff's 'unsupported allegations in their pleadings.'" *Id.* (quoting *Boit*, 967 F.2d at 675).  "Ordinarily, such evidence will be contained in affidavits, authenticated documents, and the like, submitted by one or more of the parties." *Id.*

### B.    Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore

statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.    DISCUSSION

### A.    Plaintiffs' Request to Strike the DISH Network Corporation's Reply

Before turning to the merits of DISH Corp.'s motion to dismiss, the Court briefly addresses Plaintiffs' contention that the Court should "reject and/or strike" any portion of DISH Corp.'s reply "not addressing a new matter." *Pls.' Sur-Reply* at 2. Plaintiffs submit that, with one exception, DISH Corp.'s "factual argument and legal discussion[] did not contribute anything new that had not already [been] discussed in their [motion to dismiss], and their Reply is nothing more than a second response." *Id.*

The Court disagrees. Plaintiffs rely on District of Puerto Rico Local Civil Rule 7(c), which provides:

> With prior leave of court and within seven (7) days of the service of any objection to a motion, the moving party may file a reply, which shall not exceed ten (10) pages in length, and which shall be strictly confined to responding to new matters raised in the objection or opposing memorandum.

As this rule makes clear, a reply is proper so long as it addresses "new matters raised in the . . . opposing memorandum."

Plaintiffs reason that DISH Corp.'s reply is noncompliant because it contains the same general arguments as the motion to dismiss. For example, Plaintiffs claim that DISH Corp. is "re-submitting for a second time allegations regarding the Court's lack of Personal Jurisdiction over DNC as a matter of law." *Pls.' Sur-Reply* at 4.

But this reads Local Civil Rule 7(c) too narrowly and the DISH Corp.'s' reply too strictly. The Court does not view Local Civil Rule 7(c) as prohibiting a reply from expanding upon issues raised both in the original memorandum and the response so long as the response addressed the issues generated in the motion. *See Torres-Talavera v. Ford Motor Co.*, 965 F. Supp. 2d 220, 222 n.3 (D.P.R. 2013) (noting that, pursuant to Local Civil Rule 7(c), the plaintiffs' sur-reply was "confined to respond to the arguments made in defendant Ford's reply"). Local Civil Rule 7(c) is a rule of basic fairness, clearly prohibiting the use a reply to introduce new arguments not previously addressed by the respondent.

A closer examination of the reply reveals that DISH Corp. is responding to the arguments made in Plaintiffs' opposition brief. *See, e.g.*, *Def.'s Reply* at 4 (responding to Plaintiffs' argument "that the exercise of specific jurisdiction over DNC is nevertheless proper under a joint enterprise theory with NagraStar" (internal quotation omitted)). While DISH Corp.'s reply discusses the same subject matter as the motion to dismiss, the specific argumentation in the reply is different and responds to the arguments in Plaintiffs' opposition brief. Therefore, the reply is proper under Local Civil Rule 7(c).

The Court denies Plaintiffs' request to strike.[8]

## B.    Personal Jurisdiction for Counts III Through VI

### 1.    Analytical Framework

Plaintiffs assert that the Court has federal question jurisdiction over their federal statutory claims (Counts I through VI) and supplemental jurisdiction over their PTSA claim (Count VII). *Second Am. Compl.* ¶¶ 28-29. "When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). "In such circumstances, the Constitution requires only that the defendant have the requisite minimum contacts with the United States, rather than with the particular forum state (as would be required in a diversity case)." *Id.*; *S.E.C. v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024).

However, to exercise personal jurisdiction over any defendant, service of process must be "grounded within a federal statute or Civil Rule." *Id.*; *see also BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1556 (2017) ("[A]bsent consent, a basis for service of a summons on the defendant is prerequisite to the exercise of personal jurisdiction"); *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant,

---

[8]    Plaintiffs also suggest that the Court should strike all the defenses raised by DISH Corp. pursuant to Federal Rule of Civil Procedure 12(f) because "there are no factual nor issues of law to be resolved before the validity of the defenses in the present context may be determined." *Pls.' Sur-Reply* at 9.  The Court declines to do so.

the procedural requirement of service of summons must be satisfied"). In other words, for the Court to have personal jurisdiction over DISH Corp., Plaintiffs "must show that (1) the exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause, and (2) [DISH Corp.] is subject to service of process under a federal statute or rule." *Goya Foods Inc. v. Golla Oy*, 959 F. Supp. 2d 206, 212 (D.P.R. 2013).

Here, the parties clash over whether DISH Corp. can be properly served under a federal statute or rule. Federal Rule of Civil Procedure 4(k)(1) "limits the instances in which '[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant.'" *Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 93 (1st Cir. 2022) (emphasis omitted) (quoting FED. R. CIV. P. 4(k)(1)). Relevant here, service of process establishes personal jurisdiction when made upon a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located" or when "authorized by a federal statute." FED. R. CIV. P. 4(k)(1).

The Second Amended Complaint implicates both these methods of service. 18 U.S.C. § 1965, which is part of the RICO statute, "provides for nationwide service of process in civil cases under certain circumstances." *World Depot Corp.*, 2017 U.S. Dist. LEXIS 198814, at *12. By contrast, the CFAA, SCA, DMCA, and DTSA do not authorize nationwide service of process. For those statutory claims, service of process is proper only if authorized by Puerto Rico's long-arm statute. *See Goya Foods*, 959 F. Supp. 2d at 212 ("No federal statute authorizing nationwide service of process

applies here. . .. Thus, jurisdiction over the defendants must be based on Puerto Rico's long-arm statute"). Since the service-of-process framework differs for Plaintiffs' various federal statutory claims, the Court first addresses whether Plaintiffs have demonstrated that personal jurisdiction exists for Counts III through VI under Puerto Rico's long-arm statute.

The First Circuit has interpreted Puerto Rico's long-arm statute as "coextensive with the outer limits of the Constitution." *Rodríguez-Rivera v. Allscripts Healthcare Solutions, Inc.*, 43 F.4th 150, 160 (1st Cir. 2022). "Under the Due Process Clause, a nonresident defendant may be subjected to jurisdiction within a forum only if [it] has 'certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "As long as due process concerns are satisfied, a federal court 'may exercise either general or specific jurisdiction over a defendant.'" *Chen*, 956 F.3d at 55 (quoting *Baskin-Robbins*, 825 F.3d at 35).

As the Supreme Court has explained, "[a] court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "The paradigmatic examples of locales in which a defendant corporation is considered at home are its state of

incorporation and the state that houses its principal place of business." *Chen*, 956 F.3d at 57 (citing *BNSF Ry. Co.*, 137 S. Ct. at 1558). "In 'exceptional case[s],' though, a defendant corporation's general business operations in a state in which it is neither incorporated nor headquartered 'may be so substantial and of such a nature as to render the corporation at home in that state.'" *Id.* (alteration in original) (quoting *Daimler*, 571 U.S. at 139).

Specific jurisdiction is the other variety of personal jurisdiction. It is transaction specific. *See Daimler*, 571 U.S. at 127 (noting that courts exercise specific jurisdiction when the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum" (alterations in original) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). "A litigant seeking to establish that a court has specific jurisdiction over a defendant must satisfy three criteria." *Ward*, 89 F.4th at 209. "First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum." *Id.* at 209-10 (quoting *Chen*, 956 F.3d at 59). "Second the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state." *Id.* at 210 (quoting *Chen*, 956 F.3d at 59). "Third, 'the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.'" *Id.* (quoting *Chen*, 956 F.3d at 59).

### 2. Application

As noted above, for Plaintiffs to meet their burden of establishing personal jurisdiction, they must "adduce evidence of specific facts," *Chen*, 956 F.3d at 54 (quoting *Foster-Miller*, 46 F.3d at 145), and they "may not 'rely on unsupported

allegations.'" *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018) (quoting *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016)). Plaintiffs apparently seek to establish personal jurisdiction over DISH Corp. based on the Second Amended Complaint and one attachment to their sur-reply. As far as the Court can tell, Plaintiffs have not proffered any other facts, as they attached no additional evidence to their other filings, including previous versions of the complaint. The Court concludes that Plaintiffs have failed to offer any specific facts suggesting a nexus between DISH Corp. and Puerto Rico and, as a result, Plaintiffs have failed to demonstrate that the Court has either general or specific jurisdiction over DISH Corp.

With respect to the allegations in the Second Amended Complaint, the First Circuit has repeatedly cautioned that plaintiffs seeking to establish personal jurisdiction cannot rest on "unsupported allegations in their pleadings." *Ward*, 89 F.4th at 209 (quoting *Boit*, 967 F.2d at 675). Further, the jurisdictional allegations related to DISH Corp. in the Second Amended Complaint are wholly conclusory. Apart from their general allegation that DISH Corp. participated in an elaborate conspiracy to steal their intellectual property from Puerto Rico,[9] Plaintiffs merely allege that DISH Corp. "does business, as Dish Network, PR, in San Juan, Puerto Rico." *Second Am. Compl.* ¶ 32. But this is neither a "specific fact[]," nor is it

---

[9] The majority of Plaintiffs' claims about the alleged conspiracy do not even mention DISH Corp. specifically, but instead refer to the "Racketeering Enterprises." *See, e.g.*, *Second Am. Compl.* ¶¶ 92-93, 98-99, 130-31. According to Plaintiffs, the Racketeering Enterprises are DISH Corp., DISH LLC, and NagraStar. *Id.* ¶ 125. It is unclear which of the Racketeering Enterprises' contacts with Puerto Rico can be attributed to DISH Corp., as opposed to DISH LLC or NagraStar.

supported by any evidence. *See Boit*, 967 F.2d at 675. Plaintiffs do not say whether DISH Corp. has employees in Puerto Rico, whether it owns property in Puerto Rico, or anything else about the nature of DISH Corp's alleged business activities in Puerto Rico.[10] Without more, the Court does not "credit [Plaintiff's] conclusory allegations." *Ward*, 89 F.4th at 209 (quoting *Ticketmaster-N.Y.*, 25 F.3d at 203).

The attachment to Plaintiffs' sur-reply is no more enlightening. This attachment consists of selected pages from DISH Network's 2022 Annual Report and DISH Corp.'s 2022 SEC Form 10-K, which primarily detail DISH Corp.'s officers and relationships with other companies in which it holds an ownership stake. *See Pls.' Sur-Reply*, Attach. 1, *DISH Corp. Form 10-K*. But this attachment nowhere mentions Puerto Rico, nor does it provide any insight into DISH Corp.'s contacts with Puerto Rico. As such, it does not shed any light into whether the Court has personal jurisdiction over DISH Corp. pursuant to Puerto Rico's long-arm statute.

All told, Plaintiffs have not proffered any nonconclusory evidence connecting DISH Corp. to Puerto Rico. Therefore, the Court concludes that Plaintiffs failed to meet their burden of establishing personal jurisdiction over DISH Corp. pursuant to Puerto Rico's long-arm statute. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d

---

[10]     For their part, the DISH Corp. Defendants rely on the Declaration of Jason Anguiano, which represents that DISH Corp: 1) "does not directly maintain any retail stores, warehouses, offices, mailing addresses, bank accounts, telephone listings, agents, or other personnel" in Puerto Rico; 2) "does not have any officers in Puerto Rico"; and 3) "does not directly own, manage, or lease any real or tangible property in Puerto Rico, conduct business in Puerto Rico, or maintain a registered agent for service of process in Puerto Rico." *Def.'s Mot.*, Attach. 1, *Decl. of Jason Anguiano* at 2. The only portion of the Anguiano Declaration directly disputed by Plaintiffs is the representation that DISH Corp. does not conduct business in Puerto Rico.

610, 621 (1st Cir. 2001) (noting that "there can be no requisite nexus between the contacts and the cause of action if no contacts exist").

Plaintiffs attempt to overcome this lack of facts by asserting that NagraStar's contacts should be imputed to DISH Corp. for purposes of personal jurisdiction. *See Pls.' Opp'n* at 16 ("[T]he question [of] whether the DNC defendants transacted business within the meaning of Puerto Rico's long-arm statute depends on whether Plaintiffs can establish that the DNC defendants have sufficient minimum contacts with Puerto Rico through Nagrastar"). The First Circuit has cautioned that "generally, the jurisdictional contacts of a subsidiary corporation are not imputed to its parent." *Rodríguez-Rivera*, 43 F.4th at 161. "The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary." *Id.* (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980)). "To establish jurisdiction over a parent company, under Puerto Rico law, a plaintiff 'must produce strong and robust evidence of control by the parent company over the subsidiary, rendering the latter a mere shell.'" *Id.* (quoting *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 283-84 (1st Cir. 1999)).

In their briefing, Plaintiffs adduce evidence that DISH Corp. owns a 50% stake in NagraStar, and that NagraStar supplies DISH Corp. with "encryption and related security systems." *Pls.' Sur-Reply*, Attach. 1, *DISH Corp. Form 10-K* at 8. The Second Amended Complaint also alleges that NagraStar "is located onsite with Dish in Colorado." *Second Am. Compl.* ¶ 39. But contracting for services and sharing office

41

space falls short of "strong and robust evidence of control" that would "render[ NagraStar] a mere shell." *Rodríguez-Rivera*, 43 F.4th at 161 (quoting *De Castro*, 198 F.3d at 283-84). Accepting Plaintiffs' proffers as true, they simply establish that DISH Corp. and NagraStar maintain an ongoing business relationship. Accordingly, Plaintiffs have failed to overcome the "presumption of corporate separateness." *Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 27 (1st Cir. 2007) (quoting *Escude Cruz*, 619 F.2d at 905). Therefore, NagraStar's contacts with Puerto Rico cannot be imputed to DISH Corp. for purposes of the jurisdictional analysis.

Plaintiffs further attempt to use NagraStar to create personal jurisdiction over DISH Corp. by arguing that because "joint venturers are jointly and severally liable for the negligence of another joint venturer" under Colorado law, DISH Corp. is "equally liable for the actions of [its] Nagrastar partners." *Pls.' Opp'n* at 16-19. This argument confuses liability with personal jurisdiction. Plaintiffs' argument explicitly relies on Colorado state law. But in federal court, both the "source" and the "outer limits" of personal jurisdiction "are defined exclusively by the Constitution." *Foster-Miller*, 46 F.3d at 143-44 (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). Plaintiffs cannot use state law to overcome constitutional requirements.[11] *See Thomas v. Lazard Freres & Co.*, No. 3-01-CV-2160-R, 2002 U.S.

---

[11]   Plaintiffs also argue that they "are entitled to limited [jurisdictional] discovery to review the DNC and Nagrastar Joint Venture agreement to form Nagrastar LLC, by and between Echostar Communications Corporation and Kudelski S.A." *Pls.' Opp'n* at 17. A "plaintiff who seeks jurisdictional discovery must make 'a colorable claim of jurisdiction' and must show that it 'has been diligent in preserving [its] rights to be entitled to jurisdictional discovery.'" *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 128 (1st Cir. 2022) (quoting *Swiss Am. Bank, Ltd.*, 274 F.3d at 625-27). Because an examination of the agreements identified by Plaintiffs would only shed light on liability, not jurisdiction, the Court concludes that Plaintiffs' discovery request does not identify "a

Dist. LEXIS 9212, at *11 (N.D. Tex. May 21, 2002) (rejecting argument "that the exercise of specific jurisdiction is nevertheless proper under a joint enterprise theory" because "[t]his argument impermissibly confuses the concepts of liability and personal jurisdiction" (internal quotations omitted)).

In summary, the Court determines that Plaintiffs have not put forward any facts establishing either general or specific personal jurisdiction over DISH Corp. Therefore, Plaintiffs have not met their burden of demonstrating personal jurisdiction for Counts III through VI under Puerto Rico's long-arm statute. Accordingly, the Court grants DISH Corp.'s motion as to Counts III through VI of the Second Amended Complaint.[12]

### C.    Plaintiffs' RICO Claims

#### 1.    Personal Jurisdiction under RICO

Unlike Plaintiffs' other federal statutory claims, "there is general and widespread agreement that under at least some circumstances, the RICO statute permits courts to exercise personal jurisdiction over defendants lacking traditional minimum contacts with the forum." *Dispensa v. Nat'l Conf. of Catholic Bishops*, No. 19-cv-556-LM, 2020 U.S. Dist. LEXIS 89570, *22 (D.N.H. May 21, 2020). This power comes from 18 U.S.C. § 1965, which provides:

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any

---

sufficient predicate for in personam jurisdiction." *Id.* (citing *Blair v. City of Worcester*, 522 F.3d 105, 111 (1st Cir. 2008)). Accordingly, the Court denies Plaintiffs' request for jurisdictional discovery.

[12]    Plaintiffs submit "that the DNC defendants failed to raise personal jurisdiction defenses" with respect to Counts IV, VI, and VII and "have therefore, waived any defense available under those claims pursuant to Rule 12(h)." *Pls.' Opp'n* at 20-21. This ignores that the basis for personal jurisdiction for these Counts IV and VI is the same as for Counts III and V. The Court rejects Plaintiffs' waiver argument as to Counts IV and VI and addresses Count VII below.

district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, [subpoenas] issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such [subpoena] shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

Courts disagree on which subsection of 18 U.S.C. § 1965 authorizes nationwide service of process, and therefore allows the exercise of personal jurisdiction over defendants lacking sufficient minimum contacts to the forum. The majority of circuits to consider the question have concluded that § 1965(b) is the controlling provision. These courts hold that "a federal court may exercise personal jurisdiction over a civil RICO defendant otherwise lacking traditional minimum contacts with the forum state," if 1) "personal jurisdiction over another civil RICO defendant otherwise exists in the forum," and 2) "'the ends of justice require' that the court exercise personal jurisdiction over the civil RICO codefendant lacking the requisite contacts." *Dispensa*, 2020 U.S. Dist. LEXIS 89570, at *23; *see also Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir. 1986); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671-72 (7th Cir. 1987); *PT United Can Co. Ltd. v. Crown*

44

*Cork & Seal Co., Inc.*, 138 F.3d 65, 70-72 (2d Cir. 1998); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229-33 (10th Cir. 2006).

However, courts adhering to the majority approach are split on how to determine whether the "the ends of justice require" the exercise of personal jurisdiction over a defendant lacking sufficient minimum contacts. *Compare Butcher's Union*, 788 F.2d at 539 (requiring plaintiffs to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators"), *with Cory*, 468 F.3d at 1232 (concluding that "the 'ends of justice' analysis is not controlled by the fact that all defendants may be amenable to suit in one forum" and instead observing that "the 'ends of justice' is a flexible concept uniquely tailored to the facts of each case").

In contrast to the majority approach, two circuits—the Fourth Circuit and the Eleventh Circuit—have concluded that § 1965(d) is the controlling provision. *See Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). These circuits do not inquire into whether "the ends of justice require" the exercise of personal jurisdiction over defendants lacking sufficient minimum contacts. *See Republic of Panama*, 119 F.3d at 942; *ESAB Grp.*, 126 F.3d at 626.

The First Circuit has not decided whether § 1965(b) or § 1965(d) controls. At least three district courts in the First Circuit have sided with the majority. *See World Depot Corp.*, 2017 U.S. Dist. LEXIS 198814, at *14; *Kalika, LLC v. Bos. & Me. Corp.*, No. 15-14043-GAO, 2018 U.S. Dist. LEXIS 45612, at *21 (D. Mass. Feb. 28, 2018);

*Dispensa*, 2020 U.S. Dist. LEXIS 89570, at *25.  On the other hand, at least one district court in the First Circuit has adopted the approach of the Fourth and Eleventh Circuits.  *See Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 950-51 (D.R.I. 1990).  DISH Corp. urges the Court to adopt the majority approach, *Def.'s Reply* at 5-8, while Plaintiffs suggest the Court should follow the Fourth and Eleventh Circuits. *Pls.' Opp'n* at 22-23.

Ultimately, the Court determines that it need not decide whether § 1965(b) or § 1965(d) is controlling.  Although "courts should ordinarily satisfy jurisdictional concerns before addressing the merits of a civil action," the First Circuit has advised that this "rule is not mechanically to be applied."  *Feinstein v. Resol. Trust Corp.*, 942 F.2d 34, 40-41 (1st Cir. 1991), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).  "Where, as here, the affected defendant does not insist that the jurisdictional issue be determined first, and no special circumstances exist," district courts may "eschew[] difficult jurisdiction and venue-related issues in favor of ordering dismissal on the merits."[13]  *Id.*

Having thoroughly analyzed Plaintiffs' RICO claims in the context of the motions to dismiss filed by the Federal Defendants, the DISH/NagraStar Defendants, and the Toltec Defendants, the Court concludes that it is better to assess those claims on the merits than to break new ground on an unsettled jurisdictional issue.

---

[13]    Here, DISH Corp. encourages the Court to bypass its personal-jurisdiction defense and resolve Plaintiffs' RICO claims on the merits.  *See Defs.' Reply* at 7-8 ("Notwithstanding the forgoing, if the Court dismisses Plaintiffs' RICO claims pursuant to the 12(b)(6) motions filed by the Federal Defendants, the DISH/NagraStar Defendants and the Toltec Defendants, it is unnecessary for the Court to reach DNC's jurisdictional challenge or the applicability of RICO's nationwide service of process provision").

Accordingly, the Court bypasses DISH Corp.'s personal-jurisdiction challenge as to Plaintiffs' RICO claims.  *See Ogilvie v. Beale*, No. 93 C 2934, 1994 U.S. Dist. LEXIS 1123, at *1, *7, *15-24 (N.D. Ill. Feb. 3, 1994) (bypassing personal jurisdiction to dismiss civil RICO claim pursuant to Rule 12(b)(6)); *cf. World Depot Corp.*, 2017 U.S. Dist. LEXIS 198814, at *15 (formally dismissing civil RICO claim for lack of personal jurisdiction but also "noting that the complaint appears to fail to state a claim under the RICO statute").  The Court opts to dismiss Plaintiffs' RICO claims on the merits, for the reasons explained below.

### 2.   The Merits of Plaintiffs' RICO and RICO Conspiracy Claims

Plaintiffs' RICO claim falls short because their allegations rely too heavily on conclusory statements, and the conduct they allege does not establish a colorable RICO claim.  First, the allegations in the Second Amended Complaint are too threadbare to sufficiently plead DISH Corp.'s participation in a RICO enterprise. Second, even if the Court were to credit Plaintiffs' conclusory allegations, they nonetheless have failed to adequately plead predicate acts constituting a pattern of racketeering activity.

To state a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 472 U.S. 479, 496 (1985)).  "Racketeering activity" is defined to include a variety of predicate offenses, including mail fraud, wire fraud, and theft of trade secrets.  18 U.S.C. § 1961(1).  The civil-suit provision of the RICO

statute grants the right to sue to "[a]ny person injured in his business or property by reason of a violation of" the substantive provisions of the statute. *Id.* § 1964(c).

Civil RICO claims "premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). "[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997). "Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly." *Id.* Accordingly, "courts should strive to flush out frivolous RICO allegations at an early stage." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).

### a.   RICO Enterprise

In interpreting the RICO "enterprise" requirement, the Supreme Court has explained that "there is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." *Turkette*, 452 U.S. at 580. The enterprise concept is not unbounded, however, because an enterprise must be "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 583. In cases "involving an alleged associated-in-fact RICO enterprise, the existence

of the charged enterprise does not follow, ipso facto, from evidence that those named as the enterprise's associates engaged in crimes that collectively may be characterized as a pattern of racketeering activity." *United States v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004) (internal quotation omitted).

Put differently, "criminal actors who jointly engage in criminal conduct that amounts to a pattern of 'racketeering activity' do not automatically thereby constitute an association-in-fact RICO enterprise simply by virtue of having engaged in the joint conduct" and "[s]omething more must be found—something that distinguishes RICO enterprises from ad hoc one-time criminal ventures." *Id.* at 82. Ultimately, the First Circuit has "read *Turkette* to impose a requirement that those associated in fact function as an ongoing unit and constitute an ongoing organization. Also important to such an enterprise is that its members share a common purpose." *Id.* at 82 (internal quotations omitted). Finally, the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, especially where "plaintiffs attempt to camouflage conclusory statements as allegations of fact." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013). After sifting out Plaintiffs' conclusory statements, the RICO enterprise allegations as pleaded are wafer thin, and the well-pleaded facts remaining are insufficient to establish that the

alleged association in fact "function[ed] as an ongoing unit" or constituted an "ongoing organization." *Cianci*, 378 F.3d at 82 (internal quotations omitted).

As to the enterprise requirement, the Second Amended Complaint merely offers that, starting in 2017, all Defendants conspired at the outset and together "formed an Association in Fact, [including] Legal Entity Enterprises that would help the Association in Fact defendants advance the purpose and goals of the Racketeering Enterprises' conspiratorial objectives in misappropriating themselves from Plaintiff's DISME intellectual technology property, and trade secrets." *Second. Am. Compl.* ¶¶ 17-18; *see also id.* ¶¶ 126-28.   The Second Amended Complaint later clarifies that DISH Corp., along with DISH LLC and NagraStar, "are the Racketeering Enterprises." *Id.* ¶¶ 58, 125. Further, it avers that the "Association-In-Fact defendants knowingly agreed, combined, and conspired to conduct the affairs of the Racketeering Enterprise in attempting and committing theft of trade secrets through a hoax criminal investigation operation." *Id.* ¶ 155.

With respect to the participation of DISH Corp., the Second Amended Complaint asserts that the "Racketeering Enterprise . . . authorized the Dish/NagraStar defendants to form the Association in Fact, and use the Legal Entity Enterprises to advance its conspiratorial objective." *Id.* ¶ 95.  It also alleges that "[o]n August 7, 2017, the Racketeering Enterprise contracted the Toltec defendants to purchase two (2) Naicom TV Set Top Box receivers so that the Association in Fact defendants could conduct reverse engineering on Plaintiffs' Intellectual Technology." *Id.* ¶ 87.  However, besides alleging that Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and

Ms. Rinkel "supervised and approved" Mr. Jaczewski's payments to Naicom, the Second Amended Complaint fails to shed any additional light on the alleged RICO enterprise. *Id.* ¶ 135.

Collectively, these allegations are almost entirely vague, conclusory, and devoid of factual development. At best, they describe the inner workings of the alleged RICO enterprise in a few isolated instances. But they fail to adequately describe how, apart from these isolated instances, the alleged RICO enterprise "function[ed] as an ongoing unit" or constituted an "ongoing organization" during the two-plus years it allegedly existed. *Cianci*, 378 F.3d at 82 (internal quotations omitted). In other words, Plaintiffs offer virtually no well-pleaded facts explaining how the Defendants functioned together as an ongoing unit or organization.

Plaintiffs attempt to compensate for this lack of well-pleaded facts by offering that "[t]he Association-In-Fact defendants had an ongoing organizational framework for carrying out the Racketeering Enterprises' criminal objectives" because "[t]he Association-In-Fact defendants could not have carried out the intricate task of robbing Plaintiffs' Intellectual Property and Trade Secrets . . . unless it had some structure for making and communicating group decisions." *Second Am. Compl.* ¶ 130. The Court views this allegation as the epitome of a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The allegation merely restates the requirement that the enterprise have an organizational framework, supported by nothing but the circular logic that the purported enterprise could not have succeeded unless it were truly an enterprise. The

Court concludes that Plaintiffs' allegations do not adequately plead the existence of an "ongoing unit" or "ongoing organization" required for a RICO claim.  *Cianci*, 378 F.3d at 82 (internal quotations omitted).

Furthermore, "criminal actors who jointly engage in criminal conduct that amounts to a pattern of 'racketeering activity' do not automatically thereby constitute an association-in-fact RICO enterprise simply by virtue of having engaged in the joint conduct" and "[s]omething more must be found—something that distinguishes RICO enterprises from ad hoc one-time criminal ventures."  *Id.*; *see also Bachman v. Bear Stearns & Co., Inc.,* 178 F.3d 930, 932 (7th Cir. 1999) (noting that a contrary rule would erroneously make "every conspiracy to commit fraud . . . a RICO [enterprise] and consequently every fraud that requires more than one person to commit . . . a RICO violation").   While Plaintiffs assert that DISH Corp. has previously been involved in trade secret misconduct,[14] they do not allege that this alleged association in fact as a whole has engaged or will engage in any misconduct unrelated to the one-off goal of stealing Plaintiffs' intellectual property.   In its review of the Second Amended Complaint, the Court is unable to find the "[s]omething more" that "must be found . . . that distinguishes RICO enterprises from ad hoc one-time criminal ventures."  *Cianci*, 378 F.3d at 82.

---

[14]      These allegations are also conclusory.  Plaintiffs claim that "the Racketeering Enterprise's ongoing regular way of business is to attempt to steal Intellectual Property, Patents, and Trade Secrets, from their owners every time they can do so."  *Second Am. Compl.* ¶ 129.  This allegation is supported only by references to other lawsuits involving DISH, and Plaintiffs do not attempt to connect the facts of these lawsuits to the present case.  *Id.*

As noted earlier, Civil RICO claims "premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron*, 223 F.3d at 20. Ultimately, stripped of its conclusory allegations, the Second Amended Complaint does not assert sufficient facts to plead the existence of a RICO enterprise, and Plaintiffs' RICO claim must fail.

### b. Pattern of Racketeering Activity: Mail and Wire Fraud

Plaintiffs must also plead a "pattern of racketeering activity," which "means the commission of at least two related acts of racketeering activity during a period of ten years." *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 147 n.4 (D. Mass. 2023) (citing 18 U.S.C. § 1961(5)). "Racketeering activity" is defined to include a variety of predicate offenses, including mail fraud, wire fraud, and theft of trade secrets. 18 U.S.C. § 1961(1). The First Circuit has observed that the Supreme Court has found "that the civil RICO provision's 'by reason of' language contains both but-for causation and proximate causation requirements." *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 34 (1st Cir. 2013) (citing *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)).

Plaintiffs allege that the purported RICO conspiracy's pattern of racketeering activity involved numerous criminal acts, including:

> [A]cts indictable under Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343), Conspiracy to Commit Mail And Wire Fraud (18 U.S.C. § 1341), Theft Of Trade Secrets Under The Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.), while in addition, committing the possible underlying criminal offenses as prohibited under [the Computer] Fraud and Abuse Act (18 U.S.C. § 1030(a)); Stored Communications Act (18

U.S.C. §§ 2701-12); Digital Millennium Copyright Act (17 U.S.C. § 1201 et seq.), 18 U.S.C.A. § 2235-Search warrant procured maliciously; 18 U.S.C.A. § 1621- Perjury generally; 18 U.S.C.A. § 1001-Statements or entries generally, 18 U.S.C.A. § 912-Officer or employee of the United States; 18 U.S.C.A. § 2234-Authority exceeded in executing warrant; 18 U.S.C.A. § 2236-Searches without warrant, 18 U.S.C.A. § 1905-Disclosure of Confidential Information, while accomplishing their racketeering objectives.

*Second Am. Compl.* ¶¶ 132; *see also id.* ¶ 155.

Most of these alleged offenses are not "predicate acts" under the RICO statute. Mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and theft of trade secrets (18 U.S.C. §§ 1831-1832)[15] qualify; the rest do not. *See* 18 U.S.C. § 1961(1) (listing qualifying offenses).

"Mail or wire fraud requires proof of (1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of the scheme." *Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 9-10 (1st Cir. 2007). "The 'in furtherance' requirement is to be read broadly." *United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021). "[T]he mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotations omitted).

---

[15]    The statutory provision cited by Plaintiffs—18 U.S.C. § 1836—governs civil proceedings for misappropriation of trade secrets and is not listed as a predicate act in 18 U.S.C. § 1961(1). Since the Court assumes Plaintiffs' reference to 18 U.S.C. § 1836 was in error, the Court has recharacterized Plaintiffs' predicate-act allegations relating to theft of trade secrets as arising under 18 U.S.C. §§ 1831 and 1832.

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Humana*, 666 F. Supp. 3d at 154 ("Civil RICO claims based on the predicates of mail or wire fraud must meet the heightened pleading standard of Rule 9(b)"). A complaint must specify "the time, place, and content of an alleged false representation." *United States ex. rel. Kelly v. Novartis Pharms. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016) (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996)). Furthermore, "[t]he false or fraudulent representation [in a mail or wire fraud claim] must be material." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013) (first alteration in original) (citation omitted).

Plaintiffs' mail and wire fraud claims are limited to allegations that Mr. Jaczewski—in an operation "instructed" by Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and Ms. Rinkel and "supervised and approved" by the Federal Defendants—used an alias to purchase two Naicom set-top boxes and a monthly subscription he maintained for two years. *Second Am. Compl.* ¶¶ 132-37. In Plaintiffs' view, each purchase or payment "constitutes a wire fraud racketeering act since [Mr. Jaczewski, acting under the alias] Brian Parsons, posed as [a] legitimate client and used the interstate internet electronic services to access Naicom's website, and register online under the false pretenses of BRIAN PARSONS" and "made online payments through the use of interstate internet electronic services . . . to defraud and deprive Naicom Corporation of its legitimate products, intellectual property and trade secrets." *Id.* ¶ 134. Between the initial purchases and monthly subscription payments, Plaintiffs tally 22

acts of wire fraud.  *Id.* ¶ 135.  They also consider the initial purchase to constitute mail fraud because Mr. Jaczewski "posed as a legitimate client and used the United States Postal Services to have Naicom mail him the IPTV Set Top Box to a fake address."  *Id.* ¶ 133.

Accepting these allegations as true, the Court concludes that the facts are insufficient to support Plaintiffs' wire and mail fraud claims because the purportedly fraudulent representations (limited to Mr. Jaczewski's use of an alias for the set-top-box and subscription purchases) were not material.  Nor could the mail and wire fraud allegations be predicate acts for Plaintiffs' RICO claims because the set-top-box operation was not causally connected to Plaintiffs' damages.

A material statement "has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed" but plaintiffs "need not prove that the decisionmaker actually relied on the falsehood or that the falsehood led to actual damages."  *Appolon*, 715 F.3d at 368 (alteration in original) (citations and internal quotation omitted).  In *Appolon*, the defendant provided untrue responses on a mortgage application, in response to questions "that specifically sought information regarding the purchaser's income, assets, and intent to reside in the property."  *Id.*  The First Circuit considered the false responses material because the questions "were designed to assess the borrower's creditworthiness" and thus the statements "were capable of influencing [the lender's] decision."  *Id.*

The purported false statements here are far afield from providing false financial information on a mortgage application. Naicom's set-top boxes are commercial electronic products sold in retail stores like Sam's Club, and its subscription services are available on Apple's AppStore as the Naicom TV App. *Second Am. Compl.* ¶ 70 ("On February 16, 2017, Apple Corporation approved Naicom Corporation App for Apple's AppStore as Naicom TV App"); *id.* ¶ 71 ("On December 15, 2017, Sam's Club approved Naicom Corporation to officially launch and distribute in their retail stores [] Naicom's IPTV Set Top Box which offered the distribution of tv programming to customers in Puerto Rico"). Plaintiffs allege that Mr. Jaczewski committed wire and mail fraud by providing a false name "of BRIAN PARSONS, fake Phone (727) 409-9464, fake Email: parsons.brian716@outlook.com and Address: 9079 FOURTH STREET NORTH SAINT PETERS FL 33702 IP: 70.127.233.139, and made online payments through the use of interstate internet electronic services using the PM Visa ending in 2775." *Id.* ¶ 134. Plaintiffs also allege that Mr. Jaczewski used the alias of Brian Parsons when purchasing two Naicom set-top boxes. *Id.* ¶ 133.

The allegations confirm that Mr. Jaczewski used the false name of Brian Parsons. It is unclear, however, what Plaintiffs mean by a "fake Phone"—whether Mr. Jaczewski used a different phone as part of the alias or if the number provided was entirely made up. Plaintiffs have not adequately pleaded that the remaining "false" statements are actually false. The Second Amended Complaint does not allege that email services require customers to use their real name in their email address.

Thus, the Second Amended Complaint fails to allege that using an email with "parsons.brian" in the address is a false statement as there is no allegation that the address itself does not actually exist. It is unclear what Plaintiffs mean by a "fake" address, but the Second Amended Complaint does not allege that online retail customers are prohibited from having a product shipped to any address they desire, and Plaintiffs have offered nothing to suggest that this constitutes a false representation.[16] Likewise, nothing in the Second Amended Complaint suggests that the IP address or credit card involved false statements.[17]

The Court is thus left to consider whether Mr. Jaczewski's purchase of two commercially available products and an accompanying subscription using the name Brian Parsons can support Plaintiffs' alleged mail and wire fraud violations. The Court concludes that it cannot, because—absent allegations to the contrary—a customer providing a false name in such circumstances does not have "a natural tendency to influence, [nor is it] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Appolon*, 715 F.3d at 368. Nothing in the Second Amended Complaint suggests that the use of this alias was material to Plaintiffs' decision to sell Mr. Jaczewski their commercially available product. There

---

[16]     In theory, Mr. Jaczewski could have provided an address that was entirely made up. This seems unlikely, however, because the Second Amended Complaint alleges that the Defendants used the set-top boxes to attempt remote attacks on Naicom's servers. Had the boxes been shipped to an address that didn't exist, they would have been returned to Naicom as undeliverable, meaning that the Defendants could not have used them to launch sniffing attacks. The Plaintiffs do not appear to allege that the mailing address is a fake address, and the Court doubts that they could do so, based on the information in this case.

[17]     To the contrary, the Second Amended Complaint includes a table listing all the payments made to Naicom by Mr. Jaczewski posing as Brian Parsons. *Second Am. Compl.* ¶ 136. In the Court's view, these payments confirm that the credit card number provided by Mr. Jaczewski was valid.

is no allegation that Mr. Jaczewski was either known to Plaintiffs or prohibited from purchasing Plaintiffs' products. What is missing is an allegation that the alias could have reasonably affected the "decision of the decisionmaking body" (for example, Naicom's sales department's decision to process Mr. Jaczewski's payment or ship his order). Absent allegations regarding how Mr. Jaczewski's alias affected Naicom's decision to sell him their product, Plaintiffs have not pleaded material fraud with the requisite particularity. Plaintiffs' wire and mail fraud claims cannot stand and thus do not count as predicate acts in support of their RICO claim.

Furthermore, even if the Court did find the alleged misrepresentations material, Plaintiffs' claims fall short of the causation standard required for a wire or mail fraud–based RICO claim. *Neurontin*, 712 F.3d at 34 ("[T]he civil RICO provision's 'by reason of' language contains both but-for causation and proximate causation requirements" (citing *Holmes,* 503 U.S. at 268)). "The 'central question' in evaluating proximate causation in the RICO context 'is whether the alleged violation led directly to the plaintiff's injuries.'" *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35 (1st Cir. 2021) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). Quoting the U.S. Supreme Court, the First Circuit has noted that "[a] link [between the RICO predicate acts and plaintiff's injuries] that is too remote, purely contingent, or indirect is insufficient to show proximate cause." *Id.* (alterations in original) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). In addition, the First Circuit has identified "three functional factors with

which to assess whether proximate cause exists under RICO."[18]  *Id.* (quoting *Neurontin*, 712 F.3d at 35-36)).  The but-for causation question, in contrast, asks whether the plaintiff would have suffered the same injury absent the defendant's violation.  *See Neurontin*, 712 F.3d at 34.

Here, the alleged violations fail both causation tests because Plaintiffs portray the set-top-box operation as an unmitigated failure that only provided further proof that Naicom was a legitimate company.  Plaintiffs allege that "after testing Naicom TV several times to identify if it was providing DISH programming, on each case the test *revealed no DISH content.*"  *Second Am. Compl.* ¶ 90 (emphasis added).  After attempting to use the boxes to penetrate Plaintiffs' network and steal their secrets, the "Dish/NagraStar defendants also informed the Racketeering Enterprises that the Association in Fact defendants couldn't penetrate Naicom's Data Center computers, servers, encoders electronic security system, and that a physical intrusion was necessary to extract the intellectual property from the computers, servers, and encoders by physical access."  *Id.* ¶ 93.  Plaintiffs further allege that the operation did not yield evidence that would support a search warrant and thus the defendants had to provide "affidavits they knew contained material information known to be false

---

[18]     These factors are:

(1) "concerns about proof" because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," . . . (2) "concerns about administrability and the avoidance of multiple recoveries," . . . and (3) "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case[.]"

*Sterling Suffolk Racecourse*, 990 F.3d at 35-36 (quoting *Neurontin*, 712 F.3d at 35-36).

and perjured to create probable cause to gain legal access into Plaintiffs' private business." *Id.* ¶ 20.

As the Court understands the Second Amended Complaint, Plaintiffs allege that all Defendants conspired from the outset to steal their intellectual property. The set-top-box operation was an attempt to steal Plaintiffs' secrets by reverse engineering the technology and/or penetrating Plaintiffs' networks. But the operation failed. All the Defendants gained was more proof that Naicom was a legitimate company, and they then had to resort to falsifying affidavits to justify physical access to Naicom's Data Center (through a search warrant) that would finally allow them access to the desired technology. Plaintiffs have not alleged any harm prior or unrelated to the execution of the warrants. Nor have Plaintiffs alleged that the Defendants would not have sought and executed the search warrants had they not undertaken the set-top-box operation.

The Court concludes that there is no connection—proximate or but-for— between the allegedly fraudulent set-top-box purchase and Defendants acquiring Plaintiffs' intellectual property during the execution of the warrants. The alleged mail and wire fraud is "too remote" from Plaintiffs' alleged harms, *Hemi Grp.*, 559 U.S. at 9, and there is no indication that Plaintiffs would not have suffered their alleged harms absent the set-top-box operation. Plaintiffs' Second Amended Complaint thus falls short on both the materiality and causation standards for wire and mail fraud as predicate acts.

      **c.**   **Pattern of Racketeering Activity: Theft of Trade Secrets**

RICO predicate offenses include any act indictable under 18 U.S.C. § 1832, relating to theft of trade secrets under the DTSA. 18 U.S.C. § 1961(1). 18 U.S.C. § 1832 provides that "[w]hoever, with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information," or attempts to do so, shall be subject to criminal penalties. *Id.* § 1832(a)(1), (a)(4). "Trade secret" is defined broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," as long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3). Critically, however, the DTSA also provides that "[t]his chapter does not prohibit . . . any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State." *Id.* § 1833(a)(1).

DISH Corp. argues that Plaintiffs fail to state a claim under the DTSA because the conduct alleged in the Second Amended Complaint was "supported by allegations of legitimate government action." *Def.'s Mot.* at 18 (quoting *Kahre v. Damm*, No. 2:07-CV-00231-DAE-RJJ, 2007 U.S. Dist. LEXIS 95978, at *26 (D. Nev. Dec. 18, 2007)). DISH Corp. further submits that "all actions taken by DNC were performed under

color of federal law, and at the direction and supervision of the Federal Defendants to assist them in discharging their governmental duties, including assisting with the investigation into Naicom's IPTV business operations and executing search warrants signed by a magistrate judge." *Id.* at 20.

Plaintiffs respond that the conduct alleged in the Second Amended Complaint was not legitimate law enforcement activity because "the procurement of the issuance and execution of the search and seizure warrant and the subsequent warrantless search and seizure execution were illegal and unconstitutional." *Pls.' Opp'n* at 25. Because the DTSA contains an exception for governmental activity, and the parties dispute whether the conduct alleged in the Second Amended Complaint constitutes governmental activity, the Court addresses this issue first. To do so, the Court examines the validity of the warrants.

The relevant standard for evaluating the validity of a warrant is the *Franks v. Delaware* framework, which requires Plaintiffs to adequately allege that both (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007) (quoting *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978)). Plaintiffs cite ten statements that the Defendants allegedly "falsely submitted to the Court" in an affidavit supporting their search warrant application. *Pls.' Opp'n* at 25. The Court has examined each and concludes that none supports Plaintiffs' claims.

The first purportedly false statement identified by Plaintiffs is the Defendants' statement that they believed there was probable cause that Plaintiffs were violating copyright and money laundering laws. *Id.* at 25-26. Plaintiffs allege that this statement is false because:

> The execution of the search and seizure warrant in this case did not produce any criminal evidence whatsoever; there was no probable cause. That is why the United States never opposed Plaintiffs['] Motion for Return of Property under Rule 41(g) of the Fed.R.Crim.P. In fact, they didn't even contend the serious violations Plaintiffs imputed under *Franks* in the Rule 41(g) motion.

*Id.* at 26. This logic is unavailing. Plaintiffs cannot rely on the circular reasoning that the search's alleged failure to produce incriminating evidence thereby proves the Defendants could not have believed there was probable cause to search. *See Karamanoglu v. Town of Yarmouth*, 15 F.4th 82, 88 (1st Cir. 2021) (defining the probable cause inquiry as "whether, on balance, the facts *known to the officer at the time of the arrest* support probable cause" (emphasis in original)).

Equally inadequate is Plaintiffs' claim that the Federal Defendants' failure to oppose Plaintiffs' motion to return the seized property proves not only that the seized property was not incriminating, but also that there was no probable cause to search in the first place. *See United States v. Pierre*, 484 F.3d 75, 87 (1st Cir. 2007) ("Once seized property is no longer needed as evidence, a criminal defendant is presumed to have the right to its return"). The government's return of the seized hard drives and thumb drives, which—unlike drugs or illegal firearms—are not inherently contraband and can easily be downloaded or duplicated, is consistent with *Pierre*.

Furthermore, Plaintiffs are simply incorrect that success on a Rule 41(g) motion conclusively establishes the invalidity of a search. Rule 41(g) allows motions for return of property from "[a] person aggrieved by an unlawful search and seizure of property *or* by the deprivation of property." FED. R. CRIM. P. 41(g) (emphasis supplied). Without more, the property's return alone cannot demonstrate an absence of probable cause to search and seize in the first place. Ultimately, Plaintiffs' first purportedly false statement offers nothing to undermine the validity of the warrants and searches.

Second, Plaintiffs offer that the Defendants "assured the Court they had evidence based on an investigation conducted by NagraStar of Naicom's unauthorized use of Direct TV signal to distribute its programming to its paid subscribers." *Pls.' Opp'n* at 26. Plaintiffs assert that this statement was false because "[t]he United States did not produce any evidence as to the above allegations," whereas "Naicom did produce all the documentary evidence establishing that they were authorized to distribute the copyright material and running a legitimate IPTV system." *Id.*

Again, Plaintiffs appear to be suggesting that exculpatory evidence they produced during the warrants' execution proves that the underlying affidavit was false. These conclusory assertions tied together by circular logic do not adequately demonstrate the falsity of the affidavit. While Plaintiffs contend the affidavit did not "produce any evidence" supporting the suggestion that Naicom was distributing DirecTV content without authorization, the affidavit avers that Naicom's system displayed DirecTV error messages on at least 16 channels (and includes a photo of

65

the message), that Naicom's satellite dishes were precisely oriented in a manner necessary to receive DirecTV satellite signals, that representatives of the companies offering some channels Naicom purported to provide confirmed that Naicom was not licensed to provide them, and other indicia of piracy. *See Pls.' Opp'n to DISH/ NagraStar Mot.*, Attach. 1, *Aff. in Supp. of an Application for a Search Warrant* (*Warrant Aff.*). Simply put, Plaintiffs' argument that the affidavit contained no evidence of piracy is incorrect.

Third, Plaintiffs assert that, during a 2018 FBI site visit of Naicom's property, Mr. Vega "repeatedly told the agent that Naicom was a legal corporation and showed the agent a certificate from the National Cable Television Cooperative (NCTC) on the wall," yet the Federal Defendants still "filed the affidavit containing material false and perjured statements." *Pls.' Opp'n* at 26-27. It is not clear specifically which "materially false and perjured statements" Plaintiffs are referring to, but the affidavit states that the FBI called NCTC's management group, which confirmed that Naicom was *not* a member. *Warrant Aff.* ¶ 15. Nothing in Plaintiffs' assertion that Mr. Vega told the FBI his company was legitimate and showed them a certificate on the wall establishes that the affidavit's claim—that NCTC management represented to the FBI that Naicom was not a member—was perjured.

Fourth, Plaintiffs contend that the affidavit's claim that Naicom was using the NCTC certificate to create the appearance of legal access to channels was a "false and perjured statement" because an FBI agent took pictures of "Naicom's National Rural

Telecommunications Cooperative 'NRCT' Certificate" and Naicom had licenses with other networks. *Pls.' Opp'n* at 27.

Fifth, Plaintiffs focus on the affidavit's claim that an FBI agent spoke with NCTC management, who confirmed that Naicom was not a member of their organization. *Id.* Plaintiffs allege that this "is a false and perjured statement" because Naicom provided evidence that it is a member of the NRTC. *Id.*

The distinction between NCTC and NRTC here is somewhat confusing. It appears that Plaintiffs are alleging the FBI took pictures of a NRTC certificate on the wall but incorrectly referred to it in the affidavit as a NCTC certificate, or that the FBI mistook their NRTC certificate for an NCTC certificate. However, Plaintiffs also claim that the affidavit's assertion that they are not a member of the NCTC is a perjured statement because they provided evidence that they are a member of the NRTC. Plaintiffs offer no evidence that the latter statement was perjured because proving they are a NRTC member does not contradict the claim that they are not a NCTC member. To the extent the FBI may have misidentified a NRTC certificate as a NCTC certificate, the record does not suggest that this "allegedly false statement is necessary to the finding of probable cause," especially given the strength of the other supporting claims in the affidavit. *United States v. Patterson*, 877 F.3d 419, 424 (1st Cir. 2017) (quoting *Franks*, 438 U.S. at 156).

Sixth, Plaintiffs turn to the affidavit's assertion that FBI agents contacted officials at HBO and DirecTV, who verified that Naicom did not have a relationship with their organizations despite offering HBO content. *Pls.' Opp'n* at 27. Plaintiffs

claim that "[t]his is a false and perjured statement" because "Naicom provided evidence that it is licensed to distribute HBO and Cinemax programming." *Id.* at 27-28 (citing *Pls.' Opp'n to DISH/NagraStar Mot.*, Attach. 1 at 356 (HBO invoice dated August 31, 2019, for roughly $200 per month for "Cable — Private Home" services). Plaintiffs' claim is unpersuasive for two reasons: (1) this invoice for inexpensive "Cable – Private Home" services does not appear to provide evidence of a licensing agreement; and (2) Plaintiffs have not directly contradicted the purportedly perjured claim, which was that HBO and DirecTV officials represented to the FBI that they did not have a relationship with Naicom.

Seventh, Plaintiffs focus on the affidavit's claim that the "external appearance of the Data Center offered indicia of piracy," calling it a "false and perjured statement" because "[a]t the conclusion of the search and seizure warrant execution the FBI agents found that [] Naicom's equipment (encoders) were provided by the networks authorizing the programming distribution and that the use of the satellite was in fact to download the codes provided by the networks." *Pls.' Opp'n* at 28. Plaintiffs again rely on circular logic, as the discovery of exculpatory evidence at the conclusion of a warrant's execution does not provide a "substantial preliminary showing" that the underlying affidavit was perjured. *Franks*, 438 U.S. at 155-56.

Plaintiffs' eighth point suffers from the same defect. They claim that the affidavit's statements that there were suspicious financial transactions between Naicom and other businesses owned by Mr. Quinones and Mr. Vega were false and perjured because "[d]uring the execution of the Search Warrant S/A Lange

interviewed employees from the Business Office and was provided with financial records," which established "that none of the Corporations were involved in any money laundering activities." *Pls.' Opp'n* at 28-29. Again, the fact that a search did not uncover incriminating evidence does not establish that it was predicated on a perjured affidavit.

Plaintiffs' ninth point takes issue with the affidavit's request to seize computers and data based on claimed probable cause that they contained evidence. *Id.* Plaintiffs contend that this statement was perjured because "the FBI agents were not looking for any criminal evidence" during the search and they did "not find[] any evidence whatsoever of the crimes described in the warrant, which also denied any probable cause." *Id.* at 29. The Court does not fully follow Plaintiffs' logic across these seemingly contradictory assertions, but they appear to utilize the same circular reasoning (the assertion of probable cause was perjured because the resulting search "denied any probable cause"), along with the conclusory contention that the FBI was not actually looking for evidence. These claims do not undermine the validity of the warrants.

Tenth, Plaintiffs claim that the affidavit's request to seize evidence of statutory violations was "false and perjured" because the FBI did not find any evidence at the conclusion of the search warrant execution. *Id.* Beyond the fact that this argument relies on the same circular logic, an affidavit's request to seize "things and . . . records" is not an assertion of fact and cannot be false or perjured. *Id.*

To summarize, none of these purportedly false statements, alone or in combination, satisfies Plaintiffs' burden under the *Franks* standard to overcome the presumed validity of the warrants. Moreover, Plaintiffs offer several additional, similarly unavailing, arguments that their DTSA allegations do not constitute legitimate law enforcement activity.

Plaintiffs submit that the August 29, 2019 search was "illegal" and "warrantless" because "[t]he Federal and Dish/NagraStar Defendants knew for a fact that the first search warrant execution had already denied any criminal wrongdoing, and that the initial alleged probable cause had dissipated." *Id.* at 36. This assertion—that the Defendants knew probable cause had dissipated—is wholly conclusory (especially in light of Plaintiffs' argument that the entire investigation was a hoax, and the agents knew probable cause never existed). Furthermore, the warrant did not expire until September 4, 2019 and courts generally recognize a "reasonable continuation rule" providing that a search may be reasonably continued if the warrant remains valid.[19] *See United States v. Keszthelyi*, 308 F.3d 557, 568-569 (6th Cir. 2002) (describing the rule and collecting cases). Plaintiffs have not offered any well-pleaded, nonconclusory allegations suggesting that the continuance here was unreasonable.[20]

---

[19] The "reasonable continuation rule" requires the satisfaction of two conditions: 1) "the subsequent entry must indeed be a continuation of the original search, and not a new and separate search"; and 2) "the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances." *Keszthelyi*, 308 F.3d at 569.

[20] The closest Plaintiffs come to a nonconclusory allegation is their assertion that U.S. Attorney Rodriguez-Velez and Assistant U.S. Attorney Capo-Iriarte learned, after the execution of the first search warrant, that Naicom complied with "all the programming distribution contract and agreements." *Second Am. Compl.* ¶ 103. But this allegation is still conclusory, and it is undercut by

Plaintiffs also contend that the searches were unlawful because the Federal Defendants did not follow the procedure to obtain a Stored Communications Act warrant (also known as a SCA order). *Pls.' Opp'n* at 31-33, 35. But this argument lacks merit because the Federal Defendants appropriately obtained traditional search warrants in lieu of a SCA order.

SCA orders are different from traditional search warrants. As one court has explained:

> SCA warrants "are not like the search warrants used in the physical world: they are 'executed' when a law enforcement agent delivers (sometimes by fax) the warrant to the [service provider]. The [service provider], not the agent, performs the 'search'; the [service provider] 'produces' the relevant material to the agent; the user associated with the inbox often never learns that his inbox has been 'searched.' In sum, these are not search warrants at all and to call them such confuses legal terminology."

*In re Info. Associated with @gmail.com*, No. 16-mj-00757 (BAH), 2017 U.S. Dist. LEXIS 130153, at *52-53 (D.D.C. July 31, 2017) (quoting Paul K. Ohm, *Parallel–Effect Statutes and E–Mail "Warrants": Reframing the Internet Surveillance Debate*, 72 GEO. WASH. L. REV. 1599, 1610-11 (2004)). Additionally, the standard for a SCA order is "less stringent than the probable cause standard generally required for a search warrant." *United States v. Taylor*, 54 F.4th 795, 804 (4th Cir. 2022). Finally, even if the Defendants were seeking information protected by the SCA, the statute gives law enforcement the option of seeking either a SCA order or a traditional search

---

the sentence immediately following it, which alleges that the USAO Defendants instructed S/A Pearson "to order Darwin Quinones and Victor Vega to report to the FBI Offices in San Juan with the licensing contracts for an interview regarding Naicom's company." *Id.* Clearly, whatever U.S Attorney Rodriguez-Velez and Assistant U.S. Attorney Capo-Iriarte learned did not absolve Naicom of wrongdoing; otherwise, there would have been no need to conduct an interview.

warrant.[21]  *See* 18 U.S.C. § 2703(b) (the government may obtain "a court order for such disclosure under subsection (d) of this section" *or* "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure"); *id.* § 2703(c) (same).

Plaintiffs' argument is groundless because the Federal Defendants were primarily—if not entirely—seeking information not protected by the SCA. Regardless, they obtained search warrants for the facility and computer systems, thereby satisfying the requirements of the SCA.

Plaintiffs also submit once again that "[t]he DNC Defendants can't raise at this time the defense that the execution of the search and seizure warrant was authorized, legal and constitutional, which was waived during the Rule 41(g) proceedings and abandoned forever." *Pls.' Opp'n* at 39.

However, as the Court has already explained, the government's decision not to oppose a motion to return property does not affect the validity of the warrant or seizure. *See Pierre*, 484 F.3d at 87 ("Once seized property is no longer needed as evidence, a criminal defendant is presumed to have the right to its return").

Finally, although Plaintiffs contend that the search warrant executions were unlawful due to the involvement of the DISH/NagraStar Defendants, they acknowledge that "Congress has explicitly authorized" private parties to assist law enforcement in the execution of search warrants. *Pls.' Opp'n* at 33-34 (citing 18 U.S.C. § 3105). Further, although they contend that any civilian assisting with a

---

[21]    Further, "the statute offers no express direction as to when the government should seek a warrant versus" a SCA order. *Taylor*, 54 F.4th at 804.

search "must have been serving a legitimate investigative function," *id.* at 34, Plaintiffs fail to make any well-pleaded, nonconclusory allegation that the DISH/NagraStar Defendants were not serving such a function. Indeed, Plaintiffs do not offer any persuasive argument that would permit the Court to find that the DISH/NagraStar Defendants' presence rendered the search illegal.[22]

In sum, Plaintiffs have failed to adequately challenge the validity of the search warrants or establish that anything about the warrants' executions was unlawful. Plaintiffs have thus failed to plead a DTSA violation as a predicate act in support of their RICO claim because the allegations in the Second Amended Complaint merely suggest that the Defendants were engaging in legitimate law enforcement activity. *See* 18 U.S.C. § 1833(a)(1) ("This chapter does not prohibit . . . any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State"). Absent both an enterprise and any predicate acts, Plaintiffs' RICO claim (Count I) must be dismissed as to DISH Corp.

These same pleading shortfalls doom Plaintiffs' RICO conspiracy claim. *See Efron*, 223 F.3d at 21 (1st Cir. 2000) ("A conspiracy claim under section 1962(d) may survive a *factfinder's* conclusion that there is insufficient evidence to prove a RICO violation, but if the pleadings do not state a substantive RICO claim upon which relief

---

[22]     Plaintiffs quote *Bellville v. Town of Northboro*, 375 F.3d 25 (1st Cir. 2004), for the proposition that "it might be a better practice, if circumstances permit, for law enforcement officers to disclose to the magistrate that civilians will be involved in the execution of the search and for the warrant to indicate that the magistrate permitted this involvement." *Pls.' Opp'n* at 21 (footnotes omitted) (quoting *Bellville*, 375 F.3d at 33-34). They fail to quote the preceding sentence, which states, "we will not improvise a rule that seems unnecessary in light of the overarching requirement that the use of civilians in the execution of a search must still meet the constitutional standard of reasonableness." *Bellville*, 375 F.3d at 33. The Court declines Plaintiffs' invitation to convert the best practice outlined by the First Circuit into a rule.

may be granted, then the conspiracy claim also fails" (citations omitted) (emphasis in original)); *see also Salinas v. United States*, 522 U.S. 52, 64 (1997) ("A conspirator must intend to further an endeavor which, if completed, *would satisfy all of the elements of a substantive criminal offense*, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor" (emphasis supplied)).  As such, the Court also dismisses Plaintiffs' RICO conspiracy claim (Count II).

### D.  Plaintiffs' PTSA Claim

As noted above, the Second Amended Complaint states that the Court has federal question jurisdiction over Counts I through VI and supplemental jurisdiction over Count VII.  *Second Am. Compl.* ¶¶ 28-29.  Having dismissed Counts I through VI, the Court also dismisses Count VII pursuant to 28 U.S.C. § 1367(c)(3).[23]  *See* 28 U.S.C. § 1367(c)(3) (providing that "district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction").

## V.  CONCLUSION

---

[23]     Plaintiffs also suggest that the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 "because this suit is between a citizen of a domestic state (Naicom Corporation), (Kiaras, LLC), and (Paylink, LLC), and a citizen of a foreign state (Dish Network Corporation), (Dish Network, LLC) and (Nagrastar, LLC), and (Toltec Investigations, LLC)."  *Second Am. Compl.* ¶ 30.  The Supreme Court has "consistently interpreted § 1332 as requiring complete diversity: In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005).  Here, all Plaintiffs and several Defendants are residents of Puerto Rico.  *Second Am. Compl.* ¶¶ 33-36, 46-55.  Because there is not complete diversity, and "[i]ncomplete diversity destroys original jurisdiction with respect to all claims," Plaintiffs' assertion that the Court has diversity jurisdiction is incorrect.  *Allapattah*, 545 U.S. at 554.

The Court GRANTS Defendant DISH Network Corporation's Motion to Dismiss (ECF No. 136). The Court DISMISSES Counts I though VII of Plaintiff's Second Amended Complaint as pleaded against DISH Network Corporation.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2024