UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

NAICOM CORPORATION, et al.,            )
                                       )
            Plaintiffs,                )
                                       )
        v.                             )        No. 3:21-cv-01405-JAW
                                       )
DISH NETWORK CORPORATION, et al.,      )
                                       )
            Defendants.                )

**ORDER ON THE TOLTEC DEFENDANTS' MOTION TO DISMISS**

A limited liability company and its chief executive officer file a motion to dismiss plaintiffs' seven-count complaint, arising out of a criminal investigation wherein the defendants assisted federal law enforcement.  The Court grants the motion to dismiss, dismissing all seven counts.  The Court dismisses plaintiffs' RICO claims because plaintiffs have not adequately pleaded the existence of an enterprise, a pattern of racketeering activity, or a conspiracy.  The Court dismisses plaintiffs' Defend Trade Secrets Act claim because, taking plaintiffs' allegations as true, the private parties' assistance to law enforcement fell within the statutory exception for authorized law enforcement activity.  Finally, the Court dismisses plaintiffs' Computer Fraud and Abuse Act claim, Stored Communications Act claim, Digital Millennium Copyright Act claim, and Puerto Rico Uniform Trade Secrets Act claim because plaintiffs have not adequately alleged that these particular defendants are liable for the alleged statutory violations.

## I.     PROCEDURAL HISTORY

On August 27, 2021, Naicom Corporation, D&V IP Holdings, LLC, Paylink, LLC, and Kiaras, LLC, filed a seven-count complaint against approximately twenty known Defendants and two dozen unknown Defendants.[1]  *Compl.* (ECF No. 1).  The Court has twice permitted Plaintiffs to amend their complaint, and the Second Amended Complaint is now the operative complaint.  *Am. Compl.* (ECF No. 100); *Second Am. Compl.* (ECF No. 130).

The parties categorize the numerous Defendants into four groups: 1) DISH Network LLC, NagraStar LLC, Bert Eichhorn, Emily Rinkel, [2] Jordan Smith, and Kevin Gedeon (the DISH/NagraStar Defendants); 2) DISH Network Corporation (DISH Corp. or DNC); 3) Toltec Investigations, LLC and its President and CEO, Michael Thomas Jaczewski (the Toltec Defendants); and, 4) former U.S. Attorney Rosa E. Rodriguez-Velez, former Assistant U.S. Attorney Jose Capo-Iriarte, Assistant U.S. Attorney Nicholas W. Cannon (the USAO Defendants) and Special Agents and employees of the Federal Bureau of Investigation Douglas Leff, Bradley Rex, Lance Lange, Kevin Pearson, Clay Rehrig, Juan Galarza, and Jason Lopez (the FBI Defendants) (collectively, the Federal Defendants).

---

[1]      This is the second lawsuit arising out of the underlying events at issue.  On August 25, 2020, a group of plaintiffs, including many of Plaintiffs here, filed a *Bivens* action against many of the same defendants.  *See Quinones-Pimentel v. Cannon*, No. 3:20-cv-01443-JAW, 2022 U.S. Dist. LEXIS 48109, at \*2-3 (D.P.R. Mar. 17, 2022).  On March 17, 2022, the Court dismissed the plaintiffs' *Bivens* action. *Id.* at \*88.  The plaintiffs appealed, and the Court of Appeals for the First Circuit affirmed the Court's dismissal on October 27, 2023.  *Quinones-Pimentel v. Cannon*, 85 F.4th 63, 66-68 (1st Cir. 2023).

[2]      In their Second Amended Complaint, Plaintiffs use the spelling, "Rinkle."  *See, e.g., Second Am. Compl.* ¶ 43.  In her filings, however, Ms. Rinkel uses the spelling, "Rinkel."  *See, e.g., DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Mot. to Dismiss* at 1.  No doubt, Ms. Rinkel knows how to spell her own name, and the Court uses "Rinkel" throughout this order.

Plaintiffs allege: (1) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO); (2) a RICO conspiracy; (3) violations of the Computer Fraud and Abuse Act (CFAA); (4) violations of the Stored Communications Act (SCA); (5) violations of the Digital Millennium Copyright Act (DMCA); (6) violations of the Defend Trade Secrets Act (DTSA) by misappropriation of trade secrets; and (7) violations of the Puerto Rico Industrial and Trade Secrets Protection Act (PTSA) under the Uniform Trade Secrets Act (Law No. 80). *Second Am. Compl.* ¶¶ 124-202.

On October 31 and November 1, 2022, each of the four groups of Defendants filed a motion to dismiss the complaint. *Defs.' Toltec Investigations, L.L.C. and Mike Jaczewski's Mot. to Dismiss* (ECF No. 137) (*Defs.' Mot.*); *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Mot. to Dismiss* (ECF No. 134) (*DISH/NagraStar Mot.*)*; Def. DISH Network Corp.'s Mot. to Dismiss* (ECF No. 136); *Fed. Defs.' Mot. to Dismiss* (ECF No. 138).

On December 5, 2022, Plaintiffs filed a response to the DISH/NagraStar Defendants' motion to dismiss. *Mot. in Resp. to Dish/NagraStar Defs.' Mot. to Dismiss* (ECF No. 147) (*Pls.' Opp'n to DISH/NagraStar Mot.*). On January 18, 2023, Plaintiffs responded to the Federal Defendants' motion. *Mot. in Resp. to the Fed. Defs.' Mot. to Dismiss* (ECF No. 153). On February 21, 2023, the Toltec Defendants withdrew a section of their motion to dismiss, *Unopposed Notice of Partial Withdrawal of Toltec Investigations L.L.C. and Mike Jaczewski's 12(b)(2) Mot. to Dismiss* (ECF No. 163), and on February 27, 2023, Plaintiffs responded to the remainder of the Toltec Defendants' motion. *Mot. in Resp. to Toltec Investigations*

*and Mike Jaczewski's Mot. to Dismiss* (ECF No. 167) (*Pls.' Opp'n*).   On March 17, 2023, Plaintiffs responded to DISH Corp.'s motion.   *Mot. in Resp. to Dish Network Corp.'s Mot. to Dismiss* (ECF No. 179).

Each group of Defendants filed a reply in support of its motion.   *DISH Network L.L.C., NagraStar LLC, Kevin Gedeon, Bert Eichhorn, Emily Rinkel, and Jordan Smith's Reply* (ECF No. 164); *Fed. Defs.' Reply* (ECF No. 173); *Defs. Toltec Investigations L.L.C. and Michael Jaczewski's Reply in Supp. of Rule 12(b)(6) Mot. to Dismiss* (ECF No. 185) (*Defs.' Reply*); *DISH Network Corp.'s Reply in Supp. of Its Mot. to Dismiss* (ECF No. 196).

Finally, Plaintiffs filed sur-replies opposing each motion.   *Sur-Reply to the Dish Network, LLC and NagraStar, LLC Reply Mot. to Pls.' Resp. to Defs.' Mot. to Dismiss SAC* (ECF No. 182); *Sur-Reply Mot. to Fed. Defs.' Reply Mot. to Pls.' Resp. to Fed. Defs.' Mot. to Dismiss, SAC* (ECF No. 190); *Sur-Reply Mot. to the Toltec Investigations L.L.C. and Michael Jaczewski's Reply Mot. to Pls.' Resp. to Their Mot. to Dismiss SAC* (ECF No. 195) (*Pls.' Sur-Reply*); *Sur-Reply Mot. to Dish Network Corp.'s Reply Mot. to Pls.' Resp. to Mot. to Dismiss SAC* (ECF No. 199).

## II.   FACTS[3]

### A.   The Parties

In 2015 and 2016, Darwin Quinones-Pimentel and Victor Vega-Encarnacion founded Naicom Corporation (Naicom) and D&V IP Holdings, LLC (D&V) to offer

---

[3]      Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Plaintiffs' Second Amended Complaint. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st

Internet Protocol Television (IPTV) services. The companies are structured such that D&V holds the proprietary "intellectual technology" created by Mr. Quinones, and Naicom licenses the technology from D&V to distribute television programming. *Second Am. Compl.* ¶ 63. Kiaras, LLC (Kiaras) and Paylink, LLC (Paylink) are also joint ventures operated by Mr. Quinones and Mr. Vega. *Id.* ¶ 14. Kiaras is a human resources and time-and-attendance management company, and Paylink is a payroll processing company. *Id.* Both Kiaras and Paylink operate on the "PAYLINK AND KIARAS Cloud Network," another proprietary intellectual technology creation of Mr. Quinones. *Id.* ¶¶ 5-6. All four companies are corporations existing under the laws of the commonwealth of Puerto Rico with their places of business located at Building Centro de Seguros, 701 Ponce de Leon, Suite 208, San Juan, Puerto Rico 00907. *Id.* ¶¶ 33-36.

DISH Network Corporation (DISH Corp.) was organized in 1995 as a corporation under the laws of the State of Nevada, started offering the DISH® branded pay-tv service in March 1996, and is the nation's third largest pay-tv provider. *Id.* ¶ 37. DISH Network LLC (DISH LLC) was organized in 1987 as a Limited Liability Corporation under the laws of the state of Colorado. *Id.* ¶ 38.

NagraStar, LLC (NagraStar) is a joint venture between DISH Corp. and Kudelski SA formed in 1998. *Id.* ¶ 39. NagraStar's focus is delivering and maintaining security solutions for satellite and Internet-based television systems and

---

Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in plaintiffs' favor" (internal citation omitted)).

other connectivity initiatives in North America, and their mission also includes anti-piracy investigations and cooperation with law enforcement agencies. *Id.* Jordan Smith was at all relevant times a Manager of Field Security & Investigations and Senior Anti-Piracy Investigator for NagraStar. *Id.* ¶ 41. Bert Eichhorn and Emily Rinkel were Managers of Field Security & Investigations for NagraStar. *Id.* ¶¶ 42-43. Kevin Gedeon was a Manager of Fraud Investigations for NagraStar. *Id.* ¶ 44.

Toltec Investigations, LLC (Toltec) is a private investigative agency specializing in investigating the technology and distribution involved in IPTV systems, copyrights, patents, and "Trademark and Brand's Intellectual Property." *Id.* ¶ 40. Michael Thomas Jaczewski, a.k.a. Brian Parsons, was at all relevant times President and Chief Executive Officer of Toltec. *Id.* ¶ 45.

Rosa Emilia Rodriguez-Velez was at all relevant times the United States Attorney for the District of Puerto Rico. *Id.* ¶ 46. Jose Capo-Iriarte was an Assistant U.S. Attorney (AUSA) and head of the office's Criminal Division. *Id.* ¶ 47. Nicholas Cannon was an AUSA and Deputy Chief of the Cybercrimes Division. *Id.* ¶ 48.

Douglas Leff was at all relevant times Special Agent in Charge of the FBI's San Juan Division. *Id.* ¶ 49. Also in that division, Brad Rex was a Supervisory Special Agent, Lance Lange, Kevin Pearson, and Clay Rehrig were Special Agents, Juan Galarza a Computer Science Officer, and Jason Lopez an Evidence Technician. *Id.* ¶¶ 50-55.

### B.    Naicom's Origins

Between 2002 and 2012, Mr. Quinones developed the intellectual technology, including the source code, underpinning the Paylink and Kiaras Cloud Workforce

Management system and Naicom's IPTV services. *Id.* ¶ 5. The proprietary IPTV system was characterized as a Dynamic Internet Semantic Multicast Environment (DISME), which "enabled for the first time the broadcast of media via private networks and the internet, a new concept of IPTV service to distribute Live-Video Television Content (media) to residences, business, and primes customers." *Id.* ¶¶ 8-11.

By 2016, Mr. Quinones had completed all DISME technology alpha and beta tests and, alongside Mr. Vega, founded Naicom. *Id.* ¶ 12. Naicom is a network and internet communication platform that delivers live television, video on-demand content, internet, and wireless network services to subscribers worldwide. *Id.* Naicom also provides instant access to television shows, movies, and music/videos on-demand, and live sports and music events through Naicom's set-top box using IPTV and TV Everywhere (TVE) on any mobile device. *Id.*

Mr. Quinones and Mr. Vega registered Naicom as a closed corporation with the State Department of Puerto Rico and complied with all requirements as a legitimate IPTV business. *Id.* ¶ 66. Naicom also requested to manufacture its own brand of set-top boxes for end users through Informir LLC and acquired the programing licenses to distribute on-demand content in the United States, Puerto Rico, and the U.S. Virgin Islands through worldwide television network companies. *Id.* ¶¶ 67-68. In 2017, Naicom became a member of the National Rural Telecommunications Cooperative (NRTC). *Id.* ¶ 68.

On January 6, 2017, Naicom submitted a request to the Apple Corporation to have its TV App added to Apple's AppStore. *Id.* ¶ 69. Apple's legal department requested that Naicom produce all licenses authorizing the distribution of programming to Naicom's subscribers via Naicom's TV App. *Id.* On February 16, 2017, Apple approved Naicom's App for inclusion in the Apple AppStore. *Id.* ¶ 70. In December 2017, Sam's Club approved Naicom to launch and distribute Naicom's IPTV set-top box in their retail stores. *Id.* ¶ 71.

###   C.   Naicom's Information Security

Naicom went to great lengths to protect its intellectual technology. *Id.* ¶¶ 64-65. D&V and Naicom developed significant amounts of confidential and proprietary information, including non-public information relating to the DISME's source codes, patterns, formulas, algorithms, methods, and techniques; the technological vision for Naicom's IPTV content, distribution, marketing, servicing, research and development efforts and strategies; business and marketing performance strategies; financial data and business plans; technical data; customer development management programs; and subcontractor and vendor relationships (collectively, with the DISME, the Confidential Information or Naicom's Confidential Information). *Id.* ¶ 64.

To protect this information, Plaintiffs only installed on their servers, located at the Naicom's Data Center Facility, what is known as a compiled executable. *Id.* ¶ 65. The entire system was installed with an operating system that allowed the hard drive to be encrypted and, to access the servers, an authorized employee would need to enter the secure data facility and provide a username and password. *Id.* The server is not exposed to the internet and could only be accessed from inside the

facility.  *Id.*  The Confidential Information was also downloaded onto a hard disk and kept in a safe box.  *Id.*

Plaintiff companies took additional steps to safeguard their confidential information and proprietary data, including restricting employee access, requiring employees to execute non-disclosure agreements, imposing restrictions on remote access, and implementing encryption.  *Id.*  ¶¶ 72-76.

### D.   Negotiations with Claro Puerto Rico

In 2017, Naicom entered into negotiations with Claro Puerto Rico[4] (Claro) to distribute Naicom set-top boxes to Claro customers.  *Id.* ¶ 77.  Claro represented to Naicom that it had approximately 320,000 internet subscribers who received only five megabytes and thus could not subscribe to Claro's IPTV services, which required sixty megabytes to upload programming.  *Id.* ¶ 78.  During negotiations, Naicom and Claro entered into a mutual non-disclosure agreement prior to discussing and analyzing business information and the contents of the resellers' agreement.  *Id.* ¶ 79.  Claro's Product Development Officer, Anibal Rios, projected that the Claro-Naicom business alliance would bring in over $10,000,000 in monthly gross revenue for the first year and over $13,000,000 for the second year only taking into account Claro's corporate and residential subscribers in Puerto Rico.  *Id.* ¶ 80.  Naicom projected that the Claro-Naicom alliance would add 100,000 new corporate subscribers, plus another 150,000

---

[4]      Presumably because Claro Puerto Rico is a well-known business in Puerto Rico, the Second Amended Complaint does not describe Claro Puerto Rico except by name.  *See Second Am. Compl.* ¶ 68.  According to Wikipedia, Claro Puerto Rico is the one of the largest telecommunications companies in Puerto Rico.  *See Claro P.R.*, WIKIPEDIA (updated Oct. 14, 2023), *https://en.Wikipedia.org/wiki/Claro_Puerto_Rico.*

residential subscribers, bringing in projected monthly gross sales of $9,000,000 in the first year and $12,000,000 in the second year. *Id.* ¶ 81.

Claro had an existing contract with DISH Network Satellite TV, whereby DISH Network provided TV programming to Claro's internet subscribers who could not subscribe to Claro's IPTV services. *Id.* ¶ 82. The Naicom deal represented a cancellation threat to DISH Network's contract with Claro. *Id.* Claro was also considering shutting down its IPTV business division due to loss of revenue. *Id.* During the negotiations for the Claro-Naicom deal, Carlos Garcia, Claro's IPTV business manager, became privy to information that the Claro-Naicom deal would leave him jobless if Claro opted to shut down its IPTV division, which he managed. *Id.* ¶ 83. Mr. Garcia alerted DISH Network that the Claro-Naicom IPTV deal would lead to cancellation of the DISH contract with Claro, which the Plaintiffs allege led to "great animosity" between DISH Network and Naicom. *Id.* ¶ 84. On August 14, 2018, after a year of meetings between Naicom and Claro, Claro pulled out of negotiations without notice. *Id.* ¶ 85. Plaintiffs believe the DISH Network Defendants advised Claro to withdraw because the FBI was investigating Naicom and its founders. *Id.* ¶ 86.

### E. The DISH Network Investigation

On August 7, 2017, the DISH/NagraStar and DISH Corp. Defendants instructed the Toltec Defendants to purchase two Naicom TV set-top-box receivers so

that the Defendants[5] could reverse engineer Plaintiffs' intellectual technology. *Id.* ¶ 87. The Defendants conducted "sniffing" to determine the direction of Naicom TV traffic and locate Naicom's facility. *Id.* The Defendants also used sniffing to attack and penetrate Naicom's servers and computers, monitoring content and capturing information on the network under the supervision of the Federal Defendants. *Id.* One of the two set-top-box receivers was maintained by the DISH/NagraStar Defendants, the other by the Toltec Defendants. *Id.* ¶ 88. Both receivers were used for the attacks on Naicom's data center servers. *Id.*

Mr. Jaczewski purchased the two set-top boxes from Naicom under the false name of "Brian Parsons," and he provided false contact information. *Id.* ¶ 89. According to the Defendants, their investigation revealed that the receiver provided access to approximately forty-three channels, including Disney, TBS, ESPN, CNN, HBO, Showtime, and Cinemax. *Id.* ¶ 90. The Defendants downloaded the Naicom TV App through the Apple AppStore, which provided access to approximately forty-two channels, and tested Naicom TV several times to determine whether it was providing DISH programming. *Id.* The tests revealed no DISH content. *Id.*

The Defendants also contacted several media companies to inquire into whether Naicom had the appropriate licensing contracts to distribute its programming. *Id.* ¶ 91. On each occasion, the investigators were informed that Naicom was authorized to distribute the network's content. *Id.* The investigators

---

[5]    Plaintiffs often refer in the Second Amended Complaint to the "Association in Fact defendants." *See, e.g., Second Am. Compl.* ¶ 87. As the Court interprets Plaintiffs' complaint, this term refers to all Defendants collectively. *See id.* ¶¶ 17, 62 (listing all the Defendants as together "form[ing] an Association in Fact").

also discovered that Naicom's TV distribution technology was a threat to DISH Network and Sling TV, representing future competition for subscribers in Puerto Rico and the United States. *Id.* ¶ 92.

The DISH/NagraStar Defendants informed the other Defendants that they could not penetrate Naicom's Data Center computers and servers remotely, and thus direct, physical access would be required to extract Naicom's intellectual property. *Id.* ¶ 93. They knew that by entering the data center and shutting down the computers and servers, they would be able to bypass Naicom's security measures and access the internal hard drive. *Id.* ¶ 94.

According to Naicom, the Defendants knew that the intellectual property was extremely valuable and worth obtaining by any means necessary to advance their own television programming distribution system, and the Defendants conspired to misappropriate the technology for economic advantage. *Id.* ¶ 95.

The DISH/NagraStar Defendants thereafter filed a complaint with the Federal Defendants alleging that Naicom was running an IPTV pirate operation. *Id.* ¶ 98. Plaintiffs allege that the motive behind the complaint was to secure NagraStar and DISH Network's participation in a search of Naicom's Data Center and the seizure of Naicom's computers, servers, and other hardware containing Naicom's intellectual property and trade secrets, under the ruse of assisting the Federal Defendants in discovering incriminating evidence. *Id.* Acquiring this information has given the DISH/NagraStar Defendants a competitive advantage over Naicom. *Id.* ¶ 99.

### F.    Execution of the Search Warrants

### 1.    The First Search of Naicom's Data Center

On August 27, 2019, the Federal Defendants applied for two search warrants: one for Naicom Corporation located at Building Centro de Seguros, 701 Ponce de Leon, Suite 208, San Juan, Puerto Rico 00907, and the other for Naicom's Data Center located at Villa Fontana, 4SS N2 Via Josefina, Carolina, Puerto Rico.  *Id.* ¶¶ 19, 33, 105.  Plaintiffs allege that the search warrants were "issued under illegal and unlawful means" because the Federal Defendants provided affidavits they knew to contain false and perjured information.  *Id.* ¶ 20.

On August 27, 2019, the Federal and DISH/NagraStar Defendants executed the warrants, with the DISH/NagraStar Defendants "acting as federal agents."  *Id.* ¶ 21.  They seized documents, hard drives, and thumb drives, and downloaded data from the computers and servers containing Plaintiffs' Confidential Information.  *Id.* Plaintiffs allege that the Defendants knew from their investigation prior to the searches that Naicom was authorized to distribute its programming and was not pirating content.  *Id.* ¶ 101.  The Defendants also allegedly knew that the evidence collected in the Federal Defendants' investigative files "negated any criminal wrongdoing that Naicom's founders were committing the crimes charged in the search and seizure warrant affidavit and application."  *Id.* ¶ 102.

At the conclusion of the August 27, 2019 search, the Federal Defendants "learned that Naicom TV counted with all the programming distribution contract and

agreements"[6] and instructed Mr. Quinones and Mr. Vega to report to the FBI offices with their licensing contracts for an interview. *Id.* ¶ 103. This interview took place with the Federal Defendants sitting at one table and the DISH/NagraStar Defendants sitting at another table, allegedly posing as federal agents. *Id.* ¶ 104. The Defendants questioned Mr. Quinones about how Naicom acquired the IPTV distribution contracts and the technology used to distribute the programing. *Id.* They also inspected Naicom's contracts with content providers, which contained trade/business secrets and confidential information regarding DISME technology. *Id.*

### 2.   The Second Search of Naicom's Data Center

On August 29, 2019, U.S. Attorney Rodriguez-Velez and AUSAs Capo-Iriarte and Cannon instructed FBI Agents Lange and Pearson to return to Naicom's data center with DISH/NagraStar Defendants Smith, Gedeon, and Eichhorn. *Id.* ¶ 105. Naicom alleges that the USAO Defendants ordered this search despite knowing beforehand that Naicom was a legitimate business and there was no probable cause for continued investigation. *Id.* Without obtaining new warrants, Defendants again entered Naicom's data center facility, performed password resets, and installed "pen drives and other electronic instruments" to bypass security measures and download and seize Naicom's Confidential Information. *Id.* ¶¶ 22, 106. The agents used keys taken from Naicom's offices to enter Naicom's data center. *Id.* ¶ 105.

---

[6]   Here, the Court quotes the language in the Second Amended Complaint. *Second Am. Compl.* ¶ 103. In the context of this sentence, the meaning of the verb, "counted," is unclear. It would make more sense if the sentence used "complied with," rather than "counted." Whichever verb is correct, however, makes no difference in this Court's ruling on the motion to dismiss.

During the search, Agent Pearson contacted Naicom employee Jaime Echevarria and ordered him to come to the Data Center, as Agent Pearson wanted to speak with him, Mr. Quinones, and Mr. Vega.  *Id.* ¶ 107.  Upon arriving at the Data Center, Mr. Quinones observed Agents Lange and Pearson allowing Mr. Smith, Mr. Gedeon, and Mr. Eichhorn to access Naicom's Data Center computers, servers, and other hardware equipment without authorization from Naicom.  *Id.* ¶ 108.

During the search, Agents Pearson and Lange pressured Mr. Quinones to sign a hold-harmless document accepting that he had run a pirate operation in the past so that they could close the case.  *Id.* ¶ 109.  Otherwise, they threatened that they would shut down the Data Center operation.  *Id.*  Mr. Quinones refused, despite Agents Pearson and Lange imploring him to sign the document.  *Id.* ¶ 110.

Sometime thereafter, Mr. Vega arrived and, upon entering the Data Center, asked Agents Pearson and Lange if they had another search warrant to enter and search the Data Center.  *Id.* ¶ 111.  Agent Lange represented to Mr. Vega that the search warrant gave him ten days to come in and out and search the Data Center. *Id.*  Mr. Vega told Agent Lange that Agent Lange was violating the United States Constitution and Federal law.  *Id.*

Mr. Vega thereafter informed Agents Pearson and Lange that he had discovered via LinkedIn that the alleged FBI experts who executed the search and interrogated Mr. Quinones and him at the FBI offices were Kevin Gedeon, investigator for DISH Network, and Jordan Smith, Bert Eichhorn, and Emily Rinkel, investigators for NagraStar.  *Id.* ¶ 112.  Mr. Vega questioned Agents Lange and

Pearson as to why the FBI brought in his competition to search, inspect, and photograph private documents and allowed them access to computers and servers containing trade secrets, code sources, and business and intellectual property belonging to Naicom. *Id.* ¶ 113. Mr. Vega called his attorney and told him about the second search. *Id.* ¶ 114. After speaking with Agent Lange, the FBI agents and DISH/NagraStar investigators shut down Naicom's business operation and left the premises. *Id.*

### G. The Demand for the Return of Property Under Rule 41(g)

On September 6, 2019, the Plaintiffs filed a motion to demand the return of seized property under Rule 41(g) of the Federal Rules of Criminal Procedure. *Id.* ¶ 115. The District Court granted the Plaintiffs' Rule 41(g) motion on November 5, 2019, noting that the Government had waived objections to the court's Report & Recommendation. *Id.* ¶¶ 116-17.

### H. The Plaintiffs' Alleged Harm

The Plaintiffs allege that the criminal investigation caused significant damage to their business reputation and unfairly enriched their competitors. *Id.* ¶¶ 118-19. They allege that prior to the execution of the search warrants, they had a great reputation and were about to close on a $15,000,000 investment deal, but investors pulled out upon learning Naicom was under criminal investigation. *Id.* ¶¶ 120-21. The Plaintiffs also allege that Naicom was about to close a multimillion-dollar deal with Claro when Claro learned of the FBI's investigation and pulled out of negotiations. *Id.* ¶ 122. The Plaintiffs say they have lost subscribers because of negative publicity resulting from the investigation and that the Defendants' intrusion

into Naicom's Data Center computers, servers, and equipment caused damage leaving subscribers without tv programming services for several weeks and cost more than $500,000 to repair.  *Id.* ¶ 123.

## I.    The Plaintiffs' Causes of Action

The Plaintiffs bring seven counts.  Count One alleges that the Defendants violated RICO by forming an association in fact to advance the criminal objective of stealing Plaintiffs' intellectual property and trade secrets by committing mail and wire fraud, among other crimes.  *Id.* ¶¶ 124-53.

Count Two alleges that the Defendants engaged in a RICO conspiracy by conspiring to plan and execute the scheme outlined in Count One.  *Id.* ¶¶ 154-57.

Count Three alleges that the Defendants violated the CFAA by accessing Naicom's computer systems without authorization or in excess of authorization and obtaining and using valuable information from those computers.  *Id.* ¶¶ 158-68.

Count Four alleges that the Defendants violated the SCA by "willfully and intentionally access[ing] without authorization a facility which operates servers, encoders, computers, and telecommunications systems and technology, by electronically transmitting communications involved in Webservers, Email-Servers, Carrier Grade Routers which interconnected with local ISP providers through Border Gateway Protocols (BGP) in exchanging routing information between autonomous systems."  *Id.* ¶¶ 169-75.

Count Five alleges that the Defendants violated the DMCA by illegally obtaining Plaintiffs' copyright-protected software programs, documents, confidential information, and research.  *Id.* ¶¶ 176-84.

Count Six alleges that the Defendants violated the DTSA by stealing Plaintiffs' trade secrets, including DISME technology, intellectual property, and other confidential information. *Id.* ¶¶ 185-94.

Finally, Count Seven alleges that the Defendants misappropriated Plaintiffs' trade secrets in violation the PTSA. *Id.* ¶¶ 195-202.

## III.   THE PARTIES' POSITIONS

### A.   The Toltec Defendants' Motion to Dismiss[7]

The Toltec Defendants initially argue that "Plaintiffs cannot plead a viable RICO claim on the facts" because "Plaintiffs' RICO allegations consist solely of boilerplate and conclusory language," and they "cannot plead a viable RICO enterprise on the facts." *Defs.' Mot.* at 12 (capitalization altered).

The Toltec Defendants submit that "Plaintiffs do not (and cannot) allege a RICO enterprise involving the Toltec Defendants with an ongoing organization, devoted to a common illicit purpose, unrelated to legitimate law enforcement activity, that functioned as a continuing unit separate and apart from the pattern of racketeering activities alleged in this case." *Id.* at 15.

---

[7]    The Toltec Defendants initially filed their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). *Defs.' Mot.* at 1.  However, on February 21, 2023, the Toltec Defendants withdrew their Rule 12(b)(2) arguments and elected to proceed solely under their Rule 12(b)(6) arguments.  *Unopposed Notice of Partial Withdrawal of Toltec Investigations L.L.C. and Mike Jaczewski's 12(b)(2) Mot. to Dismiss* at 1 (ECF No. 163).  The Toltec Defendants explained that Toltec's predecessor had rented a storage unit in San Juan, Puerto Rico and, after Toltec's formation, Toltec "paid the storage fees associated with that unit until its rental was terminated." *Id.* at 1 n.1.  Although the Toltec Defendants represented that the storage unit was not used in connection with the Naicom investigation, they conceded that the storage unit's existence "nevertheless impacts the 12(b)(2) jurisdictional analysis." *Id.*
        Because the Toltec Defendants voluntarily withdrew their Rule 12(b)(2) arguments, the Court summarizes only their Rule 12(b)(6) arguments.

In support, the Toltec Defendants aver that they "were not parties to the searches and seizure conducted in August 2019 and are not subject to liability for merely assisting or performing a service for the alleged enterprise." *Id.*  Further, they contend that "Toltec's online purchase of the Naicom IPTV set top boxes and related subscription services using a pseudonym as part of an undercover federal investigation to detect pirated IPTV content is not mail or wire fraud." *Id.*  Finally, they note that "even when accepting Plaintiffs' allegations as true, the conduct they attribute to the Toltec Defendants was not in furtherance of some shared illicit purpose reminiscent of an enterprise, but rather was due to lawfully authorized investigative activity." *Id.* at 16.

The Toltec Defendants similarly argue that "Plaintiffs cannot plead the conduct of a criminal enterprise that is separate and apart from the conduct of Defendants' own affairs." *Id.* at 17 (capitalization altered).  This is so, they continue, because "Plaintiffs fail to plead any factual allegations establishing how the Toltec Defendants took part in the 'operation or management' of the alleged RICO enterprise." *Id.* at 18 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).

Next, the Toltec Defendants contend that they "committed no predicate offenses," *id.* at 18 (capitalization altered), because each of the predicate acts alleged by Plaintiffs "'[is] supported by allegations of legitimate government action' and 'even when viewed in the inflammatory light bestowed upon them by Plaintiff[s], in no way resemble criminal activity." *Id.* at 19 (alterations in *Defs.' Mot.*) (quoting *Kahre v. Damm*, No. 2:07-CV-00231-DAE-RJJ, 2007 U.S. Dist. LEXIS 95978, at *26 (D. Nev.

Dec. 18, 2007)).  The Toltec Defendants assert that "Plaintiffs do not (and cannot) plead" their mail and wire fraud allegations "with the requisite specificity," and they reiterate that "it is undisputed that the Toltec Defendants did not participate in the execution of the search warrants." *Id.* at 20.

In a similar vein, the Toltec Defendants maintain that they "lacked the criminal intent to engage in 'racketeering activity,'" *id.* (capitalization altered), because "all actions undertaken by the Toltec Defendants were performed under color of federal law, and at the direction and supervision of the Federal Defendants to assist them in discharging certain governmental duties." *Id.*

Even if Plaintiffs could sufficiently allege one or more predicate acts, the Toltec Defendants continue, "Plaintiffs cannot plead an actionable pattern of racketeering activity on the facts." *Id.* at 21 (capitalization altered).  According to the Toltec Defendants, "[w]hen, as here, a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim." *Id.* at 22 (quoting *Gamboa v. Velez*, 457 F.3d 703, 708-09 (7th Cir. 2006)).

Turning to Plaintiffs' RICO conspiracy claim, the Toltec Defendants argue that this claim "fails for two independent reasons." *Id.* at 23.  First, they submit that Plaintiffs' RICO conspiracy claim should be dismissed because "Plaintiffs have failed

to allege an actionable substantive RICO claim." *Id.* Further, they aver that "Plaintiffs' allegations of agreement and conspiracy are too vague and conclusory to state a claim for relief and consist of . . . formulaic recitations and conclusory allegations." *Id.* (internal quotations omitted).

The Toltec Defendants conclude their motion by incorporating by reference several arguments made by the Federal Defendants and the DISH/NagraStar Defendants. *Id.* at 23-24. They then ask the Court to dismiss Plaintiffs' claims with prejudice. *Id.* at 24.

### B.   Plaintiffs' Opposition

In response, Plaintiffs first argue that "the procurement of the issuance and execution of the search and seizure warrant and the subsequent warrantless search and seizure execution were illegal and unconstitutional." *Pls.' Opp'n* at 11 (capitalization altered). They contend that the Toltec Defendants helped procure search warrants containing "materially false representations and perjured testimony," which ultimately lacked probable cause. *Id.* at 12. Plaintiffs submit that "the alleged initial probable cause dissipated with the first search warrant execution," and thus the second search was "illegal and warrantless." *Id.* at 16.

Plaintiffs go on to argue that "the affidavit in support of the search warrant was defective on its face." *Id.* at 17 (capitalization altered). They contend that their computer systems were protected under the SCA, that the "conclusory" statements in the affidavit were insufficient to justify a search, and that the search ultimately did not comply with the SCA. *Id.* at 18-22. According to Plaintiffs, the Federal Defendants did not "seek authorization from the Magistrate to bring Plaintiffs'

competitors, the Dish/NagraStar[8] Defendants, to execute the search warrant," and although Plaintiffs concede that 18 U.S.C. § 3105 allows private parties to assist in the execution of a search warrant, they counter that "the statute clearly prohibited the executing officer from bringing to the search a party which had another interest, profit, or other marketplace incentive." *Id.* at 22. Further, Plaintiffs submit that the Toltec Defendants cannot rely on the search warrants because the Federal Defendants conceded the invalidity of the warrants when they did not oppose Plaintiffs' motion for return of property under Federal Rule of Criminal Procedure 41(g). *Id.* at 24-26.

Shifting gears, Plaintiffs contend that "the *Noerr-Pennington* doctrine does not apply to the case at bar." *Id.* at 26 (capitalization altered). This is so, they continue, because the Toltec Defendants "knew that the Dish/NagraStar grievance was a sham, knowingly assisted and carried out by the Federal defendants in order to gain access to Plaintiffs' premises and deprive them of their intellectual and trade secret property." *Id.* at 29 (emphasis omitted). Plaintiffs assert that the *Noerr-Pennington* doctrine "does not protect 'objectively baseless' sham litigation." *Id.* at 29.

Plaintiffs next argue that sovereign immunity does not bar their RICO claims. *Id.* at 30-31. They submit that "the charges in this civil action were not brought against the United States, but against specific federal official/agent[]/Dish/NagraStar and the Toltec Defendants, in their individual and personal capacities, for criminal

---

[8]    The Plaintiffs variously spell NagraStar with a capital "S" and with a lower-case "s." *Compare Second Am. Compl.* ¶ 21, *with Pls.' Opp'n* at 1. NagraStar spells its name with a capital "S." *Defs.' Mot.* at 1. Again, on the assumption that NagraStar knows how to spell its own name, the Court has used NagraStar and inserted this spelling in lower case references.

actions indictable under RICO, falling outside their scope of employment, and beyond their statutory authority," and thus, "Plaintiffs are allowed to prosecute under equitable civil remedies of the United States laws." *Id.*

Turning to the elements of the RICO counts, Plaintiffs submit that they have "pleaded a colorable RICO claim on the facts," *id.* at 31 (capitalization altered), because they have pleaded "enough facts in the [Second Amended Complaint to give the] Toltec defendants a fair notice of what there is, and the grounds upon [which] they rest." *Id.* at 32. Plaintiffs add that they have also "pleaded a cognizable RICO enterprise on the facts." *Id.* at 33-35 (capitalization altered).

Plaintiffs further maintain that they have sufficiently "pleaded conduct of a criminal enterprise that is separate and apart from the conduct of Defendants' own affairs." *Id.* at 35 (capitalization altered). In their view, the three required elements for establishing a RICO enterprise are: 1) "an ongoing organization, formal or informal"; 2) that "the various associate[s] function as a continuing unit"; and 3) that the enterprise exists "separate and apart from the pattern of activity in which it engages." *Id.* at 36 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Plaintiffs assert that while they "will ultimately need to establish each of these factors, at this early juncture it is sufficient to merely [] allege the existence of an association-in-fact enterprise." *Id.* (quoting *Pappa v. Unum Life Ins. Co. of Am.*, No. 3:07-cv-0708, 2008 U.S. Dist. LEXIS 21500, at *29-30 (M.D. Pa. Mar. 18, 2008)). They add that it is reasonable to infer from the complaint that "the Association in Fact defendants functioned as a continuing unit and had an ascertainable structure

distinct from that inherent in the conduct of a pattern of racketeering activity." *Id.* at 38.

Plaintiffs go on to argue that the "Toltec Defendants committed the predicate offense[s] and acted with criminal intent and in bad faith." *Id.* at 39 (capitalization altered). Plaintiffs emphasize that "the Toltec Defendants' mail and wire predicate acts are criminal and indictable." *Id.* at 40 (capitalization altereted). They also maintain that, even if the Toltec Defendants' misrepresentations did not amount to mail or wire fraud, they nevertheless contributed to the Defendants' theft of trade secrets under 18 U.S.C. §§ 1831 and 1832. *Id.* at 40.

Plaintiffs then argue that they have "pleaded a pattern of racketeering activities on the facts," *id.* at 42 (capitalization altered), because they "pleaded that the Association in Fact defendants . . . committed over 30 racketeering acts ranging from Mail and Wire fraud to theft of trade secrets, in a period of two years which began in July 2017 and ended in August[] 2019." *Id.* at 43. In their view, these facts "satisfied the closed period of repeated conduct," and there are also "allegations of a threat of continued activity, in reference to the Dish Network and NagraStar corporation joint venture." *Id.* at 43-44.

Finally, Plaintiffs submit that they have pleaded a viable RICO conspiracy claim because 18 U.S.C. § 1962(d) "criminalizes an agreement rather than any substantive criminal offense," meaning that "an agreement to associate with and participate in a yet-to-be-formed racketeering enterprise that would affect interstate commerce constitutes a completed offense under § 1962(d)." *Id.* at 46. Therefore,

Plaintiffs conclude that a substantive RICO claim is not required for a viable RICO conspiracy claim, although they maintain that they have adequately alleged a substantive RICO claim. *Id.*

### C.   The Toltec Defendants' Reply

In reply, the Toltec Defendants argue that "Plaintiffs' opposition fails to remedy pleading deficiencies." *Defs.' Reply* at 2 (capitalization altered).

The Toltec Defendants submit that "Plaintiffs fail to plead a cognizable RICO enterprise," *id.* at 3 (capitalization altered), because "Plaintiffs make no attempt to detail the structure of the alleged RICO enterprise, and instead argue that their [Second Amended Complaint] gives defendants 'fair notice' of their claims and the grounds upon which they rest." *Id.* (quoting *Pls.' Opp'n* at 32). After reviewing Plaintiffs' allegations, the Toltec Defendants aver that the "allegations convey neither the mechanics of a cohesive organization nor the distinct efforts of a collaborative, criminal operation guiding an enterprise's misdeeds." *Id.* at 4-5. Further, the Toltec Defendants reiterate that their "alleged association with the Federal and DISH/NagraStar Defendants to carry out legitimate law enforcement activity cannot constitute a cognizable RICO enterprise." *Id.* at 5.

Similarly, the Toltec Defendants maintain that "Plaintiffs fail to plead conduct of a criminal enterprise separate from Defendants' own affairs." *Id.* at 6 (capitalization altered). In particular, the Toltec Defendants contend that "Plaintiffs plead no factual allegations establishing how the Toltec Defendants took any part in the 'operation or management' of the RICO enterprise and fail to identify what role Toltec or Jaczewski had in knowingly 'directing' the enterprise's affairs." *Id.*

Shifting gears, the Toltec Defendants argue that "Plaintiffs allege no predicate offenses." *Id.* at 7 (capitalization altered).  They aver that, although Plaintiffs suggest the Toltec Defendants committed the predicate offenses of mail fraud, wire fraud, and theft of trade secrets, Plaintiffs "fail to plausibly plead allegations establishing the Toltec Defendants' personal participation in wrongful conduct that gives rise to these predicate offenses."  *Id.* at 7-8.  Further, the Toltec Defendants maintain that their rendering aid to an "undercover federal investigation to detect pirated IPTV content by making more than 30 undercover purchases from Naicom using a pseudonym does not give rise to mail or wire fraud predicate offenses."  *Id.* at 8.

Next, the Toltec Defendants briefly discuss the *Noerr-Pennington* doctrine.  *Id.* at 9.  They point out that their conduct "was determined credible for the Federal Defendants to seek—and a magistrate judge to independently find probable cause to issue—search warrants for Plaintiffs' business premises."  *Id.*  According to the Toltec Defendants, "that a magistrate judge found probable cause sufficient to issue search warrants based on this petitioning conduct is the clearest indicator that the conduct was not objectively baseless."  *Id.*

Turning back to the elements of Plaintiffs' RICO claim, the Toltec Defendants maintain that "the single, narrow scheme alleged . . . also forecloses the existence of any RICO pattern."  *Id.* at 10.  According to the Toltec Defendants, "[t]he First Circuit has 'consistently declined to find continuity where [as here] the RICO claim concerns a single, narrow scheme targeting few victims.'"  *Id.* (second alteration in original) (quoting *Giuliano v. Fulton*, 399 F.3d 381, 391 (1st Cir. 2005)).  Moreover, the Toltec

Defendants submit that "Plaintiffs' attempt to manufacture a pattern and threat of continued criminal activity by referencing past, unrelated litigation involving DISH or its corporate affiliates over a span of 20 years does not vary the character of the narrow, close-ended scheme alleged by them." *Id.* The Toltec Defendants note that this is "especially true" here because "Plaintiffs have failed to plausibly plead facts linking the Toltec Defendants to such litigation or demonstrating the relatedness necessary to show a pattern." *Id.*

The Toltec Defendants then briefly discuss Plaintiffs' RICO conspiracy claim. *Id.* at 11. They argue that this claim must be dismissed because "Plaintiffs fail to allege any facts showing that the Toltec Defendants consciously agreed to anything—much less that they agreed to commit at least two predicate acts or understood the overall objective of the alleged RICO enterprise and consciously agreed to further its affairs or facilitate any criminal 'endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense.'" *Id.* (alteration in original) (quoting *United States v. Rodríguez-Torres*, 939 F.3d 16, 23 (1st Cir. 2019)).

Finally, the Toltec Defendants suggest that "Plaintiffs' failure to address their remaining claims related to the Toltec Defendants renders them waived or abandoned." *Id.* at 12 (capitalization altered). As such, they conclude that "Plaintiffs' [Second Amended Complaint] should be dismissed with prejudice." *Id.*

### D.    Plaintiffs' Sur-Reply

In their sur-reply, Plaintiffs suggest that the Court should "either reject and/or strike" any portion of the Toltec Defendants' reply "not addressing a new matter in compliance with their request for leave to file the Reply." *Pls.' Sur-Reply* at 2.

Plaintiffs further submit that, upon close examination, the Toltec Defendants'
"factual argument and legal discussion[] did not contribute anything new that they
had not already discussed" in their motion to dismiss.  *Id.* at 3.  Plaintiffs also ask the
Court to strike all the defenses raised in the Toltec Defendants' motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(f).  *Id.* at 15.

Addressing the substance of the Toltec Defendants' reply, Plaintiffs reiterate
that the factual allegations in the Second Amended Complaint "clearly show that
Plaintiffs are entitled to relief."  *Id.* at 6.  Although Plaintiffs concede that the "factual
allegations are 'circumstantial,'" they insist that the Second Amended Complaint
"provides a plausible basis . . . for believing that [the] TOLTEC defendants
participated in the crimes charged."  *Id.* at 8.

With respect to the enterprise element of their RICO claim, Plaintiffs aver that
the record reveals the Toltec Defendants "provided the Federal Defendants [with]
false information" which was then incorporated into the search warrant affidavits.
*Id.* at 10.  Plaintiffs therefore assert that the Toltec Defendants "used their resources
to fabricate evidence to support the Magistrate Judge's probable cause finding."  *Id.*

Regarding the RICO predicate offenses, Plaintiffs assert, in bold and without
providing citations, that the record "clearly establishes that all TOLTEC had to do
was call Disney, Turner, FOX or even NRTC and ask if Naicom was in fact authorized
to distribute their content, and it would have ended the investigation."  *Id.* at 11
(emphasis omitted).

Turning to their RICO conspiracy claim, Plaintiffs submit that a "RICO conspiracy and a RICO violation do not necessarily require the participation of the same people," because "the agreement to violate RICO by conspiring to commit racketeering acts could be made by a different group of people than the ones who end up committing the substantive violation." *Id.* at 12. Applying general civil conspiracy principles, Plaintiffs further declare that they "have pleaded a prima facie claim for relief for misappropriation of trade secrets against all the defendants charged." *Id.* Plaintiffs emphasize that "[l]egal impossibility is not a defense to a charge of attempted or conspiracy misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a)(4)" because the "impossibility of achieving the goal of a conspiracy is irrelevant to the crime itself." *Id.* at 13

Finally, with respect to Counts III through VII of the Second Amended Complaint, Plaintiffs claim that their allegations could, in the light most favorable to them, be construed to allege that the Toltec Defendants acted in concert with the other Defendants "to commit the misappropriation." *Id.*

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.    DISCUSSION

### A.    Plaintiffs' Claims Against the Toltec Defendants

As an initial matter, the Court attempts to clarify which of the seven counts in the Second Amended Complaint implicate the Toltec Defendants. The Second Amended Complaint, which spans eighty-seven pages, is far from a model of clarity. Counts I and II, which respectively allege a RICO violation and a RICO conspiracy, facially implicate the Toltec Defendants. *See, e.g.*, *Second Am. Compl.* ¶ 126 (describing the Toltec Defendants as being part of the association in fact); *id.* ¶ 155 (alleging that the association in fact "knowingly agreed, combined, and conspired to conduct the affairs of the Racketeering Enterprise").

The remaining Counts, Counts III through VII, are confusing. None of Plaintiffs' allegations related to these Counts specifically mentions either of the Toltec Defendants. *Id.* ¶¶ 158-202. However, some of the allegations related to Counts III through V do refer to Brian Parsons as one of the DISH/NagraStar Defendants. *Id.* ¶¶ 162-63, 171, 178-79. Brian Parsons is not a real person; rather it is the alias used by one of the Toltec Defendants, Mr. Jaczewski, to purchase the Naicom set-top boxes and subscription. *See id.* ¶¶ 133-35. Adding to the confusion, Counts III through V are based on the August 27 and 29, 2019 search warrant executions. *Id.* ¶¶ 160-61, 171, 178. Yet Plaintiffs nowhere allege that Mr. Jaczewski used the Brian Parsons alias in connection with, or was even present during, the search warrant executions. Plaintiffs also do not dispute the Toltec Defendants' contention that "Toltec and Jaczewski . . . were not parties to the searches and seizure that took place at Plaintiffs' business premises, were not in Puerto Rico, and did not participate in those searches in any way." *Defs.' Mot.* at 1. Therefore, the Court finds

the allegations that Brian Parsons was present during the search warrant executions perplexing.

The allegations related Plaintiffs' DTSA and PTSA claims (Counts VI and VII) are no less puzzling. Apart from the statement, without elaboration, that Count VII applies to all Defendants, the Court cannot find any reference to the Toltec Defendants in the allegations supporting these Counts. *Second Am. Compl.* ¶¶ 185-202. However, in discussing the DTSA as a predicate offense for their RICO claims, Plaintiffs repeatedly refer to Brian Parsons, again characterizing Brian Parsons as one of the DISH/NagraStar Defendants. *Id.* ¶¶ 138-41.

Further, while Counts III through V are limited to the search warrant executions, the scope of Plaintiffs' DTSA and PTSA claims is unclear. Plaintiffs mention only the search warrant executions with respect to their standalone DTSA claim (Count VI), *id.* ¶ 188, and they do not mention any dates or specific conduct when discussing their PTSA claim (Count VII).[9] *See id.* ¶¶ 195-202.

---

[9]     With respect to their PTSA claims, Plaintiffs first allege that:

> The Confidential Information the Dish/NagraStar defendants Kevin Gedeon, Jordan Smith, Bert Eichhorn, Emily Rinkle misappropriated from Plaintiffs through association, assistance and facilitation of the [Federal Defendants], exfiltrated from the D&V IP Holdings and Naicom computer systems trade secrets under Puerto Rico law, as discussed above, and in keeping with the definition of trade secrets under Puerto Rico law: information, including a formula, pattern, compilation, program, device, method, technique, or process, that (A) Derives actual or potential independent economic value, from not being generally known, and not being readily ascertainable by proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy, pursuant to Section 11 of Puerto Rico Industrial and Trade Secrets Protection Act (Law No. 80, of June 3, 2011).

*Second Am. Compl.* ¶ 197. Plaintiffs subsequently allege that:

Complicating matters, when discussing the PTSA as a RICO predicate act, Plaintiffs appear to refer to conduct beyond the search warrant executions. Plaintiffs generally allege that "[b]eginning on or before August 7, 2017" several Defendants, including Brian Parsons: "stole, and without authorization misappropriated, took, carried away, or by fraud, artifice, or deception obtained trade secrets," *id.* ¶ 138; "did without authorization, spy, reverse engineered, copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, and/or conveyed intellectual property and trade secrets," *id.* ¶ 139; and "misappropriated, obtained, or converted without authorization [the trade secrets] to the economic benefit of [the] Racketeering Enterprises and other defendant coconspirators." *Id.* ¶ 140. Additionally, Plaintiffs clearly allege that the *Federal Defendants* violated the DTSA on August 27 and 29, 2019 (the dates of the search warrant executions) by "facilitating and assisting" the entry of several Defendants, including Brian Parsons, into Naicom's facility to steal Naicom's trade secrets. *Id.* ¶ 141. However, it is unclear whether this allegation encompasses Defendants other than the Federal Defendants.

The only clarity the Court can glean from Plaintiffs' opposition to the Toltec Defendants' motion to dismiss is Plaintiffs' averment that the Toltec Defendants are liable under the DTSA because the statute "prohibits the attempt or conspiracy to

---

Each Defendant disclosed, received, and used these misappropriated trade secrets without Plaintiff's consent, knowing or having reason to know that the trade secrets were acquired by improper means.

*Id.* ¶ 199.

illegally obtain a trade secret," including through misrepresentations. *Pls.' Opp'n* at 40. Plaintiffs' sur-reply further clarifies that Plaintiffs are alleging the Toltec Defendants "used their resources to fabricate evidence to support the Magistrate Judge's probable cause finding." *Pls.' Sur-Reply* at 10-11.

The Court finds this latter clarification helpful because the Second Amended Complaint does attribute the information supporting the search warrants to all association-in-fact Defendants, including the Toltec Defendants. *See Second Am. Compl.* ¶ 90 ("According to the affidavit filed in support of the search warrant application the Association in Fact defendants collectively represented to the Court that their investigation revealed . . ..").  However, notwithstanding the conclusory references to Brian Parsons, the Second Amended Complaint fails to connect the Toltec Defendants to the execution of the search warrants.

Based on the content of Plaintiffs' Second Amended Complaint and Plaintiffs' statements in opposition to the Toltec Defendants' motion to dismiss, the Court takes the following actions.  First, the Court narrows the scope of the DTSA inquiry, both the standalone DTSA claim and the alleged DTSA violation incorporated into Plaintiffs' RICO claims,[10] to include only conduct associated with the issuance and execution of the search warrants.  The Court discards all other allegations related to the DTSA as insufficiently pleaded.  Even when narrowed, however, the DTSA inquiry does implicate the Toltec Defendants, since the Second Amended Complaint

---

[10]     Although the allegations related to the standalone DTSA claim do not mirror the DTSA allegations accompanying Plaintiffs' RICO claims, the Court sees no reason why there would be different factual bases for what is effectively the same violation.  Therefore, the Court reads the allegations in Count VI as coextensive with the allegations in the RICO Counts.

alleges the Toltec Defendants assisted in the procurement of the allegedly unconstitutional search warrants.  Therefore, the Court will assess the merits of Plaintiffs' DTSA allegations.

Next, because Plaintiffs' CFAA, SCA, and DMCA claims (Counts III through V) are premised on the search warrant executions, the Court dismisses those claims with respect to the Toltec Defendants.  *See Second Am. Complaint* ¶¶ 160-61, 171, 178.  The Court is unconvinced that the Toltec Defendants were present during the search warrant executions, especially because Plaintiffs do not dispute the Toltec Defendants' representation that they were not present.  Therefore, Plaintiffs have failed to carry their burden of pleading "factual content that allows the court to draw the reasonable inference that [the Toltec Defendants are] liable for the misconduct alleged."[11]  *Iqbal*, 556 U.S. at 678.

Finally, because Plaintiffs' PTSA claim does not mention the Toltec Defendants, or any specific conduct, the Court dismisses this claim as insufficiently pleaded with respect to the Toltec Defendants.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs' obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

---

[11]     Plaintiffs may have intended for Counts III through V to encompass the Toltec Defendants based on the Toltec Defendants' furnishing of allegedly false information for use in the search warrant application.  Even so, Plaintiffs have only alleged that the search warrant application contained ten misrepresentations.  In accordance with the Court's discussion of these ten misrepresentations below, Plaintiffs have failed to show that any of the allegedly false statements were actually false.  Without these ten allegedly false statements, Plaintiffs' allegations that the Toltec Defendants supplied misinformation that somehow made its way into the search warrant application are threadbare and conclusory.  Therefore, even if Counts III through V were premised on this theory, the Court would dismiss these Counts for the same reasons the Court dismisses Plaintiffs' DTSA claim.

will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)).  The facts connecting the Toltec Defendants to the PTSA claim are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33-34 (1st Cir. 2022) (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

To summarize, the Court reads the Second Amended Complaint as potentially alleging Counts I, II, and VI against the Toltec Defendants.  The Court assess the merits as to those Counts only.  The Court dismisses Counts III, IV, V, and VII as insufficiently pleaded with respect to the Toltec Defendants.[12]

## B.   Plaintiffs' Request to Strike the Toltec Defendants' Reply

Before turning to the merits of the Second Amended Complaint, the Court briefly addresses Plaintiff's contention that it should "reject and/or strike" any portion of the Toltec Defendants' reply "not addressing a new matter." *Pls.' Sur-Reply* at 2. Plaintiffs submit that upon "close examination," "the Toltec defendants' factual argument and legal discussion[] did not contribute anything new that they had not already discussed in their [motion to dismiss], and their Reply is nothing more than a second response." *Id.* at 3.

The Court disagrees.  Plaintiffs rely on District of Puerto Rico Local Civil Rule 7(c), which provides:

---

[12]   Even if these claims had been sufficiently pleaded against the Toltec Defendants, the Court still would have dismissed them.  As discussed in the Court's order on the DISH/NagraStar Defendants' motion to dismiss, Counts III, IV, V, and VII lack merit because, even accepting as true all the well-pleaded facts in the Second Amended Complaint, the Defendants' conduct was authorized pursuant to valid search warrants.  Because Plaintiffs fail to impugn the validity of the search warrants, they cannot state a claim for relief against any of the Defendants under the CFAA, SCA, DMCA, or PTSA.

> With prior leave of court and within seven (7) days of the service of any objection to a motion, the moving party may file a reply, which shall not exceed ten (10) pages in length, and which shall be strictly confined to responding to new matters raised in the objection or opposing memorandum.

As this rule makes clear, a reply is proper so long as it addresses "new matters raised in the . . . opposing memorandum."

Plaintiffs reason that the Toltec Defendants' reply is noncompliant because it contains the same general arguments as their motion to dismiss. For example, Plaintiffs ask the Court to strike the portions of the Toltec Defendants' reply discussing the enterprise and predicate-act elements of RICO because "these issues were raised and discussed" in the Toltec Defendants' motion to dismiss. *Pls.' Sur-Reply* at 5.

But this reads Local Civil Rule 7(c) too narrowly and the Toltec Defendants' reply too strictly. The Court does not view Local Civil Rule 7(c) as prohibiting a reply from expanding upon issues raised both in the original memorandum and response so long as the response addressed the issues generated in the motion. *See Torres-Talavera v. Ford Motor Co.*, 965 F. Supp. 2d 220, 222 n.3 (D.P.R. 2013) (noting that, pursuant to Local Civil Rule 7(c), the plaintiffs' sur-reply was "confined to respond to the arguments made in defendant Ford's reply"). Local Civil Rule 7(c) is a rule of basic fairness, clearly prohibiting the use of a reply to introduce new arguments not previously addressed by the respondent.

The Court's review of the reply reveals that the Toltec Defendants are responding to the arguments in Plaintiffs' opposition brief. *See, e.g.*, *Defs.' Reply* at 6 ("Plaintiffs' Opposition fails to address the deficiencies raised in the Toltec

Defendants' motion to dismiss concerning Toltec and Jaczewski's conduct or participation in the 'enterprise's affairs'"). While the Toltec Defendants' reply discusses the same subject matter as their motion to dismiss, the specific argumentation in the reply is different and responds to the arguments in Plaintiffs' opposition brief. Therefore, the reply is proper under Local Civil Rule 7(c).

The Court denies Plaintiffs' request to strike.[13]

## C.  Plaintiffs' RICO and RICO Conspiracy Claims

To state a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 472 U.S. 479, 496 (1985)). "Racketeering activity" is defined to include a variety of predicate offenses, including mail fraud, wire fraud, and theft of trade secrets. 18 U.S.C. § 1961(1). The civil-suit provision of the RICO statute grants the right to sue to "[a]ny person injured in his business or property by reason of a violation of" the substantive provisions of the statute. *Id.* § 1964(c).

Civil RICO claims "premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). "[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules

---

[13]     Plaintiffs also suggest that the Court should strike all the defenses raised by the Toltec Defendants pursuant to Federal Rule of Civil Procedure 12(f) because "there are not factual issues nor issues of law to be resolved before the validity of the defenses in the present context may be determined." *Pls.' Sur-Reply* at 15. The Court declines to do so.

with the necessity of preventing abusive or vexatious treatment of defendants." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997). "Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly." *Id.* Accordingly, "courts should strive to flush out frivolous RICO allegations at an early stage." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).

### 1. RICO Enterprise

#### a. Legal Framework

In interpreting the RICO "enterprise" requirement, the Supreme Court has explained that "there is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." *Turkette*, 452 U.S. at 580. The enterprise concept is not unbounded, however, because an enterprise must be "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 583. In cases "involving an alleged associated-in-fact RICO enterprise, the existence of the charged enterprise does not follow, ipso facto, from evidence that those named as the enterprise's associates engaged in crimes that collectively may be characterized as a 'pattern of racketeering activity.'" *United States v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004).

Put differently, "criminal actors who jointly engage in criminal conduct that amounts to a pattern of 'racketeering activity' do not automatically thereby constitute

an association-in-fact RICO enterprise simply by virtue of having engaged in the joint conduct" and "[s]omething more must be found—something that distinguishes RICO enterprises from ad hoc one-time criminal ventures." *Id.* at 82. Ultimately, the First Circuit has "read *Turkette* to impose a requirement that those associated in fact function as an ongoing unit and constitute an ongoing organization. Also important to such an enterprise is that its members share a common purpose." *Id.* at 82 (internal quotations omitted). Finally, the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, especially where "plaintiffs attempt to camouflage conclusory statements as allegations of fact." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013).

### b.    Analysis

After sifting out Plaintiffs' conclusory statements, the RICO enterprise allegations as pleaded are wafer thin, and the well-pleaded facts remaining are insufficient to establish that the alleged association in fact "function[ed] as an ongoing unit" or constituted an "ongoing organization." *Cianci*, 378 F.3d at 82 (internal quotations omitted).

As to the enterprise requirement, the Second Amended Complaint offers that, starting in 2017, all Defendants conspired at the outset and together "formed an Association in Fact, [including] Legal Entity Enterprises that would help the

Association in Fact defendants advance the purpose and goals of the Racketeering Enterprises' conspiratorial objectives in misappropriating themselves from Plaintiffs DISME intellectual technology property, and trade secrets." *Second Am. Compl.* ¶¶ 17-18; *see also id.* ¶¶ 126-28.   It adds that the "Association-In-Fact defendants knowingly agreed, combined, and conspired to conduct the affairs of the Racketeering Enterprise in attempting and committing theft of trade secrets through a hoax criminal investigation operation." *Id.* ¶ 155.

The Second Amended Complaint does assert that on August 7, 2017, Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and Ms. Rinkel "instructed" Mr. Jaczewski to purchase a Naicom TV set-top-box receiver as part of an operation "supervised and approved" by the Federal Defendants. *Id.* ¶¶ 133-34.   It also alleges that Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and Ms. Rinkel subsequently "supervised and approved" Mr. Jaczewski's payments to Naicom.   *Id.* ¶ 135.   However, these allegations are almost entirely vague, conclusory, and devoid of factual development.   At best, they describe the inner workings of the association in fact in a few isolated instances.   But they fail to adequately describe how, apart from these isolated instances, the alleged association in fact 'function[ed] as an ongoing unit" or constituted an "ongoing organization" during the two-plus years it allegedly existed.   *Cianci*, 378 F.3d at 82 (internal quotations omitted).   In other words, Plaintiffs offer virtually no well-pleaded facts explaining how the Defendants functioned together as an ongoing unit or organization.

Plaintiffs attempt to compensate for this lack of well-pleaded facts by offering that "[t]he Association-In-Fact defendants had an ongoing organizational framework for carrying out the Racketeering Enterprises' criminal objectives" because "[t]he Association-In-Fact defendants could not have carried out the intricate task of robbing Plaintiffs' Intellectual Property and Trade Secrets . . . unless it had some structure for making and communicating group decisions." *Second Am. Compl.* ¶ 130. The Court views this allegation as the epitome of a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The allegation merely restates the requirement that the enterprise have an organizational framework, supported by nothing but the circular logic that the purported enterprise could not have succeeded unless it were truly an enterprise. There is, however, an obvious alternative explanation: the Toltec Defendants were assisting with a legitimate law enforcement investigation, not joining with the other Defendants to steal Plaintiffs' intellectual property as part of an elaborate conspiracy. Plaintiffs' allegations do not adequately plead the existence of an "ongoing unit" or "ongoing organization" required for a RICO claim. *Cianci*, 378 F.3d at 82 (internal quotations omitted).

Furthermore, "criminal actors who jointly engage in criminal conduct that amounts to a pattern of 'racketeering activity' do not automatically thereby constitute an association-in-fact RICO enterprise simply by virtue of having engaged in the joint conduct" and "[s]omething more must be found—something that distinguishes RICO enterprises from ad hoc one-time criminal ventures." *Id.*; *see also Bachman v. Bear*

*Stearns & Co., Inc.,* 178 F.3d 930, 932 (7th Cir. 1999) (noting that a contrary rule would erroneously make "every conspiracy to commit fraud . . . a RICO [enterprise] and consequently every fraud that requires more than one person to commit . . . a RICO violation"). While Plaintiffs assert that the DISH/NagraStar Defendants have been previously involved in trade secret misconduct, they do not allege that this association in fact as a whole has engaged or will engage in any misconduct unrelated to the one-off goal of stealing Plaintiffs' intellectual property. In its review of the Second Amended Complaint, the Court is unable to find the "[s]omething more" that "must be found . . . that distinguishes RICO enterprises from ad hoc one-time criminal ventures." *Cianci*, 378 F.3d at 82.

As noted earlier, Civil RICO claims "premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron*, 223 F.3d at 20. Ultimately, stripped of its conclusory allegations, the Second Amended Complaint does not assert sufficient facts to plead the existence of a RICO enterprise, and Plaintiffs' RICO claim must fail.

## 2.   Pattern of Racketeering Activity

Plaintiffs must also plead a "pattern of racketeering activity," which "means the commission of at least two related acts of racketeering activity during a period of ten years." *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 147 n.4 (D. Mass. 2023) (citing 18 U.S.C. § 1961(5)). "Racketeering activity" is defined to include a variety of predicate offenses, including mail fraud, wire fraud, and theft of trade secrets. 18

U.S.C. § 1961(1). The First Circuit has observed that the Supreme Court has found "that the civil RICO provision's 'by reason of' language contains both but-for causation and proximate causation requirements." *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 34 (1st Cir. 2013) (citing *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)).

Plaintiffs allege that the purported RICO conspiracy's pattern of racketeering activity involved numerous predicate acts, including:

> [A]cts indictable under Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343), Conspiracy to Commit Mail And Wire Fraud (18 U.S.C. § 1341), Theft Of Trade Secrets Under The Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.), while in addition, committing the possible underlying criminal offenses as prohibited under [the Computer] Fraud and Abuse Act (18 U.S.C. § 1030(a)); Stored Communications Act (18 U.S.C. §§ 2701-12); Digital Millennium Copyright Act (17 U.S.C. § 1201 et seq.), 18 U.S.C.A. § 2235-Search warrant procured maliciously; 18 U.S.C.A. § 1621- Perjury generally; 18 U.S.C.A. § 1001-Statements or entries generally, 18 U.S.C.A. § 912-Officer or employee of the United States; 18 U.S.C.A. § 2234-Authority exceeded in executing warrant; 18 U.S.C.A. § 2236-Searches without warrant, 18 U.S.C.A. § 1905-Disclosure of Confidential Information, while accomplishing their racketeering objectives.

*Second Am. Compl.* ¶¶ 132[14]; *see also id.* ¶ 155.

Most of these alleged offenses are not "predicate acts" under the RICO statute. Mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and theft of trade secrets

---

[14]     Paragraph 132 of the Second Amended Complaint names the following: "The D[ISH]/NagraStar defendants Emily Rinkle, Bert Eichhorn, Jordan Smith, and Kevin Gedeon, and Federal defendants U.S. Attorney Rosa Emilia Rodriguez-Velez, AUSA Jose Capo-Iriarte, AUSA Nicholas W. Cannon, FBI Special Agents Douglas A. Leff, Bradley Rex, Lance Lange, Kevin Person, Clay Rehrig, Juan Galarza, Jason Lopez, Several Unknown Named Agents of the Federal Bureau of Investigations, and John Does 1-20." *Second Am. Compl.* ¶ 132. The Toltec Defendants are notably absent. The Court assumes that this must have been an oversight since the Plaintiffs have otherwise included the Toltec Defendants in their predicate act allegations.

(18 U.S.C. §§ 1831-1832)[15] qualify; the rest do not.  *See* 18 U.S.C. § 1961(1) (listing qualifying offenses).

### a.     Wire and Mail Fraud

"Mail or wire fraud requires proof of (1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of the scheme." *Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 9-10 (1st Cir. 2007).  "The 'in furtherance' requirement is to be read broadly." *United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021).  "[T]he mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotations omitted).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Humana*, 666 F. Supp. 3d at 154 ("Civil RICO claims based on the predicates of mail or wire fraud must meet the heightened pleading standard of Rule 9(b)").  A complaint must specify "the time, place, and content of an alleged false representation." *United States ex. rel. Kelly v. Novartis Pharms. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016) (quoting *Doyle v. Hasbro, Inc.*, 103 F.3d

---

[15]     The statutory provision cited by Plaintiffs—18 U.S.C. § 1836—governs civil proceedings for misappropriation of trade secrets and is not listed as a predicate act in 18 U.S.C. § 1961(1).  Since the Court assumes Plaintiffs' reference to 18 U.S.C. § 1836 was in error, the Court has recharacterized Plaintiffs' predicate-act allegations relating to theft of trade secrets as arising under 18 U.S.C. §§ 1831 and 1832.

186, 194 (1st Cir. 1996)).  Furthermore, "[t]he false or fraudulent representation [in a mail or wire fraud claim] must be material." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013) (first alteration in original) (citation omitted).

Plaintiffs' mail and wire fraud claims are limited to allegations that Mr. Jaczewski—in an operation "instructed" by Mr. Gedeon, Mr. Smith, Mr. Eichhorn, and Ms. Rinkel and "supervised and approved" by the Federal Defendants—used an alias to purchase two Naicom set-top boxes and a monthly subscription he maintained for two years.  *Second Am. Compl.* ¶¶ 132-37.  In Plaintiffs' view, each purchase or payment "constitutes a wire fraud racketeering act since [Mr. Jaczewski, acting under the alias] Brian Parsons, posed as [a] legitimate client and used the interstate internet electronic services to access Naicom's website, and register online under the false pretenses of BRIAN PARSONS" and "made online payments through the use of interstate internet electronic services . . . to defraud and deprive Naicom Corporation of its legitimate products, intellectual property and trade secrets."  *Id.* ¶ 134. Between the initial purchases and monthly subscription payments, Plaintiffs tally 22 acts of wire fraud.  *Id.* ¶ 135.  They also consider the initial purchase to constitute mail fraud because Mr. Jaczewski "posed as a legitimate client and used the United States Postal Services to have Naicom mail him the IPTV Set Top Box to a fake address."  *Id.* ¶ 133.

Accepting these allegations as true, the Court concludes that the facts are insufficient to support Plaintiffs' wire and mail fraud claims because the purportedly fraudulent representations (limited to Mr. Jaczewski's use of an alias for the set-top-

box and subscription purchases) were not material.  Nor could the mail and wire fraud allegations be predicate acts for Plaintiffs' RICO claims because the set-top-box operation was not causally connected to Plaintiffs' damages.

A material statement "has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed" but plaintiffs "need not prove that the decisionmaker actually relied on the falsehood or that the falsehood led to actual damages."  *Appolon*, 715 F.3d at 368 (alteration in original) (citations and internal quotation omitted).  In *Appolon*, the defendant provided untrue responses on a mortgage application, in response to questions "that specifically sought information regarding the purchaser's income, assets, and intent to reside in the property."  *Id.*  The First Circuit considered the false responses material because the questions "were designed to assess the borrower's creditworthiness" and thus the statements "were capable of influencing [the lender's] decision."  *Id.*

The purported false statements here are far afield from providing false financial information on a mortgage application.  Naicom's set-top boxes are commercial electronic products sold in retail stores like Sam's Club, and its subscription services are available on Apple's AppStore as the Naicom TV App.  *Second Am. Compl.* ¶ 70 ("On February 16, 2017, Apple Corporation approved Naicom Corporation App for Apple's AppStore as Naicom TV App"); *id.* ¶ 71 ("On December 15, 2017, Sam's Club approved Naicom Corporation to officially launch and distribute in their retail stores [] Naicom's IPTV Set Top Box which offered the

distribution of tv programming to customers in Puerto Rico"). Plaintiffs allege that Mr. Jaczewski committed wire and mail fraud by providing a false name "of BRIAN PARSONS, fake Phone (727) 409-9464, fake Email: parsons.brian716@outlook.com and Address: 9079 FOURTH STREET NORTH SAINT PETERS FL 33702 IP: 70.127.233.139, and made online payments through the use of interstate internet electronic services using the PM Visa ending in 2775." *Id.* ¶ 134. Plaintiffs also allege that Mr. Jaczewski used the alias of Brian Parsons when purchasing two Naicom set-top boxes. *Id.* ¶ 133.

The allegations confirm that Mr. Jaczewski used the false name of Brian Parsons. It is unclear, however, what Plaintiffs mean by a "fake Phone"—whether Mr. Jaczewski used a different phone as part of the alias or if the number provided was entirely made up. Plaintiffs have not adequately pleaded that the remaining "false" statements are actually false. The Second Amended Complaint does not allege that email services require customers to use their real name in their email address. Thus, the Second Amended Complaint fails to allege that using an email with "parsons.brian" in the address is a false statement as there is no allegation that the address itself does not actually exist. It is unclear what Plaintiffs mean by a "fake" address, but the Second Amended Complaint does not allege that online retail customers are prohibited from having a product shipped to any address they desire, and Plaintiffs have offered nothing to suggest that this constitutes a false

representation.[16]  Likewise, nothing in the Second Amended Complaint suggests that the IP address or credit card involved false statements.[17]

The Court is thus left to consider whether Mr. Jaczewski's purchase of two commercially available products and an accompanying subscription using the name Brian Parsons can support Plaintiffs' alleged mail and wire fraud violations.  The Court concludes that it cannot, because—absent allegations to the contrary—a customer providing a false name in such circumstances does not have "a natural tendency to influence, [nor is it] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Appolon*, 715 F.3d at 368.  Nothing in the Second Amended Complaint suggests that the use of this alias was material to Plaintiffs' decision to sell Mr. Jaczewski their commercially available product.  There is no allegation that Mr Jaczewski was either known to Plaintiffs or prohibited from purchasing Plaintiffs' products.  What is missing is an allegation that the alias could have reasonably affected the "decision of the decisionmaking body" (for example, Naicom's sales department's decision to process Mr. Jaczewski's payment or ship his order).  Absent allegations regarding how Mr. Jaczewski's alias affected Naicom's decision to sell him their product, Plaintiffs have not pleaded material fraud with the

---

[16]      In theory, Mr. Jaczewski could have provided an address that was entirely made up.  This seems unlikely, however, in light of the Second Amended Complaint's allegations that the Defendants used the set-top boxes to attempt remote attacks on Naicom's servers.  Had the boxes been shipped to an address that didn't exist, they would have been returned to Naicom as undeliverable, meaning that the Defendants could not have used them to launch sniffing attacks.  The Plaintiffs do not appear to allege that the mailing address is a fake address, and the Court doubts that they could do so, based on the information in this case.

[17]      To the contrary the Second Amended Complaint includes a table listing all the payments made to Naicom by Mr. Jaczewski posing as Brian Parsons.  *Second Am. Compl.* ¶ 136.  In the Court's view, these payments confirm that the credit card number provided by Mr. Jaczewski was valid.

requisite particularity.  Plaintiffs' wire and mail fraud claims cannot stand and thus do not count as predicate acts in support of their RICO claim.

Furthermore, even if the Court did find the alleged representations material, Plaintiffs' claims fall short of the causation standard required for a wire- or mail fraud-based RICO claim.  *Neurontin*, 712 F.3d at 34 ("[T]he civil RICO provision's 'by reason of' language contains both but-for causation and proximate causation requirements" (citing *Holmes*, 503 U.S. at 268)).  "The 'central question' in evaluating proximate causation in the RICO context 'is whether the alleged violation led directly to the plaintiff's injuries.'"  *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35 (1st Cir. 2021) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  Quoting the U.S. Supreme Court, the First Circuit has noted that "[a] link [between the RICO predicate acts and plaintiff's injuries] that is too remote, purely contingent, or indirect is insufficient to show proximate cause."  *Id.* (alterations in original) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)).  In addition, the First Circuit has identified "three functional factors with which to assess whether proximate cause exists under RICO."[18]  *Id.* (quoting *Neurontin*, 712 F.3d at 35-36)).  The but-for causation question, in contrast, asks

---

[18]     These factors are:

> (1) "concerns about proof" because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," . . . (2) "concerns about administrability and the avoidance of multiple recoveries," . . . and (3) "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case[.]"

*Sterling Suffolk Racecourse*, 990 F.3d at 35-36 (quoting *Neurontin*, 712 F.3d at 35-36).

whether the plaintiff would have suffered the same injury absent the defendant's violation. *See Neurontin*, 712 F.3d at 34.

Here, the alleged violations fail both causation tests because Plaintiffs portray the set-top-box operation as an unmitigated failure that only provided further proof that Naicom was a legitimate company. They allege that "after testing Naicom TV several times to identify if it was providing DISH programming, on each case the test *revealed no DISH content.*" *Second Am. Compl.* ¶ 90 (emphasis added). After attempting to use the boxes to penetrate Plaintiffs' network and steal their secrets, the "Dish/NagraStar defendants also informed the Racketeering Enterprises that the Association in Fact defendants couldn't penetrate Naicom's Data Center computers, servers, encoders electronic security system, and that a physical intrusion was necessary to extract the intellectual property from the computers, servers, and encoders by physical access." *Id.* ¶ 93. Plaintiffs allege further that the operation did not yield evidence that would support a search warrant and thus the defendants had to provide "affidavits they knew contained material information known to be false and perjured to create probable cause to gain legal access into Plaintiffs['] private business." *Id.* ¶ 20.

As the Court understands the Second Amended Complaint, Plaintiffs allege that all Defendants conspired from the outset to steal their intellectual property. The set-top-box operation was an attempt to steal Plaintiffs' secrets by reverse engineering the technology and/or penetrating Plaintiffs' networks. But the operation failed. All the Defendants gained was more proof that Naicom was a

legitimate company, and they then had to resort to falsifying affidavits to justify physical access to Naicom's Data Center (through a search warrant) that would finally allow them access to the desired technology. Plaintiffs have not alleged any harm prior or unrelated to the execution of the warrants. Nor have Plaintiffs alleged that the Defendants would not have sought and executed the search warrants had they not undertaken the set-top-box operation.

The Court concludes that there is no connection—proximate or but-for—between the allegedly fraudulent set-top-box purchase and Defendants acquiring Plaintiffs' intellectual property during the execution of the warrants. The alleged mail and wire fraud is "too remote" from Plaintiffs' alleged harms, *Hemi Grp.*, 559 U.S. at 9, and there is no indication that Plaintiffs would not have suffered their alleged harms absent the set-top-box operation. Plaintiffs' Second Amended Complaint thus falls short on both the materiality and causation standards for wire and mail fraud as predicate acts.

### b.    Theft of Trade Secrets

RICO predicate offenses include any act indictable under 18 U.S.C. § 1832, relating to theft of trade secrets under the DTSA. 18 U.S.C. § 1961(1). 18 U.S.C. § 1832 provides that "[w]hoever, with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information," or attempts to do so, shall be subject

to criminal penalties.  *Id.* § 1832(a)(1), (a)(4).  "Trade secret" is defined broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," as long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  *Id.* § 1839(3). Critically, however, the DTSA also provides that "[t]his chapter does not prohibit . . . any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State."  *Id.* § 1833(a)(1).

The Toltec Defendants argue that Plaintiffs fail to state a claim under the DTSA because the conduct alleged in the Second Amended Complaint was "supported by allegations of legitimate government action."  *Defs.' Mot.* at 19 (quoting *Kahre v. Damm*, No. 2:07-CV-00231-DAE-RJJ, 2007 U.S. Dist. LEXIS 95978, at *26 (D. Nev. Dec. 18, 2007)).  They submit that "all actions undertaken by the Toltec Defendants were performed under color of federal law, and at the direction and supervision of the Federal Defendants to assist them in discharging certain governmental duties, including assisting in the investigation of Naicom's IPTV business operations, and executing search warrants signed by a magistrate judge."  *Id.* at 20.

Plaintiffs respond that the conduct alleged in the Second Amended Complaint was not legitimate law enforcement activity because the "procurement of the issuance and execution of the search and seizure warrant and the subsequent warrantless

53

search and seizure execution were illegal and unconstitutional." *Pls.' Opp'n* at 11. Because the DTSA contains an exception for governmental activity, and the parties dispute whether the conduct alleged in the Second Amended Complaint constitutes governmental activity, the Court addresses this issue first. To do so, the Court examines the validity of the warrants.

The relevant standard for evaluating the validity of a warrant is the *Franks v. Delaware* framework, which requires Plaintiffs to adequately allege that both (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007) (quoting *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978)). Plaintiffs cite ten statements that the Defendants allegedly "falsely submitted to the Court" in an affidavit supporting their search warrant application. *Pls.' Opp'n* at 12. The Court has examined each and concludes that none supports Plaintiffs' claims.

The first purportedly false statement identified by Plaintiffs is the Defendants' statement that they believed there was probable cause that Plaintiffs were violating copyright and money laundering laws. *Id.* Plaintiffs allege that this statement is false because:

> The execution of the search and seizure warrant in this case did not produce any criminal evidence whatsoever; there was no probable cause. That is why the United States never opposed Plaintiffs['] Motion for Return of Property under Rule 41(g) of the Fed.R.Crim.P. In fact, they didn't even contend the serious violations Plaintiffs imputed under *Franks* in the Rule 41(g) motion.

*Id.* This logic is unavailing. Plaintiffs cannot rely on the circular reasoning that the search's alleged failure to produce incriminating evidence thereby proves the Defendants could not have believed there was probable cause to search. *See Karamanoglu v. Town of Yarmouth*, 15 F.4th 82, 88 (1st Cir. 2021) (defining the probable cause inquiry as "whether, on balance, the facts *known to the officer at the time of the arrest* support probable cause" (emphasis in original)).

Equally inadequate is Plaintiffs' claim that the Federal Defendants' failure to oppose Plaintiffs' motion to return the seized property proves not only that the seized property was not incriminating, but also that there was no probable cause to search in the first place. *See United States v. Pierre*, 484 F.3d 75, 87 (1st Cir. 2007) ("Once seized property is no longer needed as evidence, a criminal defendant is presumed to have the right to its return"). The government's return of the seized hard drives and thumb drives, which—unlike drugs or illegal firearms—are not inherently contraband and can easily be downloaded or duplicated, is consistent with *Pierre*.

Furthermore, Plaintiffs are simply incorrect that success on a Rule 41(g) motion conclusively establishes the invalidity of a search. Rule 41(g) allows motions for return of property from "[a] person aggrieved by an unlawful search and seizure of property *or* by the deprivation of property." FED. R. CRIM. P. 41(g) (emphasis supplied). Without more, the property's return alone cannot demonstrate an absence of probable cause to search and seize in the first place. Ultimately, Plaintiffs' first purportedly false statement offers nothing to undermine the validity of the warrants and searches.

Second, Plaintiffs offer that the Defendants "assured the Court they had evidence based on an investigation conducted by NagraStar of Naicom's unauthorized use of Direct TV signal to distribute its programming to its paid subscribers." *Pls.' Opp'n* at 12. Plaintiffs assert that this statement was false because "[t]he United States did not produce any evidence as to the above allegations," whereas "Naicom did produce all the documentary evidence establishing that they were authorized to distribute the copyright material and running a legitimate IPTV system." *Id.* at 13.

Again, Plaintiffs appear to be suggesting that exculpatory evidence they produced during the search warrant execution proves that the underlying affidavit was false. These conclusory assertions tied together by circular logic do not adequately demonstrate the falsity of the affidavit. While Plaintiffs contend that the affidavit did not "produce any evidence" supporting the suggestion that Naicom was distributing DirecTV content without authorization, the affidavit avers that Naicom's system displayed DirecTV error messages on at least 16 channels (and includes a photo of the message),[19] that Naicom's satellite dishes were precisely oriented in a manner necessary to receive DirecTV satellite signals, that representatives of the companies offering some channels Naicom purported to provide confirmed that Naicom was not licensed to provide them, and other indicia of piracy. *See Pls.' Opp'n to DISH/NagraStar Mot.*, Attach. 1, *Aff. in Supp. of an Application for a Search*

---

[19] In their sur-reply, Plaintiffs claim that "while the picture shows a Naicom TV Set Top Box ('STB') displayed at a table in front of a Television, the truth of the matter is that the Toltec defendants forgot to plug in and turn on the STB. Plaintiffs are assuming that the Toltec defendants plugged a pen drive behind the Television and used its content to display the image appearing in the television screen." *Pls.' Sur-Reply* at 10 n.3. Plaintiffs cite no support for this claim, and their assumptions are insufficient to impugn the contents of a sworn affidavit.

*Warrant* (*Warrant Aff.*).   Simply put, Plaintiffs' argument that the affidavit contained no evidence of piracy is incorrect.

Third, Plaintiffs assert that, during a 2018 FBI site visit of Naicom's property, Mr. Vega "repeatedly told the agent that Naicom was a legal corporation and showed the agent a certificate from the National Cable Television Cooperative (NCTC) on the wall," yet the Federal Defendants still "filed the affidavit containing materially false and perjured statements."   *Pls.' Opp'n* at 13.   It is not clear specifically which "materially false and perjured statements" Plaintiffs are referring to, but the affidavit states that the FBI called NCTC's management group, which confirmed that Naicom was *not* a member.   *Warrant Aff.* ¶ 15.   Nothing in Plaintiffs' assertion that Mr. Vega told the FBI his company was legitimate and showed them a certificate on the wall establishes that the affidavit's claim—that NCTC management represented to the FBI that Naicom was not a member—was perjured.

Fourth, Plaintiffs contend that the affidavit's claim that Naicom was using the NCTC certificate to create the appearance of legal access to channels was a "false and perjured statement" because an FBI agent took pictures of "Naicom's National Rural Telecommunications Cooperative 'NRCT' Certificate" and Naicom had licenses with other networks.   *Pls.' Opp'n* at 13.

Fifth, Plaintiffs focus on the affidavit's claim that an FBI agent spoke with NCTC management, who confirmed that Naicom was not a member of their organization.   *Id.*   They allege that this "is a false and perjured statement" because Naicom provided evidence that it is a member of the NRTC.   *Id.* at 14.

The distinction between NCTC and NRTC here is somewhat confusing.  It appears that Plaintiffs are alleging that the FBI took pictures of a NRTC certificate on the wall but incorrectly referred to it in the affidavit as a NCTC certificate, or that the FBI mistook their NRTC certificate for an NCTC certificate.  However, Plaintiffs also claim that the affidavit's assertion that they are not a member of the NCTC is a perjured statement because they provided evidence that they are a member of the NRTC.  Plaintiffs offer no evidence that the latter statement was perjured because proving they are a NRTC member does not contradict the claim that they are not a NCTC member.  To the extent the FBI may have misidentified a NRTC certificate as a NCTC certificate, the record does not suggest that this "allegedly false statement is necessary to the finding of probable cause," especially given the strength of the other supporting claims in the affidavit.  *United States v. Patterson*, 877 F.3d 419, 424 (1st Cir. 2017) (quoting *Franks*, 438 U.S. at 156).

Sixth, Plaintiffs turn to the affidavit's assertion that FBI agents contacted officials at HBO and DirecTV, who verified that Naicom did not have a relationship with their organizations despite offering HBO content.  *Pls.' Opp'n* at 14.  Plaintiffs claim that "[t]his is a false and perjured statement" because "Naicom provided evidence that it is licensed to distribute HBO and Cinemax programming." *Id.* (citing *Pls.' Opp'n to DISH/NagraStar Mot.*, Attach. 1 at 356 (HBO invoice dated August 31, 2019, for roughly $200 per month for "Cable — Private Home" services).  Plaintiffs' claim is unpersuasive for two reasons: (1) this invoice for inexpensive "Cable – Private Home" services does not appear to provide evidence of a licensing agreement; and (2)

Plaintiffs have not directly contradicted the purportedly perjured claim, which was that HBO and DirecTV officials represented to the FBI that they did not have a relationship with Naicom.

Seventh, Plaintiffs focus on the affidavit's claim that the "external appearance of the Data Center offered indicia of piracy," calling it a "false and perjured statement" because "[a]t the conclusion of the search and seizure warrant execution the FBI agents found that [] Naicom's equipment (encoders) were provided by the networks authorizing the programming distribution and that the use of the satellite was in fact to download the codes provided by the networks." *Pls.' Opp'n* at 14. Plaintiffs again rely on circular logic, as the discovery of exculpatory evidence at the conclusion of a warrant's execution does not provide a "substantial preliminary showing" that the underlying affidavit was perjured. *Franks*, 438 U.S. at 155-56.

Plaintiffs' eighth point suffers from the same defect. They claim that the affidavit's statements that there were suspicious financial transactions between Naicom and other businesses owned by Mr. Quinones and Mr. Vega were false and perjured because "[d]uring the execution of the Search Warrant S/A Lange interviewed employees from the Business Office and was provided with financial records," which established "that none of the Corporations were involved in any money laundering activities." *Pls.' Opp'n* at 15. Again, the fact that a search did not uncover incriminating evidence does not establish that it was predicated on a perjured affidavit.

Plaintiffs' ninth point takes issue with the affidavit's request to seize computers and data based on claimed probable cause that they contained evidence. *Id.* Plaintiffs contend that this statement was perjured because "the FBI agents were not looking for any criminal evidence" during the search and they did "not find[] any evidence whatsoever of the crimes described in the warrant, which also denied any probable cause." *Id.* at 15-16. The Court does not fully follow Plaintiffs' logic across these seemingly contradictory assertions, but they appear to utilize the same circular reasoning (the assertion of probable cause was perjured because the resulting search "denied any probable cause"), along with the conclusory contention that the FBI was not actually looking for evidence. These claims do not undermine the validity of the warrants.

Tenth, Plaintiffs claim that the affidavit's request to seize evidence of statutory violations was "false and perjured" because the FBI did not find any evidence at the conclusion of the search warrant execution. *Id.* at 16. Beyond the fact that this argument relies on the same circular logic, an affidavit's request to seize "things and . . . records" is not an assertion of fact and cannot be false or perjured. *Id.*

To summarize, none of these purportedly false statements, alone or in combination, satisfies Plaintiffs' burden under the *Franks* standard to overcome the presumed validity of the warrants. Moreover, Plaintiffs offer several additional, similarly unavailing, arguments that their DTSA allegations do not constitute legitimate law enforcement activity.

Plaintiffs submit that the August 29, 2019 search was "illegal" and "warrantless" because "[t]he Federal and Dish/NagraStar Defendants knew for a fact that the first search warrant execution had already denied any criminal wrongdoing, and that the initial alleged probable cause had dissipated." *Id.* at 23. This assertion—that the Defendants knew probable cause had dissipated—is wholly conclusory (especially in light of Plaintiffs' argument that the entire investigation was a hoax, and the agents knew probable cause never existed). Furthermore, the warrant did not expire until September 4, 2019 and courts generally recognize a "reasonable continuation rule" providing that a search may be reasonably continued if the warrant remains valid.[20] *See United States v. Keszthelyi*, 308 F.3d 557, 568-569 (6th Cir. 2002) (describing the rule and collecting cases). Plaintiffs have not offered any well-pleaded, nonconclusory allegations suggesting that the continuance here was unreasonable.[21]

Plaintiffs also contend that the searches were unlawful because the Federal Defendants did not follow the procedure to obtain a Stored Communications Act warrant (also known as a SCA order). *Pls.' Opp'n* at 17-20. But this argument lacks

---

[20]    The "reasonable continuation rule" requires the satisfaction of two conditions: 1) "the subsequent entry must indeed be a continuation of the original search, and not a new and separate search"; and 2) "the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances." *Keszthelyi*, 308 F.3d at 569.

[21]    The closest Plaintiffs come to a nonconclusory allegation is their assertion that U.S. Attorney Rodriguez-Velez and Assistant U.S. Attorney Capo-Iriarte learned, after the execution of the first search warrant, that Naicom complied with "all the programming distribution contract and agreements." *Second Am. Compl.* ¶ 103. But this allegation is still conclusory, and it is undercut by the sentence immediately following it, which alleges that the USAO Defendants instructed S/A Pearson "to order Darwin Quinones and Victor Vega to report to the FBI Offices in San Juan with the licensing contracts for an interview regarding Naicom's company." *Id.* Clearly, whatever U.S Attorney Rodriguez-Velez and Assistant U.S. Attorney Capo-Iriarte learned did not absolve Naicom of wrongdoing; otherwise, there would have been no need to conduct an interview.

61

merit because the Federal Defendants appropriately obtained a traditional search warrant in lieu of a SCA order.

SCA orders are different from traditional search warrants. As one court has explained:

> SCA warrants "are not like the search warrants used in the physical world: they are 'executed' when a law enforcement agent delivers (sometimes by fax) the warrant to the [service provider]. The [service provider], not the agent, performs the 'search'; the [service provider] 'produces' the relevant material to the agent; the user associated with the inbox often never learns that his inbox has been 'searched.' In sum, these are not search warrants at all and to call them such confuses legal terminology."

*In re Info. Associated with @gmail.com*, No. 16-mj-00757 (BAH), 2017 U.S. Dist. LEXIS 130153, at *52-53 (D.D.C. July 31, 2017) (quoting Paul K. Ohm, *Parallel–Effect Statutes and E–Mail "Warrants": Reframing the Internet Surveillance Debate*, 72 GEO. WASH. L. REV. 1599, 1610-11 (2004)). Additionally, the standard for a SCA order is "less stringent than the probable cause standard generally required for a search warrant." *United States v. Taylor*, 54 F.4th 795, 804 (4th Cir. 2022). Finally, even if the Defendants were seeking information protected by the SCA, the statute gives law enforcement the option of seeking either a SCA order or a traditional search warrant.[22] *See* 18 U.S.C. § 2703(b) (the government may obtain "a court order for such disclosure under subsection (d) of this section" *or* "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure"); *id.* § 2703(c) (same).

---

[22] Further, "the statute offers no express direction as to when the government should seek a warrant versus" a SCA order. *Taylor*, 54 F.4th at 804.

Plaintiffs' argument is groundless because the Federal Defendants were primarily—if not entirely—seeking information not protected by the SCA. Regardless, they obtained search warrants for the facility and computer systems, thereby satisfying the requirements of the SCA.

Plaintiffs also submit once again that "[t]he Toltec Defendants can't raise at this time the defense that the execution of the search and seizure warrant was authorized, legal and constitutional, which was waived during the Rule 41(g) proceedings, and abandoned forever." *Pls.' Opp'n* at 25-26.  However, as the Court has already explained, the government's decision not to oppose a motion to return property does not affect the validity of the warrant or seizure.  *See Pierre*, 484 F.3d at 87 ("Once seized property is no longer needed as evidence, a criminal defendant is presumed to have the right to its return").

Finally, while Plaintiffs contend that the search warrant executions were unlawful due to the involvement of the DISH/NagraStar Defendants, they acknowledge that "Congress has explicitly authorized" private parties to assist law enforcement in the execution of search warrants.  *Pls.' Opp'n* at 20 (citing 18 U.S.C. § 3105).  Further, although they contend that any civilian assisting with a search "must have been serving a legitimate investigative function," *id.*, Plaintiffs fail to make any well-pleaded, nonconclusory allegation that the DISH/NagraStar Defenants were not serving such a function.  Indeed, Plaintiffs do not offer any

persuasive argument that would permit the Court to find that the DISH/NagraStar Defendants' presence rendered the search illegal.[23]

In sum, Plaintiffs have failed to adequately challenge the validity of the search warrants or establish that anything about the warrants' executions was unlawful. Plaintiffs have thus failed to plead a DTSA violation as a predicate act in support of their RICO claim because the allegations in the Second Amended Complaint, even when read in the light most favorable to Plaintiffs, merely suggest that the Defendants were engaging in legitimate law enforcement activity. *See* 18 U.S.C. § 1833(a)(1) ("This chapter does not prohibit . . . any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State"). Absent both an enterprise and any predicate acts, Plaintiffs' RICO claim must be dismissed as to the Toltec Defendants.

These same pleading shortfalls doom Plaintiffs' RICO conspiracy claim. *See Efron*, 223 F.3d at 21 (1st Cir. 2000) ("A conspiracy claim under section 1962(d) may survive a *factfinder's* conclusion that there is insufficient evidence to prove a RICO violation, but if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails" (citations omitted) (emphasis in original)); *see also Salinas v. United States*, 522 U.S. 52, 64 (1997) ("A conspirator

---

[23]    Plaintiffs quote *Bellville v. Town of Northboro*, 375 F.3d 25 (1st Cir. 2004) for the proposition that "it might be a better practice, if circumstances permit, for law enforcement officers to disclose to the magistrate that civilians will be involved in the execution of the search and for the warrant to indicate that the magistrate permitted this involvement." *Pls.' Opp'n* at 21 (footnotes omitted) (quoting *Bellville*, 375 F.3d at 33-34). They fail to quote the preceding sentence, which states, "we will not improvise a rule that seems unnecessary in light of the overarching requirement that the use of civilians in the execution of a search must still meet the constitutional standard of reasonableness." *Bellville*, 375 F.3d at 33. The Court declines Plaintiffs' invitation to convert the best practice outlined by the First Circuit into a rule.

must intend to further an endeavor which, if completed, *would satisfy all of the elements of a substantive criminal offense*, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor" (emphasis supplied)).

### D.   Plaintiffs' DTSA Claim

As noted above, the Court reads Plaintiffs' freestanding DTSA claim as containing the same allegations as the DTSA claim offered as a predicate act for the RICO claim.  Thus, the standalone DTSA claim fails for the reasons previously described.  While the DTSA does provide a private right of action for owners "of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce," 18 U.S.C. § 1836, this right of action cannot be used to challenge "otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State."  *Id.* § 1833(a)(1).

## VI.   CONCLUSION

The Court GRANTS Defendants Toltec Investigations L.L.C. and Mike Jaczewski's Motion to Dismiss (ECF No. 137).  The Court DISMISSES Counts I through VII of Plaintiff's Second Amended Complaint as pleaded against the Toltec Defendants.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2024